# EXHIBIT B
# PART 1

*Before the:*

## WORLD INTELLECTUAL PROPERTY ORGANIZATION
## ARBITRATION AND MEDIATION CENTER

| | |
|---|---|
| RITZIO PURCHASE LIMITED<br>Corporate ID: 144533<br>Diagorou Street 4, Kermia building<br>6th Floor, Office 601, P.C. 1097<br>Nicosia, Cyprus<br>**(Complainant**) | **Case No:**  D2016-1981 |
| -v- | **Disputed Domain Names:** |
| ALEX BOOLOP[1]<br>Kiev, Ukraine | vulcan-club-online.top |
| -and- | -and- |
| DAVY KIBA-GASTE<br>CAMELOT<br>Suite 1, 2F, Sound Vision House<br>Victoria, Mahe, Seychelles | 1vulcano.com<br>2vulcano.com<br>3vulcano.com<br>5vulcano.com<br>7vulcano.com<br>vulcano7.com |
| -and- | -and- |
| ZHOSELIN-PATRICK MANDZELA<br>19BD Julien Devos<br>Vernon, Haute-Normandie 27200<br>France<br><br>**(Respondents)** | wulkancasino.com<br>volcan24.com<br>vulcan-online-club.com<br>volcanozal.com<br>online-volcano.com<br>vulcan-club-online.com |

## RESPONSE
## BY DAVY-KIBA GASTE AND ZHOSELIN-PATRICK MANDZELA
(Rules, para. 5(b))

---

[1] This Response is not filed on behalf of the registrant Alex Boolop as the case has been improperly consolidated as detailed below.

1

## I.  Introduction

[1.]    On October 21, 2016, the Respondents received a Notification of Complaint and Commencement of Administrative Proceeding from the WIPO Arbitration and Mediation Center (the **Center**) by email informing the Respondents that an administrative proceeding had been commenced by the Complainant in accordance with the Uniform Domain Name Dispute Resolution Policy (the **Policy**), approved by the Internet Corporation for Assigned Names and Numbers (**ICANN**) on October 24, 1999, the Rules for Uniform Domain Name Dispute Resolution Policy (the **Rules**) approved by ICANN on September 28, 2013, and in effect as of July 31, 2015, and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the **Supplemental Rules**).  The Center set November 10, 2016 as the original last day for the submission of a Response by the Respondents.  On November 8, 2016, the Center granted an extension to November 14, 2016 as the last day for the submission of a Response by Respondents.

## II. Respondents' Contact Details

(Rules, para. 5(b)(ii) and (iii))

[2.]    This response is on behalf of the following respondents in the above captioned UDRP Proceeding (the "**Respondents**"):

|  |  |
|---|---|
| Name: | Davy Kiba-Gaste |
| Organization: | Camelot |
| Address: | Suite 1, 2F, Sound Vision House |
|  | Victoria, Mahe, Seychelles |
| Telephone: | +7.9214303025 |
| Fax: | N/A |
| E-mail: | hosting@acem.pw |

-and-

|  |  |
|---|---|
| Name: | Zhoselin-Patrick Mandzela |
| Address: | 19BD Julien Devos |
|  | Vernon, Haute Normandie 27200 |
|  | France |
| Telephone: | +33.667410100 |
| Fax: | N/A |
| E-mail: | bait0ot@gmail.com |

## Complainant Impermissibly Consolidated the Case

Preliminarily, the Complaint should be dismissed because Complainant has impermissibly consolidated the UDRP proceeding against multiple respondents with multiple domain names and websites not under common control.  Specifically, the domain name vulcan-club-online.top is not under common control with any of the other domain names subject to this proceeding as currently drafted and the consolidation is unfair to all Registrants.  The domain names 1vulcano.com, 2vulcano.com, 3vulcano.com, 5vulcano.com, 7vulcano.com, and vulcano7.com are all registered to the Respondent Davy Kiba-Gaste.  *See* Affidavit of Davy Kiba-Gaste, Annex 1, ¶ 2.  The Respondent Zhoselin-Patrick Mandzela registered the domain names wulkancasino.com, volcan24.com, vulcan-online-club.com, volcanozal.com, online-volcano.com, and vulcan-club-online.com for the benefit of Mr. Kiba-Gaste.  *Id.*, ¶ 3.  Mr. Kiba-Gaste does not know the registrant of vulcan-club-online.top, the so called "Alex Boolop."  *Id.*, ¶¶4-5.  Mr. Kiba-Gaste did not register the vulcan-club-online.top domain name nor did anyone register it on his behalf.  *Id.*, ¶6.  Mr. Kiba-Gaste does not control the vulcan-club-online.top domain name or the website at the domain name.  *Id.*, ¶7.  The vulcan-club-online.top domain name is not even registered with the same domain name registrar as the other domain names. Consolidation of this case against these two separate groups results in an unfair and inequitable situation for both sets of respondents because their defenses may contradict each other and/or otherwise taint each other's positions.

The WIPO Overview of WIPO Panel View on Selected UDRP Questions, Second Edition ("**WIPO Overview 2.0**"), Section 4.16, states that a UDRP Proceeding can only be made against multiple registrants when "(i) the domain names or the websites to which they resolve are subject to common control, and (ii) the consolidation would be fair and equitable to all parties." Therefore, a Complaint cannot be filed unless *both* of these criteria are met.  Given that neither of these criteria are met (the domain names are not under common control and consolidation would not be fair or equitable) the Complaint should be dismissed.  As the WIPO Overview 2.0 continues to state, "The onus of establishing [the criteria] falls on the filing party/parties, and where the relevant criteria have not been met, the complaint in its filed form would not be accepted."  Because Complainant has not met its onus, and quite to the contrary, the relevant criteria could *not ever* be met, the Complaint must not be accepted, but must instead be dismissed.

3

[3.]    The Respondents' authorized representatives in this administrative proceeding are:

      Name:              Matthew Shayefar, Esq.
      Organization:    Boston Law Group, PC
      Address:       825 Beacon Street, Suite 20, Newton, MA 02459 US
      Telephone:     +1-617-928-1806
      Fax:           +1-617-928-1802
      E-Mail:        matt@bostonlawgroup.com
and

      Name:              Val Gurvits, Esq.
      Organization:    Boston Law Group, PC
      Address:       825 Beacon Street, Suite 20, Newton, MA 02459 USA
      Telephone:     +1-617-928-1804
      Fax:           +1-617-928-1802
      E-Mail:        vgurvits@bostonlawgroup.com

[4.]    The Respondents' preferred method of communications directed to the Respondents in this administrative proceeding is:

      <u>Electronic-only material</u>
      Method:       e-mail
      Address:       matt@bostonlawgroup.com & vgurvits@bostonlawgroup.com
      Contact:       Matthew Shayefar, Esq. & Val Gurvits, Esq.

      <u>Material including hardcopy (where applicable)</u>
      Method:       Post/Courier
      Address:       Boston Law Group, PC,
                    825 Beacon Street, Suite 20, Newton, MA 02459 USA
      Fax:           +1-617-928-1802
      Contact:       Matthew Shayefar, Esq.

### III.  <u>Response to Statements and Allegations Made in Complaint</u>
(Policy, paras. 4(a), (b), (c); Rules, para. 5)

## A.    <u>Introduction</u>

After years of acting as if it has no trademark rights and after recently engaging in fraudulent acts at least twice to steal the domain names of legitimate competitors, Complainant has initiated this UDRP action against Respondents to take away their domains.  Undoubtedly, if this administrative panel grants Complainant's requested relief (which, it should not), Complainant will again seek to fraudulently strip Respondents of their rights to properly adjudicate the merits of this dispute.

Complainant brings the present action despite the following facts: (1) VULKAN is not a valid trademark as used in connection with gambling in Russia, where gambling is essentially

illegal; (2) all the asserted country-level trademark registrations were issued in Russia prior to the prohibition and those registrations are now invalid; (3) all of Complainant's international trademark registrations rely upon those invalid Russian registrations; (4) this is the incorrect forum to resolve this dispute, as two prior UDRP decisions have held;[2] and (5) Complainant has used the UDRP process to perpetrate a fraud upon the Center and registrants.

In two other proceedings,[3] Complainant laid bare its fraudulent scheme. In the Complaints in those matters, pursuant to Rule 3(b)(xii), Complainant represented that it agreed to jurisdiction of the courts in the location of the registrants, such that if the respondents lost the proceedings, they could file suit in those courts to fully adjudicate their rights pursuant to Policy ¶4(k). However, after the panels found for Complainant, when the respondents filed suit, Complainant reneged on its representations and instead filed motions disputing jurisdiction. As a result of these misrepresentations, those registrants lost their domain despite the protections of Policy ¶4(k).

In short, Complainant fraudulently used the UDRP to strip registrants of their property without full adjudication of their rights. Complainant should not be permitted to continue its scheme of using expedited UDRP proceedings to steal domain names without the intended backup of the courts. Complainant's putative trademark rights are questionable, an issue that cannot be resolved in this forum. A UDRP proceeding should not be (and was never meant to be) the first *and* last stop in such a dispute. However, Complainant has managed to find a way to make it so. Therefore, Complainant has engaged in Reverse Domain Name Hijacking by "using the Policy in bad faith to attempt to deprive a registered domain name holder of a domain name."

Finally, Respondents acknowledge the complex nature of the arguments herein. However, the arguments are not intended to confuse or distract the Panel, but to show the genuine complicated nature of this dispute and how it is not appropriate for adjudication here. And given Complainant's fraudulent acts in the past to deny resolution in a court of law, the only way this dispute will be properly and fairly adjudicated is if the Panel denies the requested relief.

---

[2] *EvoPlay LLC v. Ziganshin*, D2015-0222 (April 16, 2015) (complaint by Complainant's putative licensee denied), Annex 4; and *EvoPlay LLP v. Haladjian*, D2015-0252 (May 18, 2015) (same), Annex 6. The cases are discussed in detail below.
[3] *Ritzio Purchase Limited v. Escave Ltd*, D2015-00875 (Aug. 12, 2015); *Ritzio Purchase Limited v. Budusov / InfoStar Management Ltd*, D2015-1106 (Oct. 7, 2015).

B.      **Factual Background.**

1.      **Use of the marks in connection with gambling is illegal in Russia**

Complainant states that it began providing casino and entertainment products in Russia under the trademark VULKAN in 1992. Complaint, p.13. Complainant claims that it eventually received four trademark registrations in Russia ("**Russian Registrations**"). Complainant also introduces various international trademark registrations, all of which rely upon the Russian Registrations as the underlying or "basic" registrations ("**International Registrations**," and together with the Russian Registrations, "**Disputed Registrations**").

Complainant tries to hide however that (1) Russia banned all online gambling in late 2006, with the effect that Complainant could not have had any legal online gambling operations in Russia thereafter, and (2) Complainant ceased all brick-and-mortar gambling operations in Russia in early 2009 as a result of another law that made all gambling virtually illegal throughout Russia. Annex 2, Russian Law N244-FZ, §§5.3&5.4.[4] As discussed below, because of the illegality of both online and brick-and-mortar gambling operations in Russia, Complainant has been unable to offer services in Russia for at least the past seven years (bricks-and-mortar) or ten years (online), such that to the extent they claim protection for gambling services, the Russian Registrations are invalid due to abandonment and non-use and are subject to cancellation.

2.      **Registration of the disputed marks was rejected in Ukraine**

The English translation of the Cyrillic-character trademark shown in Complainant's Russian Registrations is "volcano." Volcano-related imagery is popular in the context of gambling, as such imagery calls to mind the "eruptions" of coins and other winnings that are bestowed upon lucky gamblers.[5] As a result, gambling-related trademarks frequently incorporate references to volcanoes and volcano-related imagery. Notably absent from the Complaint is any acknowledgement that Complainant operates in an environment where many other parties use volcano-related trademarks. As detailed below, the existence of those other parties and their own trademarks has prevented Complainant from registering such marks in Ukraine.

---

[4] Complaint Annex 18 supports Respondents' assertions. Page 3 shows that "Local Operations," that is, Russian and Ukrainian operations, dropped off immensely in 2009 and were null in 2010. It also states that 100% of Complainant's operations in the second half of 2010 came from outside Russia and Ukraine. *Id.*, p.2. Complaint Annex 19, a Summary of Complainant's operations and locations, also shows no venues within Russia or Ukraine.
[5] E.g., the famous volcano at the Mirage Casino in Las Vegas:  http://www.mirage.com/attractions/volcano.aspx

### 3.       The Disputed Domains and their Websites

In 2013 – more than seven years after Russia banned Internet gambling, more than five years after Complainant was legally prohibited from operating physical casinos in Russia, and more than five years after Complainant thus ceased using its trademarks – Respondents began registering the Disputed Domains (see table below).  Respondents did so with the knowledge that trademark rights no longer could exist in Russia for any gambling related activities.  After registering the domains registered in his name, Respondent Zhoselin-Patrick Mandzela transferred the operation and control of them to Respondent Davy Kiba-Gaste.  Annex 1, ¶¶2-3.

Most, if not all, of the visitors to the Disputed Domains come from Russia or Ukraine – where Complainant can possess no rights in the putative trademarks.  *See* Annex 3, summarized as follows:

| Domain Name | Registration Date | Russian Users | Ukrainian Users |
|---|---|---|---|
| 1vulcano.com | May 11, 2016 | N/A | 100% |
| 2vulcano.com | May 11, 2016 | 100% | N/A |
| 3vulcano.com | May 11, 2016 | N/A | N/A |
| 5vulcano.com | May 11, 2016 | 92.66% | 5.31% |
| 7vulcano.com | May 11, 2016 | N/A | N/A |
| online-volcano.com | March 7, 2013 | N/A | N/A |
| volcan24.com | March 7, 2013 | 65.02% | N/A |
| volcanozal.com | March 26, 2013 | 100% | N/A |
| vulcan-club-online.com | September 18, 2014 | 46.98% | 21.57% |
| vulcano7.com | June 6, 2016 | N/A | N/A |
| vulcan-online-club.com | September 18, 2014 | 100% | N/A |
| wulkancasino.com | March 7, 2013 | 46.78% | 39.63% |

Moreover, the websites at the Disputed Domains are available ONLY in the Russian language, and thus are aimed only at users in Russia and Ukraine.

### 4.       Prior Proceedings

On February 17, 2015, Complainant's putative licensee, EvoPlay LLP ("**EvoPlay**"), commenced a UDRP proceeding against the registrant of domains like casino-vulcan.com and clubvulcan.com.  *EvoPlay LLC v. Ziganshin*, D2015-0222 (April 16, 2015), Annex 4.  The domains were operated by GGS Ltd.  *See* Sevostianov Affidavit, filed in *InfoStar* case, Annex 5, ¶12.  The factual allegations and legal arguments in the *Ziganshin* proceeding are nearly identical to this proceeding.  On February 26, 2015, EvoPlay commenced another proceeding directly

against GGS, regarding the domain names bestvulkan.com and myvulkan.com. *EvoPlay LLP v. Haladjian*, D2015-0252 (May 18, 2015), <u>Annex 6</u>. Again, the allegations and arguments in the *Haladjian* proceeding are nearly identical to those here.

EvoPlay based its complaints on its putative license of the putative trademark VULKAN and related trademarks from Complainant, and alleged that the respondents were operating gambling websites using those trademarks in the disputed domains. The respondents replied that they had registered their domain names more than five years after Russia had banned Internet gambling, more than three years after Complainant was legally prohibited from operating physical casinos in Russia, and more than three years after Complainant ceased using the VULKAN marks in Russia and Ukraine. The respondents also showed that the users of their websites were almost entirely from Russia and Ukraine, that the websites were operated with the implicit consent of Complainant, and that Complainant and GGS had even discussed joint projects.

After an extensive period spent reviewing over 1,000 pages of annexes in those cases, the *Ziganshin* panel **DENIED** the complaint. In arriving at its decision, the majority of the panel found that "the Complainant has not carried its burden of proving that Respondent registered and used the Domain Names in bad faith within the meaning of the Policy." The majority[6] continued:

> As the sheer mass of documentation accompanying the parties' submissions in this case tends to indicate, this dispute is not well suited for resolution under the Policy.... The Policy does not contemplate this Panel serving as a tribunal of general jurisdiction over any and all disputes which are somehow related to domain names. The issues raised by the parties here exceed the relatively narrow confines of the Policy, which is designed chiefly to address clear cases of cybersquatting.

On May 18, 2015, the three-judge panel in the *Haladjian* proceeding also denied that complaint. As the panel wrote:

> This Panel finds that the issues raised in this proceeding are outside the scope of proceedings under the Policy and are properly decided by traditional (*e.g.*, appropriate judicial) means.... Complainant itself, citing prior cases decided under the Policy, points out to us that issues of trademark validity are generally outside the purview of UDRP proceedings. For that very reason (among others), Complainant's case fails. The facts of this case do not establish a clear-cut case of cybersquatting.... These are complex issues best addressed through the court

---

[6] In a concurring opinion, the third panelist simply found that the dispute was not well suited for resolution under the Policy and recommended denying the requested relief without considering the merits of the case.

system rather than under the Policy.

Because the issues in this proceeding and those cases are virtually identical, Respondents request that the panel in this proceeding follow the decisions in the those cases.  *See* WIPO Overview 2.0, §4.1 ("The UDRP does not operate on a strict doctrine of precedent.  However, panels consider it desirable that their decisions are consistent with prior panel decisions dealing with similar fact situations.").  The issues raised in this proceeding, like those in *Ziganshin* and *Haladjian*, are outside the scope contemplated by the Policy and are instead properly decided by traditional means.  Therefore, the Complaint should be dismissed.  *See*, *also*, *Clinomics Biosciencesv. Simplicity Software*, D2001-0823 (August 28, 2001), Annex 7; *Libro AG v. NA Global Link*, D2000-0186 (May 16, 2000), Annex 8.[7]

5.       **Complainant's Abuse of Administrative Proceedings**

After the failure of Complainant's putative licensee in the *Ziganshin* and *Haladjian* cases, Complainant filed two UDRP proceedings, *Ritzio Purchase Limited v. Escave Ltd*, D2015-00875 (Aug. 12, 2015) and *Ritzio Purchase Limited v. Budusov / InfoStar Management Ltd*, D2015-1106 (Oct. 7, 2015).  Pursuant to UDRP Rule Paragraph 3(b)(xiii), Complainant agreed, in both cases, to submit, with respect to any challenges that would be made by the respondents to a decision by the Panel to transfer or cancel the domain names, to the jurisdiction of the courts at the location of the registrants' addresses in the WhoIs database (the "**Mutual Jurisdiction**").  Annex 9, p.26; Annex 10, p.28.  Escave was in the Seychelles and InfoStar in England.  In both of these cases, the Panels found in favor of Complainant.  But, shortly thereafter and in accordance with the provisions of Policy ¶4(k), both respondents filed a lawsuit in their appropriate jurisdictions to challenge the Panels' decisions.  Annexes 11-12.

However, despite representing in the complaints that Complainant would submit to the jurisdiction of the courts in England and the Seychelles pursuant to Rule 3(b)(xiii), Complainant subsequently challenged the right and jurisdiction of the respective courts to hear the disputes.  Annexes 13-14.  As a result of these actions, the respondents were stripped of their rights to fully

---

[7] Other than the *Escave* and *InfoStar* cases (in which, as detailed below, Complainant perpetrated fraud using the UDRP), Complainant references a number of other UDRP cases where it putatively succeeded.  In all but one of those cases, the registrants did not respond to the complaints and therefore they are of no precedential value.  *See Ritzio Purchase Ltd. v. Lykov*, D2015-0633 (May 23, 2016) ("No response has been filed."); *Ritzio Purchase Ltd. v. Twist Services Ltd.*, D2016-0967 (July 11, 2016) ("The Respondent did not reply to the substance of the Complainant's contentions."); *Ritzio Purchase Ltd. v. Whoisguard Protected*, D2015-0295 (April 14, 2015) ("The Respondent did not submit a formal Response in this proceeding.").

adjudicate the merits of their cases as promised by Policy ¶4(k).  ***The domains have now been transferred to Complainant as a result of its fraud.***  Annex 15.

Complainant's actions constitute not only fraud but an abuse of the UDRP proceeding. Complainant filed the complaints with its representation that it would agree to the jurisdiction of the Seychelles and England courts, respectively, if respondents chose to challenge the decisions of the Panels.  Complainant was required to submit to these jurisdictions in order to file its complaints and was not entitled to a decision from the Panels if it did not submit.  However, after Complainant received the Panels' decisions in its favor, it completely ignored its obligations to submit to the Mutual Jurisdictions, taking action in direct contravention.  ***Complainant lied to the Panels when it promised to submit to the courts***.

There is no question that if Complainant is successful in its Complaint here that it will continue to use the same fraudulent scheme to deny Respondents their rights under UDRP ¶4(k) to have this dispute resolved by a court of competent jurisdiction before their domain names are irretrievably stripped.  The UDRP was never intended to be the last stop for disputes between the parties.  Given the fraud and abuse of proceedings perpetrated by Complainant in the past, Complainant's requested relief should be denied and the Panel should declare in its decision that the Complaint was brought in bad faith and constitutes an abuse of the administrative proceeding.  Rule 15(e) ("If after considering the submissions the Panel finds that the complaint was brought in bad faith, for example in an attempt at Reverse Domain Name Hijacking[8] or was brought primarily to harass the domain-name holder, the Panel shall declare in its decision that the complaint was brought in bad faith and constitutes an abuse of the administrative proceeding.").

### 6.    Complainant's Implied Consent to Third Parties

Evidence proffered in the prior UDRP proceedings indicate that, for many years, Complainant either explicitly consented to third parties using its putative trademarks without any oversight or licensing, or simply did not care that third parties did so.  This confirms that even Complainant did not believe it had any trademark rights in Russia or Ukraine.  For instance, GGS, a subject of the above referenced proceedings, had been using the VULKAN mark since 2011 at the latest.  GGS began operating a website at the domain vulcan-casino.com in June of

---

[8] The Rules define Reverse Domain Name Hijacking as "using the Policy in bad faith to attempt to deprive a registered domain-name holder of a domain name."

2011, and continued to operate numerous other domain names and websites incorporating the name.  Annex 5, ¶7.  GGS operated its domain names openly and with the implicit consent of Complainant for nearly four years.  GGS alleged that during those four years, Complainant had extensive discussions with GGS regarding its domain names and websites, including discussions about possible join projects.

Complainant also allowed EvoPlay to operate without license for years. EvoPlay operated websites at no fewer than 18 domain names that include the putative VULKAN mark, including domain names like club-vulkan.com and vulkanpremium.com.  *Id.*, ¶15.  EvoPlay had been operating these domains and websites since as early as 2011, without any authorization or license from Complainant.  It is clear that Complainant permitted EvoPlay to operate because Complainant knew its alleged trademark rights are not enforceable.  Indeed, it was only shortly before EvoPlay filed the *Ziganshin* and *Haladjian* proceedings that it sought a license from Complainant (and Complainant wasn't going to turn away a profitable licensing opportunity, even if EvoPlay had no legitimate reason to get a license).  *Id.*, ¶16.

Similarly, Respondents have operated the websites at the Disputed Domains for years in full view of Complainant, who has taken no action until now.  Having at the very least impliedly consented to so many third parties using the marks for so many years in the same way that Respondents have been operating, Complainant should not now be permitted to hijack the domain names of others to use for its own purposes.  Therefore, to the extent that Complainant may possess any rights in the putative trademarks, Complainant's inaction over the past five years constitutes acquiescence and implied consent to Respondents' use of the marks.

**C.**    **The Disputed Domains are Not Confusingly Similar to Any Trademark in which Complainant has Colorable Rights.**

Complainant asserts that it owns two sets of trademark rights for the VULKAN mark: a set of registrations issued by Rospatent and a set of international registrations issued under the Madrid Protocol.  These Disputed Registrations all are invalid to the extent they claim protection for use in connection with gambling.

**1.**    **Complainant does not have colorable trademark rights arising from the Russian Registrations, which are invalid**

Complainant alleges that it has trademark rights in the marks VULKAN and its English translation, VOLCANO, arising from four registrations issued for those marks by Rospatent.  All

of the registrations claim coverage in Class 41 concerning the provision of gambling services (both online and offline).  Those registrations all were issued in 2008 or earlier.  In mid-2009, however, Russia instituted a ban on the provision of casino and gambling services.  As reported at the time:

> Russia closed down its casinos overnight as gambling was banned nationwide....
> The July 1 ban shut gaming halls, from gaudy casinos crowned by extravagant neon
> structures to dingy dwellings containing a handful of slot machines....  The Kremlin
> plans to restrict gambling to Las Vegas-style gaming zones in four rarely visited
> regions deemed to need investment... but nothing has been built and critics say the
> zones will fail.

Annex 16.  *See also* Annex 2, §5.4.  Complainant does not operate in the four gaming zones. Complaint Annex 18; Annex 17.  In short, gambling has largely been illegal in Russia for over seven years, and in the few isolated zones where it remains possible, Complainant has no operations.

Russia's statutes prohibit the registration of trademarks "that are contrary to public interests, or to principles of humanity or morality." Civil Code of the Russian Federation ("Civil Code"), Article 1483 §3(2), Annex 18.  The Civil Code provides that any registration may be invalidated "fully or in part during the whole period of validity of the exclusive right to a trademark," on such grounds.  Civil Code, Art.1512 §2.  Given Russia's virtual bans on gambling, and Complainant's subsequent decision not operate in Russia, Complainant's registrations are invalid and vulnerable to cancellation.

The Russian Registrations also are vulnerable to cancellation on grounds of non-use, owing to Complainant's failure to offer gambling and casino services within Russia itself since the ban.  *See*, *e.g.*, *In Re Casino De Monaco*, 2010 U.S.Dist. LEXIS 33950 (SDNY 2010) (where mark holder did not operate casinos within the United States, it had no protectable trademark rights and could not compel the transfer of respondent's online casino domains incorporating the putative mark), Annex 19.  Similarly, the Russian Civil Code provides that "Legal protection of a trademark may be early terminated with respect to all goods or part of the goods for the individualization of which the trademark has been registered as the result of the nonuse of the trademark continuously within any three years after its official registration," and "Termination of legal protection of a trademark shall mean the termination of the exclusive right to this trademark."  Art.1486 §§1&4.

Here, Complainant is attempting to rely upon Russian trademark registrations that are of dubious validity because the claimed services are illegal throughout Russia and have not been utilized there for nearly twice as long as the statutory non-use period. Those registrations cannot form a valid basis for granting Complainant's demand.

2.      **Complainant does not have colorable trademark rights in the International Registrations, which are invalid**

Complainant also attempts to assert the trademark rights embodied in five International Registrations issued under the Madrid Protocol. None of the four registrations grant or extend any rights into Russia, and they are not "applicable in" Russia; instead, each simply relies upon on an earlier Russian registration:

| International Registration No. | Mark | "Basic" Registration |
|---|---|---|
| 989103 | VOLCANO | Russian Registration No. 307879 |
| 992196 |  | Russian Registration No. 342291 |
| 977713 |  | Russian Registration No. 342290 |
| 984297 | VULKAN | Russian Registration No. 353692 |

As noted, the Russian Registrations are presumptively invalid due to Complainant's non-use, and inability to use, the subject marks in connection with gambling, and none of the International Registrations, in themselves, create any trademark rights in Russia or Ukraine.

Furthermore, Complainant is a Cyprus entity. For a party to file a valid Madrid Protocol application, that party must "have a real and effective industrial or commercial establishment or a domicile in, or [be] a national of, one of the countries party to the Protocol," and "Before a mark can be the subject of an international application, it must already have been registered, or registration must have been applied for, for the same goods or services with the trademark registration office of a country in respect of which one of the requirements mentioned in point 3 is fulfilled." Madrid Protocol, §§3&4, Annex 20. Complainant provides no evidence of any

trademark rights extant in Cyprus, however, which means that Complainant must have "a real and effective industrial or commercial establishment" in Russia in order for the International Registrations to be valid.  However, Complainant has no establishments in Russia, and the International Registrations in their entireties thus are suspect and invalid.

> 3. **Complainant shares any rights to the VULKAN/VOLCANO mark with other parties.**

In attempting to extend the International Registration into multiple jurisdictions, Complainant has encountered repeated refusals from national intellectual property registries and objections from private parties arising out of the fact that other entities make use of VULKAN/VOLCANO trademarks specifically in connection with gambling activities.  As the chart below shows, objections and oppositions repeatedly have been lodged against Complainant's attempts to register the VULKAN/VOLCANO trademarks in connection with Class 41 services, on the grounds that doing so would create a likelihood of confusion:

| Complainant Int'l. Reg. | Mark | Total Refusal of Protection on Confusion Grounds | Partial Refusal on Confusion Grounds (Class 41 specifically) | Third Party Opposition on Confusion Grounds (Class 41 specifically) |
|---|---|---|---|---|
| 989103 | VOLCANO | | European Community, Kazakhstan | European Community |
| 992196 |  | Belarus | Ukraine, Kazakhstan | |
| 977713 |  | | Ukraine, Kazakhstan | |
| 984297 | VULKAN | Ukraine | European Community, Serbia, Belarus, Kazakhstan | European Community (x3) |

Copies of these registry objections and third-party oppositions are attached hereto as Annexes 21-34.  To pick a single example, in 2009, the Ukrainian registry refused registration of the VULKAN mark to Complainant *because other parties had long been using similar marks for casinos in Ukraine.*  Annex 21.  In French, in Section IV, "Grounds for Refusal," the registry states that "The sign <VULKAN> cannot be taken as a mark because similar signs have been

taken previously in the names of Ukraine with 'VOLCANO.'"  Section VI states that it is a "refusal for the totality of products and services."[9]  Ritzio never disputed that provisional refusal, which then became final.

Complainant exists and operates in an environment where it does not possess exclusive rights to use the word VULKAN/VOLCANO as a trademark, even in connection with gambling services, and its attempt to wrestle the Disputed Domains away from the Respondents represents an improper attempt to expand such rights.

**D.**      **Respondents Have Rights and Legitimate Interests in the Disputed Domains.**

Policy paragraph 4(c) states that if the respondent has *any* legitimate rights or interest in the disputed domains, then Complainant cannot succeed for the purposes of Policy ¶4(a)(ii). Specifically, Policy ¶4(c)(i) states that if, before any notice of the Dispute to Respondents, Respondents' use of the domain name or a trademark corresponding to the domain name was made in connection with a bona fide offering of goods or services, then the Respondents have rights and legitimate interests.  Respondents easily satisfy this test.

Respondents have a plausible, non-infringing reason for selecting the Disputed Domains, proving that their use is bona fide.  *WebVan Group v. Atwood*, D2000-1512 (February 20, 2001) ("[A] plausible, non-infringing explanation for selection of the domain name is evidence that the use is bona fide."), Annex 35.  Specifically, Complainant had not been operating in Russia or Ukraine under the trademarks for four years when they first registered any of the Disputed Domains, constituting abandonment of the trademarks and making the trademark registrations vulnerable to cancellation.  Moreover, Complainant's VULKAN-trademarked operations in Russia had by then been made illegal, and therefore Complainant could not have legitimate trademark rights arising out of a now-illegal activity.  Based on the foregoing, Respondents had a good faith belief that they were not infringing any legitimate trademark rights when they registered the Disputed Domains to be used in Russia and Ukraine.  For the foregoing reasons, Respondents have rights to and legitimate interests in the Disputed Domains.

**E.**      **The Disputed Domains Were Not Registered or Used in Bad Faith.**

"The Policy, paragraph 4(a)(iii), obliges the Complainant to establish that the Domain Name 'has been registered and is being used in bad faith.'  The consensus view since the Policy

---

[9] If the Panel desires, Respondent will provide a certified translation of the entirety of this refusal and the others enclosed herewith.

was implemented in 1999 has been that the conjunctive 'and' indicates that there must be bad faith both at the time of registration and subsequently." *Mile v. Burg*, D2010-2011 (February 7, 2011), Annex 36.

 **1. No bad faith registration**

 The Disputed Domains were not registered in bad faith because Respondents had a legitimate and non-infringing reason for registering the them.  Complainant had not been operating in Russia or Ukraine under the VULKAN trademark for four years by the time Respondents registered any of the Disputed Domains.  Moreover, Complainant's casino and online gambling operations in Russia had been made illegal, and therefore could not have formed the basis for any legitimate trademark rights.  Therefore, Respondents had a good faith belief that they were not infringing any trademark rights when they registered the Disputed Domains.  *See WebVan*, D2000-1512 ("However, a plausible, non-infringing explanation for selection of the domain name is evidence that the use is bona fide."), Annex 35.  Because the Policy requires bad faith intent at the time of registration, and because there was no bad faith intent at such time, Policy ¶4(a)(iii) is not satisfied.

 **2. No bad faith use**

 The websites located at the Disputed Domains are not "copycat" websites that compete with Complainant, because Complainant does not operate online gaming services, either in Russia or Ukraine (where Mr. Kiba-Gaste's websites are used), or elsewhere in the world.  Moreover, well before the filing of the Complaint, Mr. Kiba-Gaste had been operating his websites openly and in full view and with the implicit consent of Complainant for over three years.  Complainant certainly knew, or should have known, about Mr. Kiba-Gaste's operation of the Disputed Domains.  Therefore, to the extent that the Disputed Marks are valid, Complainant's actions constituted acquiescence to and implied consent for Respondents' activities.  Complainant argues that Respondents have acted in bad faith because they did not receive authorization from Complainant before they registered the Disputed Domains.  But because Complainant had no relevant trademark rights at the time the domains were registered or at any time since then (not, at least, in Russia and Ukraine where the Disputed Domains are used), Respondents were under no obligation to receive authorization.

**3.      Other indicia of bad faith do not exist**

Policy ¶4(b) lists several other factors that might evidence use and registration in bad faith, none of which are present here.  Respondents have not registered the Disputed Domains for the purpose of selling them to Complainant, nor have Respondents registered them to prevent Complainant from reflecting its putative trademarks in domain names.  As referenced above, Complainant and EvoPlay have already registered and used numerous domains containing the putative trademarks.  Also, Respondents did not register the Disputed Domains for the purpose of disrupting the business of any competitor (although it is clear that Complainant is disrupting the business of its competitors).

Finally, the use of a WHOIS privacy service is irrelevant.  There are wholly legitimate reasons to use a WHOIS privacy service, and the mere use of such a service is of no relevance to the issue of bad faith.  *See, e.g.*, *WWF-World Wide Fund v. Moniker*, D2006-0975 (November 1, 2006) ("[T]here can be wholly legitimate reasons for a person wishing to protect privacy by means of a proxy service.  Many reputable registration services now offer a proxy registration service."), <u>Annex 37</u>.


For the reasons stated herein, Respondents requests that the Panel **deny** the relief requested by Complainant.  Respondents also request that the Panel issue a finding that the Complaint was brought in bad faith and constitutes an abuse of the administrative proceeding.


## IV.  <u>Omitted</u>


## V.  <u>Administrative Panel</u>

(Rules, paras. 5(b)(iv) and (b)(v) and para. 6; Supplemental Rules, para. 7)


[7.]      Respondents elect to have the dispute decided by a **three-member Administrative Panel**.  Respondents provide the names of the following three persons for use in the panel:


1.      Robert A. Badgley
         Karbal Cohen Economou Silk Dunne LLC
         150 South Wacker Drive
         Chicago, IL 60606

United States of America
Telephone: +1-312-431-3634
Fax: +1-312-431-3670
Email: rbadgley@karballaw.com
http://www.wipo.int/amc/en/domains/panel/profiles/badgley-roberta.pdf

2.      Paul C. Van Slyke
        Hoove Slovacek LLP
        Galleria Tower II
        5051 Westheimer, Suite 1200
        Houston, TX 77024
        United States of America
        Telephone: +1-713-977-8686
        Fax: +1-713-977-5395
        Email: vanslyke@hooverslovacek.com
        http://www.wipo.int/export/sites/www/amc/en/domains/panel/profiles/vanslyke-paulc.pdf

3.      David E. Sorkin
        Center for Information Technology and Privacy Law
        The John Marshall law School
        315 South Plymouth Court
        Chicago, Illinois 60604
        United States of America
        Telephone: +1-312-987-2387
        Fax: +1-773-648-7044
        Email: david@sork.com
        http://www.wipo.int/export/sites/www/amc/en/domains/panel/profiles/sorkin-davide.pdf

## VI.  Other Legal Proceedings

(Rules, para. 5(b)(vi))

[8.]    None.

## VII.  Communications

(Rules, paras. 2(b), 5(b)(vii); Supplemental Rules, para. 3, 7, 12)

[9.]    A copy of this Response has been sent or transmitted to the Complainant on November 14, 2016 in electronic form.

[10.]   This Response is submitted to the Center in electronic form, including any annexes, in the appropriate format.

18

## VIII.  <u>Payment</u>

(Rules, para. 5(c); Supplemental Rules, Annex D)


[11.]    In view of Complainant's designation of a single-member Panel and the Respondents'
designation of a three-member Panel, Respondents submitted payment in the amount of USD
$3,000 by the WIPO Center's secure online payment facility on November 14, 2016
(Transaction Number DOM-200208420).


## IX.  <u>Certification</u>

(Rules, para. 5(b)(viii), Supplemental Rules, para. 14)


[12.]    Respondents agree that, except in respect of deliberate wrongdoing, an Administrative
Panel, the World Intellectual Property Organization and the Center shall not be liable to a party,
a concerned registrar or ICANN for any act or omission in connection with the administrative
proceeding.

[13.]    Respondents certify that the information contained in this Response is to the best of
Respondents' knowledge complete and accurate, that this Response is not being presented for
any improper purpose, such as to harass, and that the assertions in this Response are warranted
under the Rules and under applicable law, as it now exists or as it may be extended by a good-
faith and reasonable argument.


Respectfully submitted,


Matthew Shayefar, Esq.

Val Gurvits, Esq.


Date: November 14, 2016


19

## X.     List of Response Annexes

1.     Affidavit of Davy Kiba-Gaste

2.     Federal Law of December 29, 2006 No. 244FZ, "On government regulation of gambling activities and on introduction of amendments to some legislative acts of Russian Federation."

3.     Geographic Breakdowns for Disputed Domains

4.     *EvoPlay LLC v. Mr. Timur Ziganshin / Moniker Privacy Services / Timur*, WIPO Case No. D2015-0222 (April 16, 2015)

5.     Affidavit of Andrey Sevostianov

6.     *EvoPlay LLP v. Mardiros Haladjian / GGS Ltd.*, WIPO Case No. D2015-0252 (May 18, 2015)

7.     *Clinomics Biosciences, Inc. v. Simplicity Software, Inc.*, WIPO Case No. D2001-0823 (August 28, 2001)

8.     *Libro AG v. NA Global Link Limited*, WIPO Case No. D2000-0186 (May 16, 2000)

9.     Complaint in *Ritzio Purchase Limited v. Escave Ltd*, WIPO Case No. D2015-00875 (Aug. 12, 2015)

10.    Complaint in *Ritzio Purchase Limited v. Budusov / InfoStar Management Ltd*, WIPO Case No. D2015-1106 (Oct. 7, 2015)

11.    Plaint filed with Supreme Court of Seychelles in *Escave Ltd v Ritzio Purchase Limited*

12.    Particulars of Claim filed with The High Court of Justice in *InfoStar Management Ltd v. Ritzio Purchase Limited*

13.    Ritzio Defence in Limine Litis filed in Seychelles case of *Escave Ltd v. Ritzio Purchase Limited*

14.    Ritzio Filings in England case of *InfoStar Management Ltd. v. Ritzio Purchase Limited* disputing jurisdiction

15.    Email from PanaNames

16.    "Russia bans all gambling and shuts casinos," REUTERS (July 1, 2009)

17.     "A raw deal for Russia's casino workers," THE MOSCOW NEWS (January 2, 2010)

18.     Civil Code of the Russian Federation, Selected Articles

19.     *In Re Casino De Monaco*, 2010 U.S. Dist. LEXIS 33950 (S.D.N.Y. 2010)

20.     Protocol Relating to the Madrid Agreement Concerning the International Registration of Marks

21.     Ukraine Provisional Refusal of Protection

22.     Kazakhstan Refusal of Protection

23.     Bélarus Provisional Refusal of Protection

24.     European Union Provisional Refusal of Protection with opposition filed by Region D'Auvergne (dated 15/10/2009)

25.     European Union Provisional Refusal of Protection with opposition filed by Vulcan Productions, Inc. (dated 15/10/2009)

26.     European Union Provisional Refusal of Protection with opposition filed by Nürburg Quelle Hermann Kreuter GmbH (dated 15/10/2009)

27.     Kazakhstan Refusal of Protection

28.     Republic of Serbia Provisional Refusal of Protection

29.     Ukraine Provisional Refusal of Protection

30.     European Union Provisional Refusal of Protection with opposition filed by Region D'Auvergne (dated 18/12/2009)

31.     Kazakhstan Refusal of Protection

32.     Bélarus Provisional Refusal of Protection

33.     Kazakhstan Refusal of Protection

34.     Ukraine Provisional Refusal of Protection

35.     *WebVan Group, Inc. v. Stan Atwood*, WIPO Case No. D2000-1512 (February 20, 2001)

36.     *Mile, Inc. v. Michael Burg*, WIPO Case No. D2010-2011 (February 7, 2011)

37.     *WWF-World Wide Fund for Nature v. Moniker Online Services LLC,* WIPO Case No. D2006-0975 (November 1, 2006)

# Response Annex 1

## AFFIDAVIT OF DAVY KIBA-GASTE

I, Davy Kiba-Gaste, affirm and declare as follows:

1.      My name is Davy Kiba-Gaste.  I am over the age of 18.  I have personal knowledge of the facts stated herein.

2.      I am the registrant of the following domain names (and the operator of the websites at those domain names) that are subject to the UDRP Proceeding *Ritzio Purchase Limited v. Alex Boolop / Davy Kiba-Gaste / Zhoslein-Patrick Mandzela*, Case No. D2016-1981 (the "UDRP Proceeding"): 1vulcano.com, 2vulcano.com, 3vulcano.com, 5vulcano.com, 7vulcano.com, vulcano7.com.

3.      Zhoselin-Patrick Mandzela registered the following other domains that are part of the UDRP Proceeding for my benefit: wulkancasino.com, volcan24.com, vulcan-online-club.com, volcanozal.com, online-volcano.com, vulcan-club-online.com.  I control each of these domain names and operate the website at the domain names.

4.      I do not know who "Alex Boolop" is.

5.      "Alex Boloop" is listed in the Complaint of the UDRP Proceeding as the registrant of the last domain name that is part of the UDRP Proceeding: vulcan-club-online.top.

6.      I did not register the vulcan-club-online.top domain name nor did anyone do so on my behalf.

7.      I do not control the vulcan-club-online.top domain name nor the website at the domain name.

8.      I do not know why the Complainant in the UDRP Proceeding believes that the Domain Name is associated with the domain names that I control and operate.

9.      From my review, there does not even appear to be a website currently at that domain name.  That domain name is also registered with a different domain name registrar than I have used for the other domain names that are a part of the UDRP Proceeding.

I swear under the pains and penalty of perjury that the foregoing is true and correct.

Dated: November 10, 2016

Davy Kiba-Gaste

# Response Annex 2

# Original Document

 

# ГАРАНТ
### Информационно-правовой портал

    

| Главная страница | Документы системы ГАРАНТ | Искать другие документы | | Eng |

Федеральный закон от 29 декабря 2006 г. N 244-ФЗ "О государственном регулировании деятельности по организации и проведению азартных игр и о внесении изменений в некоторые законодательные акты Российской Федерации" (с изменениями и дополнениями) > Глава 1. Общие положения

# Общие положения

### Федеральный закон от 29 декабря 2006 г. N 244-ФЗ
### "О государственном регулировании деятельности по организации и проведению азартных игр и о внесении изменений в некоторые законодательные акты Российской Федерации"

С изменениями и дополнениями от:

24 июля 2009 г., 22 апреля, 3 ноября 2010 г., 4 мая, 13 июля, 18 июля, 21 ноября 2011 г., 16 октября 2012 г., 23 июля 2013 г., 21, 22 июля 2014 г.

**Принят Государственной Думой 20 декабря 2006 года**
**Одобрен Советом Федерации 27 декабря 2006 года**

*ГАРАНТ: См. комментарии к настоящему Федеральному закону*

### Глава 1. Общие положения

**Статья 1.** Предмет регулирования настоящего Федерального закона

1. Настоящим Федеральным законом определяются правовые основы государственного регулирования деятельности по организации и проведению азартных игр на территории Российской Федерации и устанавливаются ограничения осуществления данной деятельности в целях защиты нравственности, прав и законных интересов граждан.

*Информация об изменениях: Федеральным законом от 21 ноября 2011 г. N 327-ФЗ в часть 2 статьи 1 настоящего Федерального закона внесены изменения, вступающие в силу с 1 января 2012 года*
*См. текст части в предыдущей редакции*

2. Действие настоящего Федерального закона не распространяется на деятельность по организации и проведению лотерей, а также на деятельность организаторов торговли, осуществляющих свою деятельность в соответствии с Федеральным законом "Об организованных торгах".

*ГАРАНТ: См. комментарии к статье 1 настоящего Федерального закона*

**Статья 2.** Законодательство о государственном регулировании деятельности по организации и проведению азартных игр

Правовое регулирование деятельности по организации и проведению азартных игр осуществляется в соответствии с Гражданским кодексом Российской Федерации, настоящим Федеральным законом, другими федеральными законами, законами субъектов Российской Федерации, а также может осуществляться принятыми в соответствии с настоящим Федеральным законом иными нормативными правовыми актами.

*ГАРАНТ: См. комментарии к статье 2 настоящего Федерального закона*

**Статья 3.** Государственное регулирование деятельности по организации и проведению азартных игр

1. Государственное регулирование деятельности по организации и проведению азартных игр осуществляется путем:

1) установления порядка осуществления деятельности по организации и проведению азартных игр и соответствующих ограничений, обязательных требований к организаторам азартных игр, игорным заведениям, посетителям игорных заведений, игорных зон;

2) выделения территорий, предназначенных для осуществления деятельности по организации и проведению азартных игр, - игорных зон;

3) выдачи разрешений на осуществление деятельности по организации и проведению азартных игр в игорных зонах;

4) выдачи лицензий на осуществление деятельности по организации и проведению азартных игр в букмекерских конторах и тотализаторах;

*Информация об изменениях: Федеральным законом от 18 июля 2011 г. N 242-ФЗ пункт 5 части 1 статьи 3 настоящего Федерального закона изложен в новой редакции, вступающей в силу с 1 августа 2011 г.*
*См. текст пункта в предыдущей редакции*

5) осуществления государственного надзора в области организации и проведения азартных игр, направленного на предупреждение, выявление и пресечение нарушений законодательства о государственном регулировании деятельности по организации и проведению азартных игр лицами, осуществляющими указанную деятельность.

2. Государственное регулирование деятельности по организации и проведению азартных игр в соответствии с настоящим Федеральным законом осуществляется Правительством Российской Федерации, федеральным органом исполнительной власти, уполномоченным Правительством Российской Федерации на осуществление функций по нормативно-правовому регулированию в сфере организации и проведения азартных игр, иными федеральными органами исполнительной власти Российской Федерации в пределах их компетенции, органами государственной власти субъектов Российской Федерации, уполномоченными на осуществление функций по управлению игорными зонами.

3. Проверка технического состояния игрового оборудования осуществляется уполномоченным Правительством Российской Федерации федеральным органом исполнительной власти, осуществляющим функции по контролю и надзору за соблюдением законодательства о налогах и сборах.

*ГАРАНТ: См. комментарии к статье 3 настоящего Федерального закона*

**Статья 4.** Основные понятия, используемые в настоящем Федеральном законе

Для целей настоящего Федерального закона используются следующие основные понятия:

1) **азартная игра** - основанное на риске соглашение о выигрыше, заключенное двумя или несколькими участниками такого соглашения между собой либо с организатором азартной игры по правилам, установленным организатором азартной игры;

2) **пари** - азартная игра, при которой исход основанного на риске соглашения о выигрыше, заключаемого двумя или несколькими участниками пари между собой либо с организатором данного вида азартной игры, зависит от события, относительно которого неизвестно, наступит оно или нет;

*Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ пункт 3 статьи 4 настоящего Федерального закона изложен в новой редакции, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст пункта в предыдущей редакции*

3) **ставка** - денежные средства, передаваемые участником азартной игры организатору азартной игры (за исключением денежных средств, признаваемых в соответствии с настоящим Федеральным законом интерактивной ставкой) и служащие условием участия в азартной игре в соответствии с правилами, установленными организатором азартной игры;

*Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ статья 4 настоящего Федерального закона дополнена пунктом 3.1, вступающим в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

3.1) **интерактивная ставка** - денежные средства, в том числе электронные денежные средства, передаваемые с использованием электронных средств платежа центром учета переводов интерактивных ставок букмекерских контор или тотализаторов организатору азартной игры в букмекерской конторе или тотализаторе по поручениям участников данных видов азартных игр и служащие условием участия в азартной игре в соответствии с правилами, установленными таким организатором азартных игр;

Общие положения

4) **выигрыш** - денежные средства или иное имущество, в том числе имущественные права, подлежащие выплате или передаче участнику азартной игры при наступлении результата азартной игры, предусмотренного правилами, установленными организатором азартной игры;

5) **организатор азартной игры** - юридическое лицо, осуществляющее деятельность по организации и проведению азартных игр;

📖 *Информация об изменениях: Федеральным законом от 23 июля 2013 г. N 198-ФЗ пункт 6 статьи 4 настоящего Федерального закона изложен в новой редакции, вступающей в силу по истечении ста восьмидесяти дней после дня официального опубликования названного Федерального закона*
*См. текст пункта в предыдущей редакции*

6) **деятельность по организации и проведению азартных игр** - деятельность по оказанию услуг по заключению с участниками азартных игр основанных на риске соглашений о выигрыше и (или) по организации заключения таких соглашений между двумя или несколькими участниками азартной игры;

7) **игорная зона** - часть территории Российской Федерации, которая предназначена для осуществления деятельности по организации и проведению азартных игр и границы которой установлены в соответствии с настоящим Федеральным законом;

8) **разрешение на осуществление деятельности по организации и проведению азартных игр в игорной зоне** - выдаваемый в соответствии с настоящим Федеральным законом документ, предоставляющий организатору азартных игр право осуществлять деятельность по организации и проведению азартных игр в одной игорной зоне без ограничения количества и вида игорных заведений;

📖 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ пункт 9 статьи 4 настоящего Федерального закона изложен в новой редакции, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст пункта в предыдущей редакции*

9) **лицензия на осуществление деятельности по организации и проведению азартных игр в букмекерских конторах и тотализаторах** - документ, выдаваемый в соответствии с настоящим Федеральным законом и предоставляющий организатору азартных игр право осуществлять деятельность по организации и проведению азартных игр в букмекерских конторах и (или) тотализаторах вне игорных зон, с обязательным указанием вида оказываемых услуг (услуг по заключению с участниками азартных игр основанных на риске соглашений о выигрыше и (или) услуг по организации заключения основанных на риске соглашений о выигрыше между двумя или несколькими участниками азартной игры), места нахождения процессингового центра букмекерской конторы или тотализатора, количества и места нахождения филиалов, пунктов приема ставок букмекерских контор или тотализаторов либо иных мест осуществления деятельности по организации и проведению азартных игр в букмекерских конторах и тотализаторах;

📖 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ в пункт 10 статьи 4 настоящего Федерального закона внесены изменения, вступающие в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст пункта в предыдущей редакции*

10) **участник азартной игры** - физическое лицо, достигшее возраста восемнадцати лет, принимающее участие в азартной игре и заключающее основанное на риске соглашение о выигрыше с организатором азартной игры или другим участником азартной игры;

11) **игорное заведение** - здание, строение, сооружение (единая обособленная часть здания, строения, сооружения), в которых осуществляется исключительно деятельность по организации и проведению азартных игр и оказанию сопутствующих азартным играм услуг (в том числе филиал или иное место осуществления деятельности по организации и проведению азартных игр и оказанию сопутствующих азартным играм услуг);

12) **казино** - игорное заведение, в котором осуществляется деятельность по организации и проведению азартных игр с использованием игровых столов или игровых столов и иного предусмотренного настоящим Федеральным законом игрового оборудования;

13) **зал игровых автоматов** - игорное заведение, в котором осуществляется деятельность по организации и проведению азартных игр с использованием игровых автоматов или игровых автоматов и иного предусмотренного настоящим Федеральным законом игрового оборудования, за исключением игровых столов;

📖 *Информация об изменениях: Федеральным законом от 13 июня 2011 г. N 133-ФЗ в пункт 14 статьи 4 настоящего Федерального закона внесены изменения, вступающие в силу с 1 января 2012 г.*
*См. текст пункта в предыдущей редакции*

14) **букмекерская контора** - игорное заведение, в котором организатор азартных игр заключает пари с участниками данного вида азартных игр;

📖 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ в пункт 15 статьи 4 настоящего Федерального закона внесены изменения, вступающие в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст пункта в предыдущей редакции*

15) **тотализатор** - игорное заведение, в котором организатор азартных игр организует заключение пари между участниками данного вида азартных игр, а также выплату выигрышей за счет суммы ставок, принятых от участников данного вида азартных игр, за вычетом размера взимаемого организатором данного вида азартных игр вознаграждения;

16) **игровое оборудование** - устройства или приспособления, используемые для проведения азартных игр;

17) **игровой стол** - игровое оборудование, которое представляет собой место с одним или несколькими игровыми полями и при помощи которого организатор азартных игр проводит азартные игры между его участниками либо выступает в качестве их участника через своих работников;

18) **игровой автомат** - игровое оборудование (механическое, электрическое, электронное или иное техническое оборудование), используемое для проведения азартных игр с материальным выигрышем, который определяется случайным образом устройством, находящимся внутри корпуса такого игрового оборудования, без участия организатора азартных игр или его работников;

📖 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ в пункт 19 статьи 4 настоящего Федерального закона внесены изменения, вступающие в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст пункта в предыдущей редакции*

19) **касса букмекерской конторы** - часть пункта приема ставок букмекерской конторы, в которой организатор азартных игр принимает ставки от участников данного вида азартных игр, за исключением интерактивных ставок, и выплачивает выигрыши;

📖 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ в пункт 20 статьи 4 настоящего Федерального закона внесены изменения, вступающие в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст пункта в предыдущей редакции*

20) **касса тотализатора** - часть пункта приема ставок тотализатора, в которой организатор азартных игр принимает ставки от участников данного вида азартных игр, за исключением интерактивных ставок, и выплачивает выигрыши;

21) **касса игорного заведения** - часть игорного заведения, в которой организатор азартных игр осуществляет операции с денежными средствами и в которой находится специальное оборудование, позволяющее осуществлять указанные операции;

22) **зона обслуживания участников азартных игр** - часть игорного заведения, в которой установлено игровое оборудование, кассы игорного заведения, тотализатора, букмекерской конторы, а также иное используемое участниками азартных игр оборудование;

23) **служебная зона игорного заведения** - обособленная часть игорного заведения, которая предназначена для работников организатора азартных игр и в которую не допускаются участники азартных игр;

📖 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ в пункт 24 статьи 4 настоящего Федерального закона внесены изменения, вступающие в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст пункта в предыдущей редакции*

24) **сопутствующие азартным играм услуги** - гостиничные услуги, услуги общественного питания, услуги в сфере зрелищно-развлекательных мероприятий, услуги по распространению (реализации, выдаче) лотерейных билетов, лотерейных квитанций, электронных лотерейных билетов, приему лотерейных ставок среди участников лотереи, выплате, передаче или предоставлению выигрышей участникам международных лотерей, которые проводятся на основании международных договоров Российской Федерации, и всероссийских государственных лотерей;

📖 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ пункт 25 статьи 4 настоящего Федерального закона изложен в новой редакции, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст пункта в предыдущей редакции*

25) **процессинговый центр букмекерской конторы** - часть игорного заведения, в которой организатор азартных игр проводит учет ставок, принятых от участников данного вида азартных игр, проводит на основе информации, полученной от центра учета переводов интерактивных ставок букмекерских контор, учет интерактивных ставок, принятых от участников данного вида азартных игр, фиксирует результаты азартных игр,

*Общие положения*

рассчитывает суммы подлежащих выплате выигрышей, осуществляет представление информации о принятых ставках, интерактивных ставках и о рассчитанных выигрышах в пункты приема ставок букмекерской конторы и в центр учета переводов интерактивных ставок букмекерских контор;

✉ *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ пункт 26 статьи 4 настоящего Федерального закона изложен в новой редакции, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст пункта в предыдущей редакции*

26) **процессинговый центр тотализатора** - часть игорного заведения, в которой организатор азартных игр проводит учет ставок, принятых от участников данного вида азартных игр, проводит на основе информации, полученной от центра учета переводов интерактивных ставок тотализаторов, учет интерактивных ставок, принятых от участников данного вида азартных игр, фиксирует результаты азартных игр, рассчитывает суммы подлежащих выплате выигрышей, осуществляет представление информации о принятых ставках, интерактивных ставках и о рассчитанных выигрышах в пункты приема ставок тотализатора и в центр учета переводов интерактивных ставок тотализаторов;

✉ *Информация об изменениях: Федеральным законом от 13 июня 2011 г. N 133-ФЗ статья 4 настоящего Федерального закона дополнена пунктом 27, вступающим в силу с 1 января 2012 г.*

27) **пункт приема ставок букмекерской конторы** - территориально обособленная часть игорного заведения, в которой организатор азартных игр заключает пари с участниками данного вида азартных игр и осуществляет представление информации о принятых ставках, выплаченных и невыплаченных выигрышах в процессинговый центр букмекерской конторы;

✉ *Информация об изменениях: Федеральным законом от 13 июня 2011 г. N 133-ФЗ статья 4 настоящего Федерального закона дополнена пунктом 28, вступающим в силу с 1 января 2012 г.*

28) **пункт приема ставок тотализатора** - территориально обособленная часть игорного заведения, в которой организатор азартных игр организует заключение пари между участниками данного вида азартных игр и осуществляет представление информации о принятых ставках, выплаченных и невыплаченных выигрышах в процессинговый центр тотализатора;

✉ *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ статья 4 настоящего Федерального закона дополнена пунктом 29, вступающим в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

29) **центр учета переводов интерактивных ставок букмекерских контор или тотализаторов** - кредитная организация, в том числе небанковская кредитная организация, осуществляющая деятельность в соответствии со статьей 14.2 настоящего Федерального закона.

✉ *ГАРАНТ: См. комментарии к статье 4 настоящего Федерального закона*

**Статья 5.** Ограничения осуществления деятельности по организации и проведению азартных игр

1. Деятельность по организации и проведению азартных игр может осуществляться организаторами азартных игр при соблюдении требований, предусмотренных настоящим Федеральным законом, другими федеральными законами, законами субъектов Российской Федерации и иными нормативными правовыми актами.

2. Деятельность по организации и проведению азартных игр может осуществляться исключительно в игорных заведениях, соответствующих требованиям, предусмотренным настоящим Федеральным законом, другими федеральными законами, законами субъектов Российской Федерации, иными нормативными правовыми актами Российской Федерации.

✉ *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ в часть 3 статьи 5 настоящего Федерального закона внесены изменения, вступающие в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст части в предыдущей редакции*

3. Деятельность по организации и проведению азартных игр с использованием информационно-телекоммуникационных сетей, в том числе сети "Интернет", а также средств связи, в том числе подвижной связи, запрещена, за исключением случаев, предусмотренных настоящим Федеральным законом.

✉ *Информация об изменениях: Федеральным законом от 13 июня 2011 г. N 133-ФЗ статья 5 настоящего Федерального закона внесены изменения, вступающие в силу с 1 января 2012 г.*
*См. текст части в предыдущей редакции*

4. Игорные заведения (за исключением букмекерских контор, тотализаторов, их пунктов приема ставок) могут быть открыты исключительно в игорных зонах в порядке, установленном настоящим Федеральным законом.

✉ *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ статья 5 настоящего Федерального закона внесены изменения, вступающие в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст части в предыдущей редакции*

5. Игорные зоны не могут быть созданы на землях населенных пунктов, за исключением создания игорной зоны в границах земельных участков, предоставленных для размещения олимпийских объектов федерального значения, финансирование и строительство которых не осуществлялись за счет бюджетных ассигнований или средств Государственной корпорации по строительству олимпийских объектов и развитию города Сочи как горноклиматического курорта (далее - Корпорация).

✉ *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ статья 5 настоящего Федерального закона дополнена частью 6, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

6. Не допускается прием ставок организатором азартных игр в букмекерских конторах или тотализаторах путем перевода денежных средств, в том числе перевода электронных денежных средств, приема платежей физических лиц, почтового перевода денежных средств организатору азартных игр, осуществляемых оператором по переводу денежных средств, в том числе оператором электронных денежных средств, банковским платежным агентом и (или) банковским платежным субагентом, за исключением денежных средств, признаваемых в соответствии с настоящим Федеральным законом интерактивной ставкой. Организатор азартных игр в букмекерских конторах или тотализаторах вправе принимать интерактивные ставки, передаваемые только путем перевода денежных средств, в том числе электронных денежных средств (за исключением почтовых переводов), центром учета переводов интерактивных ставок букмекерских контор или тотализаторов с использованием электронных средств платежа по поручениям участников данных видов азартных игр.

✉ *ГАРАНТ: См. комментарии к статье 5 настоящего Федерального закона*

✉ *Информация об изменениях: Федеральным законом от 22 апреля 2010 г. N 64-ФЗ в статью 6 настоящего Федерального закона внесены изменения*
*См. текст статьи в предыдущей редакции*

**Статья 6.** Требования к организаторам азартных игр

1. Организаторами азартных игр могут выступать исключительно юридические лица, зарегистрированные в установленном порядке на территории Российской Федерации.

✉ *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ статья 6 настоящего Федерального закона дополнена частью 1.1, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

1.1. Организаторами азартных игр в букмекерских конторах или тотализаторах могут выступать исключительно юридические лица, являющиеся членами саморегулируемой организации организаторов азартных игр в букмекерских конторах или саморегулируемой организации организаторов азартных игр в тотализаторах.

✉ *Информация об изменениях: Федеральным законом от 22 июля 2014 г. N 278-ФЗ статья 6 настоящего Федерального закона дополнена частью 1.2*

1.2. Организаторами азартных игр могут выступать юридические лица, которые будут осуществлять деятельность по организации и проведению азартных игр в игорной зоне, созданной в границах земельных участков, предоставленных для размещения олимпийских объектов федерального значения, финансирование и строительство которых не осуществлялись за счет бюджетных ассигнований или средств Корпорации.

✉ *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ части 2 статьи 6 настоящего Федерального закона изложена в новой редакции, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст части в предыдущей редакции*

2. Не могут выступать организаторами азартных игр юридические лица, учредителями (участниками) которых являются Российская Федерация, субъекты Российской Федерации или органы местного самоуправления, за исключением созданного в соответствии с указом Президента Российской Федерации акционерного общества, которое указывает иподромы Российской Федерации и одним из приоритетных направлений деятельности которого является развитие национальной коневодческой индустрии. Не могут выступать организаторами азартных игр юридические лица, учредителями (участниками) которых являются лица, имеющие неснятую или непогашенную судимость за преступления в сфере

сфере экономики либо за умышленные преступления средней тяжести, тяжкие преступления, особо тяжкие преступления.

📄 *Информация об изменениях: Федеральным законом от 18 июля 2011 г. N 242-ФЗ в часть 3 статьи 6 настоящего Федерального закона внесены изменения, вступающие в силу с 1 августа 2011 г.*
*См. текст части 3 в предыдущей редакции*

3. Организатор азартных игр обязан предоставить сведения, необходимые для осуществления государственного надзора за соблюдением требований законодательства о государственном регулировании деятельности по организации и проведению азартных игр. Состав и порядок предоставления таких сведений устанавливаются Правительством Российской Федерации.

📄 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ статья 6 настоящего Федерального закона дополнена частью 3.1, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

3.1. Организаторы азартных игр в букмекерских конторах или тотализаторах представляют информацию о вступлении в члены саморегулируемой организации организаторов азартных игр в букмекерских конторах или саморегулируемой организации организаторов азартных игр в тотализаторах и прекращении соответствующего членства в уполномоченный Правительством Российской Федерации федеральный орган исполнительной власти, осуществляющий государственный надзор в области организации и проведения азартных игр, в течение пяти дней с даты вступления в члены саморегулируемой организации организаторов азартных игр соответствующего вида либо прекращения соответствующего членства.

4. Организатор азартных игр обязан обеспечивать личную безопасность участников азартных игр, иных посетителей игорного заведения, работников организатора азартных игр во время их нахождения в игорном заведении.

5. Организатор азартных игр обязан соблюдать установленные Правительством Российской Федерации в соответствии с настоящим Федеральным законом правила совершения операций с денежными средствами при организации и проведении азартных игр.

6. Стоимость чистых активов организатора азартных игр в течение всего периода осуществления деятельности по организации и проведению азартных игр не может быть менее:

1) 600 миллионов рублей - для организаторов азартных игр в казино и залах игровых автоматов;

📄 *ГАРАНТ: Пункт 2 части 6 статьи 6 настоящего Федерального закона (в редакции Федерального закона от 22 апреля 2010 г. N 64-ФЗ) не применяется в отношении организаторов азартных игр в букмекерских конторах и тотализаторах, получивших лицензии на осуществление деятельности по организации и проведению азартных игр в букмекерских конторах и тотализаторах до дня вступления в силу названного Федерального закона, до истечения срока действия таких лицензий*

2) 1 миллиард рублей - для организаторов азартных игр в тотализаторах.

7. Для целей настоящего Федерального закона порядок расчета стоимости чистых активов организаторов азартных игр устанавливается уполномоченным Правительством Российской Федерации федеральным органом исполнительной власти.

8. Утратила силу.

📄 *Информация об изменениях: См. текст части 8 статьи 6*

📄 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ в часть 9 статьи 6 настоящего Федерального закона внесены изменения, вступающие в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст части 9 в предыдущей редакции*

9. Минимальный размер уставного капитала организатора азартных игр в букмекерской конторе или тотализаторе устанавливается в сумме 100 миллионов рублей. В оплату такого уставного капитала могут быть внесены только денежные средства, за исключением случаев, если организатором азартных игр выступает созданное в соответствии с указом Президента Российской Федерации акционерное общество, которое объединяет ипподромы Российской Федерации и одним из приоритетных направлений деятельности которого является развитие национальной коневодческой индустрии. Для формирования такого уставного капитала не могут быть использованы заемные денежные средства. Порядок подтверждения источников происхождения денежных средств, вносимых в оплату такого уставного капитала, устанавливается Правительством Российской Федерации.

📄 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ часть 10 статьи 6 настоящего Федерального закона изложена в новой редакции, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст части 10 в предыдущей редакции*

10. В целях защиты прав и законных интересов участников азартных игр осуществление деятельности по организации и проведению азартных игр в букмекерской конторе допускается только при наличии у организатора азартных игр в букмекерской конторе банковской гарантии исполнения обязательств перед участниками азартных игр. Гарантом, предоставившим банковскую гарантию, может быть только банк. Срок действия банковской гарантии не может быть менее чем пять лет. Банковская гарантия продлевается или переоформляется в течение всего срока действия имеющейся у организатора азартных игр в букмекерской конторе лицензии на осуществление указанной деятельности и не может быть отозвана, в этих случаях банковская гарантия на соответствующий срок ее действия должна быть получена организатором азартных игр в букмекерской конторе на день, следующий после окончания срока действия договора о предоставлении банковской гарантии. Размер банковской гарантии определяется в соответствующем договоре и не может быть менее чем 500 миллионов рублей.

11. Организатор азартных игр обязан предоставлять ежегодно уполномоченному Правительством Российской Федерации федеральному органу исполнительной власти сведения о лицах, которые имеют голосующие акции или долю в уставном капитале этого организатора азартных игр в размере не менее 10 процентов и соответственно прямо и (или) косвенно могут оказывать существенное влияние на решение вопросов, отнесенных к компетенции общего собрания учредителей (участников) этого организатора азартных игр, а также документы, подтверждающие указанные сведения. Состав и порядок предоставления указанных сведений и документов устанавливаются Правительством Российской Федерации.

12. Бухгалтерская (финансовая) отчетность организатора азартных игр подлежит обязательной ежегодной аудиторской проверке.

13. Сведения и документы, указанные в части 11 настоящей статьи, заключение аудитора по результатам ежегодной аудиторской проверки являются обязательными приложениями к бухгалтерской (финансовой) отчетности организатора азартных игр.

14. Проверку достоверности сведений, предоставление которых предусмотрено частями 3, 9 и 11 настоящей статьи, проводит уполномоченный Правительством Российской Федерации федеральный орган исполнительной власти. Организатор азартных игр несет ответственность за полноту и достоверность указанных сведений в соответствии с законодательством Российской Федерации.

📄 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ статья 6 настоящего Федерального закона дополнена частью 14.1, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

14.1. Технические и иные средства организатора азартных игр в букмекерских конторах или тотализаторах, с использованием которых осуществляется деятельность по учету ставок и интерактивных ставок, расчету сумм подлежащих выплате выигрышей и представлению информации о рассчитанных выигрышах, должны размещаться в процессинговых центрах букмекерских контор и процессинговых центрах тотализаторов на территории Российской Федерации и находиться в собственности организатора азартных игр.

15. Правительство Российской Федерации могут установлены дополнительные требования к организаторам азартных игр, а также к отчетности организаторов азартных игр, ее составу и порядку представления.

📄 *ГАРАНТ: См. комментарии к статье 6 настоящего Федерального закона*

📄 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ в наименование статьи 6.1 настоящего Федерального закона внесены изменения, вступающие в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст наименования в предыдущей редакции*

**Статья 6.1.** Требования к организаторам азартных игр в букмекерских конторах и тотализаторах при заключении пари на официальные спортивные соревнования и проведении других азартных игр, требования к центру учета переводов интерактивных ставок букмекерских контор или тотализаторов при осуществлении деятельности по приему, учету и переводу интерактивных ставок

1. Организаторы азартных игр в букмекерских конторах и тотализаторах в целях выявления противоправного влияния на результаты официальных спортивных соревнований обязаны:

📄 *Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ пункт 1 части 1 статьи 6.1 настоящего Федерального закона изложен в новой редакции, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*
*См. текст пункта в предыдущей редакции*

Общие положения

1) принимать ставки, интерактивные ставки на официальные спортивные соревнования и выплачивать соответствующие выигрыши, суммы которых превышают размер дохода, не подлежащего налогообложению в соответствии с частью второй Налогового кодекса Российской Федерации, при предъявлении участником азартной игры документа, удостоверяющего его личность, или применении иного способа идентификации участника азартной игры, предусмотренного Федеральным законом от 7 августа 2001 года N 115-ФЗ "О противодействии легализации (отмыванию) доходов, полученных преступным путем, и финансированию терроризма" и обеспечивающего установление возраста такого участника азартной игры;

2) информировать в порядке, установленном Правительством Российской Федерации, и с соблюдением законодательства Российской Федерации в области персональных данных и законодательства Российской Федерации о коммерческой тайне общероссийскую спортивную федерацию по соответствующему виду спорта и уполномоченный федеральный орган исполнительной власти, осуществляющий государственный надзор в области организации и проведения азартных игр, о выигрышах, выплаченных или подлежащих выплате по результатам пари, заключенных на официальные спортивные соревнования, завершившимися с наименее вероятным результатом или исходом. Такая информация должна быть представлена не позднее тридцати дней со дня проведения соответствующего официального спортивного соревнования;

*Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ в пункт 3 части 1 статьи 6.1 настоящего Федерального закона внесены изменения, вступающие в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

*См. текст пункта в предыдущей редакции*

3) вести в букмекерских конторах и тотализаторах учет участников азартных игр, от которых принимаются ставки, интерактивные ставки на официальные спортивные соревнования, и представлять с соблюдением законодательства Российской Федерации в области персональных данных данные такого учета в уполномоченный федеральный орган исполнительной власти, осуществляющий государственный надзор в области организации и проведения азартных игр, при осуществлении им этого надзора. Порядок ведения учета и представления данных, их объем и содержание устанавливаются Правительством Российской Федерации.

2. В случае выявления уполномоченным федеральным органом исполнительной власти, осуществляющим государственный надзор в области организации и проведения азартных игр, фактов представления организатором азартных игр недостоверной информации, предусмотренной пунктом 2 части 1 настоящей статьи, указанный орган уведомляет об этом общероссийскую спортивную федерацию по соответствующему виду спорта. Порядок и форма уведомления определяются федеральным органом исполнительной власти, уполномоченным Правительством Российской Федерации на осуществление функций по нормативно-правовому регулированию в сфере организации и проведения азартных игр.

*Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ статья 6.1 настоящего Федерального закона дополнена частью 2.1, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

2.1. Центр учета переводов интерактивных ставок букмекерских контор или тотализаторов осуществляет деятельность по приему от физического лица денежных средств, в том числе электронных денежных средств с исключением почтовых переводов, их учету и переводу организатору азартных игр в букмекерской конторе или тотализаторе с проведением идентификации участника азартной игры в соответствии с Федеральным законом от 7 августа 2001 года N 115-ФЗ "О противодействии легализации (отмыванию) доходов, полученных преступным путем, и финансированию терроризма", обеспечивающей установление возраста такого участника азартной игры.

*Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ статья 6.1 настоящего Федерального закона дополнена частью 2.2, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

2.2. Центр учета переводов интерактивных ставок букмекерских контор или тотализаторов при осуществлении деятельности по приему от физических лиц денежных средств, в том числе электронных денежных средств, обеспечивает учет и предоставление с соблюдением законодательства Российской Федерации в области персональных данных организатором азартных игр в букмекерских конторах или тотализаторах информации об участниках азартных игр, интерактивных ставках, принятых от участников данных видов азартных игр.

*Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ часть 3 статьи 6.1 настоящего Федерального закона изложена в новой редакции, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

*См. текст части в предыдущей редакции*

3. Предусмотренное пунктом 1 части 1 настоящей статьи требование о приеме ставок, интерактивных ставок и выплате выигрышей при предъявлении участником азартной игры документа, удостоверяющего его личность, или применении иного способа идентификации участника азартной игры, предусмотренного Федеральным законом от 7 августа 2001 года N 115-ФЗ "О противодействии легализации (отмыванию) доходов, полученных преступным путем, и финансированию терроризма" и обеспечивающего установление возраста такого участника азартной игры, применяется при проведении любых азартных игр в букмекерских конторах и тотализаторах с соблюдением при обработке соответствующих персональных данных законодательства Российской Федерации в области персональных данных.

*ГАРАНТ: См. комментарии к статье 6.1 настоящего Федерального закона*

### Статья 7. Требования к посетителям игорного заведения

1. Посетителями игорного заведения являются находящиеся в игорном заведении участники азартных игр, а также иные лица, доступ которых в игорное заведение не запрещен в соответствии с настоящим Федеральным законом.

2. Посетителями игорного заведения не могут являться лица, не достигшие возраста восемнадцати лет.

3. Организатор азартных игр вправе самостоятельно устанавливать правила посещения игорного заведения, не противоречащие настоящему Федеральному закону.

4. По требованию работников организатора азартных игр посетитель игорного заведения, нарушающий установленные в соответствии с настоящим Федеральным законом правила посещения игорного заведения, обязан немедленно покинуть игорное заведение.

*ГАРАНТ: См. комментарии к статье 7 настоящего Федерального закона*

### Статья 8. Общие требования к игорному заведению

1. Игорное заведение должно быть разделено на зону обслуживания участников азартных игр и служебную зону игорного заведения.

*Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ части 2 статьи 8 настоящего Федерального закона изложена в новой редакции, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

*См. текст части в предыдущей редакции*

2. При входе в игорное заведение, его филиал, пункт приема ставок букмекерской конторы или тотализатора либо иное место осуществления деятельности по организации и проведению азартных игр организатор азартных игр размещает на по первому требованию посетителя игорного заведения предоставляет информацию о фирменном наименовании организатора азартных игр, об адресе и о часах работы соответственно игорного заведения, его филиала, пункта приема ставок букмекерской конторы или тотализатора, иного места осуществления деятельности по организации и проведению азартных игр. В доступном для посетителей игорного заведения месте должны быть размещены текст настоящего Федерального закона, установленные организатором азартных игр правила азартных игр, правила посещения игорного заведения, правила приема ставок и выплаты выигрышей, разрешение на осуществление деятельности по организации и проведению азартных игр в игорной зоне или его копия либо лицензия на осуществление деятельности по организации и проведению азартных игр в букмекерских конторах и тотализаторах или ее копия, приложение к этой лицензии или его копия, а также решение о приеме в члены саморегулируемой организации организаторов азартных игр в букмекерских конторах и (или) саморегулируемой организации организаторов азартных игр в тотализаторах либо иной подтверждающий соответствующее членство документ или его копия.

3. Организация и проведение азартных игр могут осуществляться исключительно работниками организатора азартных игр. Работниками организатора азартных игр не могут являться лица, не достигшие возраста восемнадцати лет.

*Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ часть 4 статьи 8 настоящего Федерального закона изложена в новой редакции, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

*См. текст части в предыдущей редакции*

4. Используемое в игорном заведении игровое оборудование должно находиться в собственности организатора азартных игр.

5. Технически заложенный средний процент выигрыша каждого игрового автомата не может составлять менее чем девяносто процентов.

*Информация об изменениях: Федеральным законом от 16 октября 2012 г. N 168-ФЗ статья 8 настоящего Федерального закона дополнена частью 6*

6. В служебной зоне игорного заведения (за исключением пунктов приема ставок букмекерской конторы и тотализатора) должны находиться помещение для отдыха работников организатора азартных игр, специально оборудованное помещение для приема, выдачи и временного хранения

денежных средств, помещение для организации службы безопасности игорного заведения.

*✉ Информация об изменениях: Федеральным законом от 16 октября 2012 г. N 168-ФЗ статья 8 настоящего Федерального закона дополнена частью 7*

7. Игорное заведение не может быть расположено в здании, строении, сооружении, в которых расположены физкультурно-оздоровительные и спортивные учреждения (за исключением букмекерских контор, тотализаторов, их пунктов приема ставок).

*✉ Информация об изменениях: Федеральным законом от 21 июля 2014 г. N 222-ФЗ статья 8 настоящего Федерального закона дополнена частью 8, вступающей в силу по истечении тридцати дней после дня официального опубликования названного Федерального закона*

8. Выигрыши, суммы которых превышают размер дохода, не подлежащего налогообложению в соответствии с частью второй Налогового кодекса Российской Федерации, выплачиваются организатором азартной игры участнику азартной игры при предъявлении участником азартной игры документа, удостоверяющего его личность, или применении иного способа идентификации участника азартной игры, предусмотренного Федеральным законом от 7 августа 2001 года N 115-ФЗ "О противодействии легализации (отмыванию) доходов, полученных преступным путем, и финансированию терроризма" и обеспечивающего установление возраста такого участника азартной игры.

*✉ ГАРАНТ: См. комментарии к статье 8 настоящего Федерального закона*

*✉ Информация об изменениях: Федеральным законом от 16 октября 2012 г. N 168-ФЗ глава 1 настоящего Федерального закона дополнена статьёй 8.1*

**Статья 8.1.** Требования к казино и залам игровых автоматов

1. Казино и зал игровых автоматов могут располагаться только в здании, строении, сооружении, являющихся объектом капитального строительства, занимать указанный объект полностью или располагаться в единой обособленной его части.

2. Площадь зоны обслуживания участников азартных игр в казино не может быть менее чем восемьсот квадратных метров, и в ней должны находиться касса игорного заведения, гардероб, места для отдыха посетителей игорного заведения и туалет.

3. В зоне обслуживания участников азартных игр в казино должно быть установлено не менее чем десять игровых столов, а также могут быть установлены игровые автоматы и могут находиться пункты приема ставок тотализатора и (или) букмекерской конторы.

4. В случае установки игровых автоматов в зоне обслуживания участников азартных игр в казино на данное игорное заведение распространяются требования, установленные частью 6 настоящей статьи.

5. Площадь зоны обслуживания участников азартных игр в зале игровых автоматов не может быть менее чем сто квадратных метров, и в ней должны находиться касса игорного заведения и туалет.

6. В зоне обслуживания участников азартных игр в зале игровых автоматов должно быть установлено не менее чем пятьдесят игровых автоматов, а также могут находиться пункты приема ставок тотализатора и (или) букмекерской конторы.

7. В служебной зоне зала игровых автоматов должно находиться специально оборудованное помещение или должно быть установлено оборудование для приема, выдачи и временного хранения денежных средств.

*✉ ГАРАНТ: См. комментарии к статье 8.1 настоящего Федерального закона*

Глава 2. >>
Игорные зоны

Содержание
Федеральный закон от 29 декабря 2006 г. N 244-ФЗ
"О государственном регулировании деятельности по
организации и проведению...

**Права на материалы сайта**
**Реклама на портале**

© ООО "НПП "ГАРАНТ-СЕРВИС", 2015. Система ГАРАНТ выпускается с 1990 года. Компания "Гарант" и ее партнеры являются участниками Российской ассоциации правовой информации ГАРАНТ.

Портал ГАРАНТ.РУ (Garant.ru) зарегистрирован в качестве сетевого издания Федеральной службой по надзору в сфере связи, информационных технологий и массовых коммуникаций (Роскомнадзором), Эл № ФС77-58365 от 18 июня 2014 г.



# Certified Translation

## **Certificate of Translation**

I, the undersigned, hereby certify that I speak, read and write both English and Russian and that the translation appearing hereinafter is an accurate and faithful rendition into English from its Russian original text of Articles 1 through 5 of the original document, and that nothing has been added thereto or omitted therefrom, to the best of my knowledge and belief.

Tatiana Livermont

Dated: March 9, 2015

Commonwealth of Massachusetts                    )
Middlesex County                                         )    ss

On this 9th day of March, 2015, before me, the undersigned notary public, personally appeared Tatiana Livermont, proved to me through satisfactory evidence of identification, which was Massachusetts drivers license, to be the person whose name is signed on the preceding document, and acknowledged that she signed it voluntarily for its stated purpose.

MATTHEW SHAYEFAR
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
August 24, 2018

Notary Public

My commission expires: 8/24/18

1

GENERAL TERMS

Federal Law of December 29, 2006 No. 244FZ
"On government regulation of gambling activities and on introduction of amendments to some legislative acts of Russian Federation."
Adopted by the State Duma on December 20, 2006
Approved by the Federation Council on December 27, 2006
*Guarantee: see comments for the present Federal Law*

Chapter 1. General Terms

**Article 1.**  Subject of Regulation of the present Federal Law
      1.      The present law defines the legal fundamentals of the government regulation of gambling activities in the territory of Russian Federation and places limitations on pursuit of such activities in order to protect good morals, rights and legitimate interests of citizens.
Amendments information: Federal Law of November 21, 2011, No. 327-FZ of Part 1 Article 2 of the present Federal Law hereof made changes effective from January 1, 2013.
*See. Text part in the previous edition*
      2.      The present Federal Law does not apply to the activities connected to the organization and conduct of lotteries, neither to the activities of the trade organizers, conducting their activities in accordance with the Federal Law "On the organized commerce".
*See. Comments on Article 1 of this Federal Law*

**Article 2.**  Legislation on government regulation of gambling activities
      Legal control of the gambling activities is conducted in accordance with the Civil Code of the Russian Federation, the present Federal Law, other federal laws, laws of subjects of the Russian Federation, as well as may be adopted in accordance with this federal law other normative legal acts, and may also be conducted through other regulatory legal acts adopted in accordance with the present Federal Law.
*See. Commentary to article 2 of this Federal Law*

**Article 3.**  Government regulation of gambling activities
      1.  Government regulation of gambling activities is performed though:
1) Establishing an order for organization and conduct of gambling activities and existing limitations, mandatory requirements for the facilitating agents of gambling activities, gambling establishments, visitors to gambling establishments, and gaming zones;
2) Providing areas designated for the gambling activities – gambling zones;
3) Granting permissions for gambling activities within the gambling zones;
4) The issuance of licenses for gambling activities in bookmakers and betting;
*Federal Law of July 18, 2011 No. 242FZ, paragraph 5 of Part 1 of Article 3 hereof reworded, effective from August 1, 2011*
*See. Item in the previous edition*
5) Execution of government's monitoring of the gambling activities aimed to prevent, detect and restrain violations of the government regulation of gambling activities by the entities engaged in this activity.
      2.  Government regulation of the gambling activities in accordance with the present Federal Law is conducted by the Government of the Russian Federation, federal executive body authorized by the Government of the Russian

Federation to exercise the functions of normative legal regulation in the sphere of gambling activities, other federal agencies executive authorities of the Russian Federation within their competence, public authorities of the subjects of the Russian Federation authorized to exercise the functions of managing gambling zones.

3. Inspection of the technical condition of the gaming equipment is performed by the federal executive authority authorized by the Government of the Russian Federation, and responsible for the control and supervision of compliance with the taxes and fees legislation.

*See. Comments on Article 3 of this Federal Law*

**Article 4.**  The basic concepts used in this Federal Law

For the purposes of the present Federal Law the following basic concepts are used:

**1) Game of chance** – risk driven agreement based on scoring, made between two or more parties of the betting among themselves or with the organizer of gambling in accordance to the rules set by the organizer of gambling;

**2) Bet gambling** is a game of chance where the outcome of the risk-benefit agreements, made between two or more parties of the betting among themselves or with the organizer of this kind of gambling, depends on the event that can't be predicted if it happens or not;

*Federal Law of 21 July 2014 No. 222FZ of paragraph 3 of Article 4 hereof reworded, effective thirty days after the date Of the official publication of the said Federal Law*

*See. Item in the previous edition*

**3) Bet –** funds that are transferred from the gambler to the organizer of the gambling (except for funds recognized as bet in accordance with the present Federal Law) and serve as a condition for participation in the game of chance, in accordance with the rules established by the organizer of gambling;

*Federal Law of 21 July 2014 No. 222FZ of Article 4 of this Federal Law, paragraph 3.1, effective thirty days after the date of the official publication of the said Federal Law*

3.1) **interactive betting -** funds, including electronic funds, transmitted by electronic payment means through the interactive betting accounting center of the bookmakers and betting to the organizer of gambling at the bookmaker's office or betting by order of the participants of these forms of gambling and serves as a condition for participation in the gambling, in accordance with the rules established by the organizer of gambling;

**4) Gambling gain -** cash or other property, including property rights, to be paid or transferred to the gambler upon the completion of gambling in accordance with the rules established by the organizer of gambling;

5) **The organizer of gambling** a legal entity carrying out the gambling activities.

*Federal Law of 23 July 2013 N 198FZ of paragraph 6 of Article 4 hereof reworded, effective one hundred and eighty days after the official publication of the said Federal Law*

*See. Item in the previous edition*

6) **Gambling activities** – rendering services on agreement undertaking between the participants of gambling based on risk and benefit agreements (or) on the organization of such agreement executions between two or more gambling parties;

7) **Gaming zone** – part of the territory of the Russian Federation, which is designated to carry out gambling activities and the boundaries of which are established in accordance with the Federal Law;

8) **Permit to conduct gambling activities within gambling zone** – document issued in accordance with this Federal Law that provides the gambling organizers with the right to carry out gambling activities within the gambling zone without limitations on the number and types of gambling establishments;

*Federal Law of 21 July 2014 N 222FZ of paragraph 9 of Article 4 hereof reworded, effective thirty days after the date Of the official publication of the said Federal Law*

*See. Item in the previous edition*

3

9) **License to conduct gambling activities through bookmakers and betting.** A document issued in accordance with this Federal Law gives the gambling organizers a right to carry out gambling activities through bookmakers and (or) betting within gambling zones, with the obligatory indication of the type of services provided (services on agreement undertaking between the participants of gambling based on risk and benefit agreements (or) services on the organization of such agreement executions between two or more gambling parties agreements) benefit and (or) services for the organization to enter into an agreement based on risk of winning between two or more parties to gambling), location of the bookmakers' office or betting processing center, the number and location of branches and points of betting acceptance in bookmakers or betting or other places that conduct gambling activities  through in bookmakers and betting;

*Federal Law of 21 July 2014 N 222FZ of Article 10, paragraph 4 hereof amended, effective thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

10) **Gambler -** an individual who has reached age of eighteen, participating in gambling and making risk-driven agreement for winning with the organizer of gambling or another member of gambling;

11) **gaming house**, - structure, construction (single detached part of a building, structure, structures), where only gambling  activities and provision of related services takes place (including a branch or other place for conducting gambling activities and providing gambling related services);

12) **Casino -** establishment in which the gambling activities are conducted through usage of gaming tables or gaming tables and other gaming equipment recognized by the Federal Law;

13) **Video arcade hall -** establishment in which the gambling activities are conducted by slot machines or slot machines And other gaming equipment provided by the Federal Law, except for the gaming tables;

*Federal Law of June 13, 2011 N 133FZ of paragraph 14 of Article 4 hereof changes, effective from January 1, 2012*
*See. Item in the previous edition*

14) **Bookmaker's office -** establishment where gambling organizer makes a bet with the participants of this type of gambling;

*Federal Law of 21 July 2014 N 222FZ of Article 15, paragraph 4 hereof amended, effective thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

15) **Betting house -** establishment where gambling organizer organizes betting among the participants of this type of gambling, as well as the payment of winnings from to the amount of bets collected from the participants of this type of gambling, minus the organizer's fee;

16) **Gaming equipment -** device or devices used for gambling;

17) **Gaming table** – gaming equipment which is a place with one or more playing fields and by which the gambling organizer organizes gambling between the parties or act as their party through its employees;

18) **A slot machine** – gaming equipment (mechanical, electrical, electronic or other technical equipment) used for gambling resulting in material gain, which is determined randomly by the device located inside the gaming equipment, without the participation of the gambling organizer or its employees;

*Federal Law of 21 July 2014 N 222FZ of Article 19, paragraph 4 hereof amended, effective thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

19) **Bookmakers box office -** a part of betting shop where the gambling organizer accepts any bets from the participants of this type of gambling, except for interactive rates, and pay the winnings;

*Federal Law of 21 July 2014 N 222FZ of Article 20, paragraph 4 hereof amended, effective thirty days after the date of the official publication of the said Federal Law*

*See. Item in the previous edition*

20) **box office of the betting house** – part of totalizator betting, in which the gambling organizer accepts any bets from the participants of this type of gambling, except for interactive rates, and pay the winnings;

21) **Box office of gambling establishments a** part of gambling establishments where the gambling organizers conduct gambling transactions with cash and where there is special equipment located that allows carrying out such operations;

22) **Gamblers service zone -** part of the gambling establishment where gambling equipment and box offices for gambling, betting, bookmaker are located, as well as other gaming equipment used by participants;

23) **The service area of gambling establishments** separate part of the gambling establishment designed to the employees of the gambling organizer of in which the participants are not allowed gambling;

*Federal Law of 21 July 2014 N 222FZ of Article 24, paragraph 4 hereof amended, effective thirty days after the date of the official publication of the said Federal Law*

*See. Item in the previous edition*

24) **related to gambling services** – hotel services, catering services, services in the field of spectacular entertainment events, distribution services (sale, issuance) of lottery tickets, lottery receipts, electronic lottery tickets, lottery admission rates among the participants of a lottery payment, transfer or the provision of prizes to participants of international lotteries, which are held on the basis of international treaties of the Russian Federation, and Russian state lotteries;

*Federal Law of 21 July 2014 N 222FZ of Article 25, paragraph 4 hereof reworded, effective thirty days after the date of the official publication of the said Federal Law*

*See. Item in the previous edition*

25) **Processing center of the bookmaker's office** – part of a gambling establishment where the gambling organizer maintains accounting of the betting made by the participants of this type of gambling; conducts accounting of the interactive betting on the basis of information received from the transfer accounting center of the bookmaker's office, online accounting rates, accepted from the participants this type of gambling; records the gambling results; calculates the amounts of winnings to be paid; provides information on the bid, online betting and calculated winnings to the betting shop  and to the transfer accounting center of the bookmaker's office;

*Federal Law of 21 July 2014 N 222FZ of Article 26, paragraph 4 hereof reworded, effective thirty days after the date of the official publication of the said Federal Law*

*See. Item in the previous edition*

26) **processing center of the betting house -**  part of a gambling establishment where the gambling organizer maintains accounting of the betting made by the participants of this type of gambling; conducts accounting of the interactive betting on the basis of information received from the transfer accounting center of the  betting houses,  online accounting rates, accepted from the participants this type of gambling; records the gambling results; calculates the amounts of winnings to be paid; provides information on the bid, online betting and calculated winnings to the betting house shop and to the transfer accounting center of the betting house;

*Federal Law of June 13, 2011 N 133FZ of Article 4 of this Federal Law, paragraph 27, effective from January 1, 2012*

27) **Bookmakers betting shop** – geographically separated part of the gambling establishment where the gambling organizer organizes agreement undertaking between the participants of this type of gaming and provides reporting on bid, paid and unpaid winnings to the processing center of bookmakers' office;

*Federal Law of June 13, 2011 N 133FZ of Article 4 of this Federal Law, paragraph 28, effective from January 1, 2012*

28) **Betting house betting shop –** geographically separated part of the gambling establishment, where the gambling organizer organizes the agreement undertaking between the participants of this type of gaming and provides reporting on bid, paid and unpaid winnings to the processing center of betting house;

*Federal Law of 21 July 2014 N 222FZ of Article 4 of this Federal Law, paragraph 29, effective thirty days after the official publication of the said Federal Law*

**29) Accounting center of interactive betting transfers for bookmakers or betting house** – credit organization, including nonbank credit organizations operating in accordance with Article 14.2 of the Federal Law.
*See. Comments on Article 4 of this Federal Law*

**Article 5.** Restrictions on the gambling activities

    1. The gambling activities can be carried out exclusively by the organizers of gambling, subject to the requirements of the Federal Law, other federal laws, the laws of the Russian Federation and other normative legal acts.

    2. The gambling activities can take place only in gambling establishments that meet the requirements stipulated by the present Federal Law, other federal laws, the laws of the Russian Federation and other normative legal acts of the Russian Federation.

*Federal Law of 21 July 2014 N 222FZ of Part 3 of Article 5 of this Federal Law amended, effective thirty days after the date of the official publication of the said Federal Law*
*See. Text part in the previous edition*

    3. The gambling activities through use of information and telecommunication networks, including "Internet", as well as means of communication, including mobile communications, is prohibited, except the cases provided for the Federal Law.

*Federal Law of June 13, 2011 N 133FZ of Part 4 of Article 5 hereof changes, effective from January 1, 2012*
*See. Text part in the previous edition*

    4. Gambling establishments (except for bookmakers, betting houses, betting shops) can be opened only in the gambling zones in accordance with the procedure established by the Federal Law.

*Federal Law of 21 July 2014 N 222FZ of Part 5 of Article 5 of this Federal Law amended, effective thirty days after the date of the official publication of the said Federal Law*
*See. Text part in the previous edition*

    5. Gaming zone cannot be established on the residential territory with the exception of establishing a gaming zone within the boundaries of land provided for establishing Olympic venues of federal significance, financing and construction of which was not covered by the budget or resources of the government owned corporation for the construction of Olympic facilities and Development of Sochi as a mountain resort (hereinafter the Corporation).

*Federal Law of 21 July 2014 N 222FZ of Article 5 of this Federal Law, part 6, effective thirty days after the date of the official publication of the said Federal Law*

    6. The gambling organizers are not allowed to accept bids at bookmakers' offices or betting houses through transferred funds, including electronic transfers of funds, receiving payments from individuals, postal transfer of funds to gambling organizer performed by the money transfer operator, including operator of electronic cash, bank payment agent and (or) bank payment subagent, except cash payments that are recognized as an interactive betting in accordance with the Federal Law. The gambling organizer of bookmakers' offices and betting houses have the right to take interactive bets transferred only by transfer of funds, including electronic cash (except for postal orders), by the accounting center of interactive betting transfers for bookmakers or betting house through the use of the electronic means of payment by order of the participants of these types of gambling.

*See. Comments on Article 5 of this Federal Law*
*Federal Law of 22 April 2010 N 64FZ Article 6 hereof amended*
*See. Article in the previous edition*

# Google Translation

 translate  Translated to: English ▼   Show original  Options ▼ ✕

 Информационно-правовой портал   

| Home | Documents safeguards system | Search for other documents |       Eng |

Federal Law of 29 December 2006 N 244-FZ "On state regulation of activities of the organization and conduct of gambling and on amendments to some legislative acts of the Russian Federation" (as amended) > Chapter 1. General Provisions

# General provisions

### Federal Law of 29 December 2006 N 244-FZ
### "On state regulation of activities of the organization and conduct of gambling and on amendments to some legislative acts of the Russian Federation"

As amended by:
July 24, 2009, April 22, November 3, 2010, May 4, June 13, July 18, November 21, 2011, October 16, 2012, July 23, 2013, 21, 22 July 2014

**Adopted by the State Duma on December 20, 2006**
**Federation Council approved December 27, 2006**
*GUARANTEE: See. Comments hereto*

### Chapter 1. General Provisions

**Article 1** . The subject of regulation of this Federal Law

1. This Federal law defines the legal basis for state regulation of activities of the organization and conduct of gambling in the territory of the Russian Federation and set restrictions on the exercise of this activity in order to protect morals, rights and legitimate interests of citizens.
*Information about changes: Federal Law dated November 21, 2011 N 327-FZ of Part 2 of Article 1 hereof changes, which come into force from January 1, 2013*
*See. Text part in the previous edition*

2. The present Federal Law shall not apply to the activities of the organization and conduct of lotteries, as well as the activities of the organizers of the trade, carrying out their activities in accordance with the Federal Law "On the organized trading".
*GUARANTEE: See. Comments on Article 1 of this Federal Law*

**Article 2** . Legislation on state regulation of activities of the organization and conduct of gambling

Legal regulation of the organization and conduct of gambling in accordance with the Civil Code of the Russian Federation, the present Federal Law, other federal laws, the laws of the Russian Federation, as well as may be adopted in accordance with this federal law other normative legal acts.
*GUARANTEE: See. Commentary to article 2 of this Federal Law*

**Article 3** . State regulation of activity in the organization and conduct of gambling

1. State regulation of activity in the organization and conduct of gambling is done by:
1) establishing the order of activities for the organization and conduct of gambling and related restrictions, mandatory requirements for the gambling, gambling establishments, visitors to gambling, gaming zones;
2) highlight areas designated for the activity of the organization and conduct of gambling - gambling zones;
3) the issuance of permits for activities on the organization and conduct of gambling in the gambling zones;
4) the issuance of licenses for activities to organize and conduct gambling in bookmakers and betting;
*Information about changes: Federal Law of July 18, 2011 N 242-FZ of paragraph 5 of Part 1 of Article 3 hereof reworded, shall enter into force from 1 August 2011*
*See. Item in the previous edition*

5) the state supervision in the field of organizing and conducting gambling aimed at the prevention, detection and suppression of violations of the law on state regulation of activities of the organization and conduct of gambling entities engaged in this activity.
2. State regulation of the activities of the organization and conduct of gambling in accordance with this Federal Law by the Government of the Russian Federation, federal executive body authorized by the Government of the Russian Federation to exercise the functions of normative legal regulation in the sphere of organization and conduct of gambling, other federal agencies executive authorities of the Russian Federation within their competence, public authorities of the Russian Federation authorized to exercise the functions of managing gambling zones.
3. Check the technical condition of the playing equipment is authorized by the Government of the Russian Federation, federal executive authority responsible for the control and supervision of compliance with legislation on taxes and fees.
*GUARANTEE: See. Comments on Article 3 of this Federal Law*

**Article 4** . The basic concepts used in this Federal Law

For the purposes of this Federal Law the following basic concepts:
1) **game of chance** - based on risk scoring agreement concluded by two or more parties to such an agreement among themselves or with the organizer of gambling according to the rules set by the organizer of gambling;
2) **bet** - gambling, where the outcome of the risk-benefit agreements concluded between two or more parties to bet with each other or with the organizer of this kind of gambling depends on the events about which is unknown, it will come or not;
*Information about changes: Federal Law of 21 July 2014 N 222-FZ of paragraph 3 of Article 4 hereof reworded, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

3) **rate** - funds transferred party organizer gambling gambling (except for cash, recognized in accordance with this Federal Law interactive rate) and employees for participation in the game of chance, in accordance with the rules established by the organizer of gambling;
*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 4 of this Federal Law, paragraph 3.1, which come into force after the expiration of thirty days after the official publication of the said Federal Law*

3.1) **interactive rate** - cash, including electronic cash, transmitted by electronic means of payment center accounting transfers interactive betting bookmakers or betting organizer gambling bookmaker or betting on the instructions of the participants of these forms of gambling and employees for participation in the gambling in accordance with the rules laid down in this gambling operator;
4) **gain** - money or other property, including property rights, to be paid or transferred gambler upon the occurrence of the result of gambling, under the rules established by the organizer of gambling;
5) **the organizer of gambling** - a legal entity carrying out activities for the organization and conduct of gambling;
*Information about changes: Federal Law of 23 July 2013 N 198-FZ of paragraph 6 of Article 4 hereof reworded, shall enter into force after the expiration of one hundred and eighty days after the official publication of the said Federal Law*

General provisions

*one hundred and eighty days after the official publication of the said Federal Law.*
*See. Item in the previous edition*

    6) **activities for the organization and conduct of gambling** - service activities to conclude with the participants of gambling based on risk and benefit agreements (or) on the organization of such agreements between two or more parties to gambling;

    7) **gaming zone** - part of the territory of the Russian Federation, which is designed to carry out activities for the organization and conduct of gambling and the boundaries of which are established in accordance with this Federal Law;

    8) **approval to operate on the organization and conduct of gambling in the gambling zone** - issued in accordance with this Federal Law a document provided by the organizers of gambling right to carry out activities for the organization and conduct of gambling in a gambling zone without limiting the number and types of gambling;

✉️ *Information about changes: Federal Law of 21 July 2014 N 222-FZ of paragraph 9 of Article 4 hereof reworded, shall enter in force thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

    9) **a license to operate on the organization and conduct of gambling in bookmakers and betting** - a document issued in accordance with this Federal Law and provided by the organizers of gambling right to carry out activities for the organization and conduct of gambling in bookmakers and (or) betting is gambling zones, with the obligatory indication of the type of services (services on the conclusion of the participants of gambling risk-based agreements benefit and (or) services for the organization to enter into an agreement based on risk of winning between two or more parties to gambling), the location of the processing center bookmaker or betting, the number and location of branches and points of betting bookmakers or betting or other place of business for the organization and conduct of gambling in bookmakers and betting;

✉️ *Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 10, paragraph 1 hereof amended, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

    10) **gambler** - a natural person who has attained the age of eighteen years, participating in gambling and concludes agreement based on risk of winning the organizer of gambling or another member of gambling;

    11) **gaming house** - building, structure, construction (single detached part of a building, structure, structures), in which the only activity on the organization and conduct of gambling and gambling provision of related services (including a branch or other place of business for the organization and conduct of gambling and gambling related provision of services);

    12) **casino** - gambling establishment, in which the activities of the organization and conduct of gambling using the gaming tables or gaming tables and other contemplated hereby gaming equipment;

    13) **video arcade** - gambling establishment, in which the activities of the organization and conduct of gambling with slot machines or slot machines and other contemplated hereby gaming equipment, except for the gaming tables;

✉️ *Information about changes: Federal Law of June 13, 2011 N 133-FZ of paragraph 14 of Article 4 hereof changes, which come into force from January 1, 2012*
*See. Item in the previous edition*

    14) **Bets** - gambling establishment in which the gambling bets with the participants of this type of gambling;

✉️ *Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 15, paragraph 4 hereof amended, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

    15) **tote** - gambling establishment in which gambling organizer organizes betting among the participants of this type of gambling, as well as the payment of winnings due to the amount of rates adopted by the participants of this type of gambling, minus the size levied organizer of this kind of gambling remuneration;

    16) **playground equipment** - a device or devices used for gambling;

    17) **gaming table** - playground equipment, which is a place with one or more playing fields and by which the gambling organizer organizes gambling between the parties or act as their party through its employees;

    18) **a slot machine** - playground equipment (mechanical, electrical, electronic or other technical equipment) used for gambling with material gain, which is determined randomly device located inside the housing of the gaming equipment, without the participation of the organizer of gambling or its employees;

✉️ *Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 19, paragraph 4 hereof amended, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

    19) **Booking bookmaker** - part of paragraph betting bookmaker in which the gambling organizer accepts any bets from the participants of this type of gambling, except for interactive rates, and pay the winnings;

✉️ *Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 20, paragraph 4 hereof amended, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

    20) **tote box office** - part of paragraph totalizator betting, in which the gambling organizer accepts any bets from the participants of this type of gambling, except for interactive rates, and pay the winnings;

    21) **Booking gambling establishments** - a part of gambling establishments in which the gambling transactions with cash and in which there is special equipment, allowing to carry out such operations;

    22) **Zone Member Services gambling** - gambling establishments part, in which there are playground equipment, cash gambling establishment, betting, bookmaker, as well as other participants used gaming equipment;

    23) The **service area of gambling establishments** - separate part of the gambling establishment, which is designed for employees of the organizer of gambling in whom the participants are not allowed gambling;

✉️ *Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 24, paragraph 4 hereof amended, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

    24) **related to gambling services** - hotel services, catering services, services in the field of spectacular entertainment events, distribution services (sale, issuance) of lottery tickets, lottery receipts, electronic lottery tickets, lottery admission rates among the participants of a lottery payment, transfer or the provision of prizes to participants of international lotteries, which are held on the basis of international treaties of the Russian Federation, and Russian state lotteries;

✉️ *Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 25, paragraph 4 hereof reworded, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

    25) **processing center bookmaker** - part of a gambling establishment in which gambling organizer holds accounting rates, adopted by the participants of this type of gambling is conducted on the basis of information received from the center of the accounting for transfers of interactive betting bookmaker, online accounting rates, adopted by the participants this type of gambling, gambling records the results, calculate the amounts to be paid winnings shall provide information on the bid, online betting and winnings calculated in paragraphs betting bookmaker in the center of the accounting for transfers of interactive betting bookmakers;

✉️ *Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 26, paragraph 4 hereof reworded, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

    26) **processing center tote** - part of a gambling establishment in which gambling organizer holds accounting rates, adopted by the participants of this type of gambling is conducted on the basis of information received from the center of the accounting for transfers of interactive betting betting, online betting account, taken from the participants of this type gambling, gambling records the results, calculate the amounts to be paid winnings shall provide information on the bid, online betting and winnings calculated in points totalizator betting and the center of the accounting translation rates interactive sweepstakes;

✉️ *Information about changes: Federal Law of June 13, 2011 N 133-FZ of Article 4 of this Federal Law, paragraph 27, which come into force from January 1, 2012*

    27) **point betting bookmaker** - geographically separate part of the gambling establishment in which the gambling bets with this type of gaming and provides reporting on bid, paid and unpaid winnings to the processing center bookmaker;

✉️ *Information about changes: Federal Law of June 13, 2011 N 133-FZ of Article 4 of this Federal Law, paragraph 28, which come into force from January 1,*

*Information about changes: Federal Law of June 13, 2011 N 133-F 2 of Article 4 of this Federal Law, paragraph 28, which come into force from January 1, 2012*

28) **point betting betting** - geographically separate part of the gambling establishment, which is organizing the gambling wagering among the participants of this type of gaming and provides reporting on bid, paid and unpaid winnings to the processing center tote;

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 4 of this Federal Law, paragraph 29, which come into force after the expiration of thirty days after the official publication of the said Federal Law*

29) **accounting center transfers interactive betting bookmakers or betting** - credit organization, including non-bank credit organizations operating in accordance with Article 14.2 hereof.

*GUARANTEE: See. Comments on Article 4 of this Federal Law*

**Article 5** . Restrictions on the activities of the organization and conduct of gambling

1. The activities of the organization and conduct of gambling can be carried out exclusively by the organizers of gambling, subject to the requirements of this Federal Law, other federal laws, the laws of the Russian Federation and other normative legal acts.

2. The activities of the organization and conduct of gambling can take place only in gambling establishments that meet the requirements stipulated by the present Federal Law, other federal laws, the laws of the Russian Federation and other normative legal acts of the Russian Federation.

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Part 3 of Article 5 of this Federal Law amended, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Text part in the previous edition*

3. The activities of the organization and conduct of gambling, using information and telecommunication networks, including network "Internet", as well as means of communication, including mobile communications, is prohibited, except as provided for by this Federal Law.

*Information about changes: Federal Law of June 13, 2011 N 133-FZ of Part 4 of Article 5 hereof changes, which come into force from January 1, 2012*
*See. Text part in the previous edition*

4. Casinos (except for bookmakers, betting, betting their points) can be opened only in the gambling zones in accordance with the procedure established by this Federal Law.

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Part 5 of Article 5 of this Federal Law amended, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Text part in the previous edition*

5. Gaming zone can not be created on the lands of settlements, with the exception of a gaming zone within the boundaries of land plots allocated for locating Olympic venues of federal significance, financing and construction of which is not carried out within the budget or resources of the State Corporation for the construction of Olympic facilities and Development of Sochi as a mountain resort (hereinafter - the Corporation).

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 5 of this Federal Law, part 6, shall enter into force thirty days after the date of the official publication of the said Federal Law*

6. Do not be receiving bids organized gambling bookmakers or betting by transferring funds, including electronic transfer of funds, receiving payments from individuals, postal money gambling organizer, the operator will transfer funds, including operator of electronic cash, bank payment agent and (or) bank payment subagent, except cash, are recognized in accordance with this Federal Law interactive rate. The organizer of gambling or betting bookmakers have the right to take bets interactive transferred only by transfer of funds, including electronic cash (except for postal orders), the center of the accounting for transfers of interactive betting bookmakers or betting by electronic means of payment on the instructions of participants these types of gambling.

*GUARANTEE: See. Comments on Article 5 of this Federal Law*

*Information about changes: Federal Law of 22 April 2010 N 64-FZ Article 6 hereof amended*
*See. Article in the previous edition*

**Article 6** . Requirements for organizers of gambling

1. The organizers of gambling can act only legal entities registered in the prescribed manner on the territory of the Russian Federation.

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 6 of this Federal Law with part 1.1, shall enter into force thirty days after the date of the official publication of the said Federal Law*

1.1. The activities of the organization and conduct of gambling bookmakers or betting may act only entities that are members of the self-regulatory organization of the organizers of gambling bookmakers or betting organization of the organizers of gambling in the sweepstakes.

*Information about changes: Federal Law of 22 July 2014 N 278-FZ of Article 6 of this Federal Law Part 1.2*

1.2. The organizers of gambling may be legal persons who will carry out activities for the organization and conduct of gambling in the gambling zone created within the boundaries of land plots allocated for locating Olympic venues of federal significance, financing and construction of which is not made at the expense of budget appropriations or funds of the Corporation.

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Part 2 of Article 6 hereof The new wording, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Text part in the previous edition*

2. They can not act as an organizer of gambling entities, founders (participants) of which the Russian Federation, the subjects of the Russian Federation or local governments, with the exception created in accordance with the decree of the President of the Russian Federation Joint-Stock Company, which integrates racetracks of the Russian Federation and one of the priority activities is the development of national horse-breeding industry. Can not act as organizers of gambling entities, founders (participants) are persons who have not taken off or outstanding conviction for crimes in economy or for intentional crimes of medium gravity , grave crimes , especially grave crimes.

*Information about changes: Federal Law of July 18, 2011 N 242-FZ of Part 3 of Article 6 hereof changes, which come into force from 1 August 2011*
*See. Text part in the previous edition*

3. The organizer of gambling is obliged to provide the information necessary for the implementation of state supervision over compliance with the law on state regulation of the activities of the organization and conduct of gambling. The composition and the procedure for the provision of such information shall be established by the Government of the Russian Federation.

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 6 of this Federal Law with Part 3.1, shall enter into force thirty days after the date of the official publication of the said Federal Law*

3.1. Organizers of gambling or betting bookmakers provide information on becoming a member of a self-regulatory organization of the organizers of gambling bookmakers or self-regulatory organization of the organizers of gambling in the sweepstakes or termination of membership authorized by the Government of the Russian Federation federal executive body responsible for state supervision in the field and conduct of gambling, within five days from the date of accession, the self-regulatory organization of the organizers of gambling respective type or termination of the respective membership.

4. The organizer of gambling is obliged to ensure the personal safety of the participants of gambling, gambling establishments other visitors, employees of the organizer of gambling during their stay in the gambling establishment.

5. The organizer of gambling is obliged to abide by the Government of the Russian Federation in accordance with this federal law rules of the transactions with cash in the organization and conduct of gambling.

6. The net asset value of the organizer of gambling during the entire period of activity in the organization and conduct of gambling can not be less than:
1) 600 million rubles - for the organizers of gambling in casinos and slot machine arcades;

*GUARANTEE: Item 2 of Part 6 of Article 6 hereof (as amended by Federal Law dated April 22, 2010 N 64-FZ) does not apply in relation to the organizers of gambling or betting bookmakers have received a license to operate on the organization and conduct of gambling in bookmakers and betting before the date of entry into force of the said Federal Law, before the expiry of such licenses*

2) 1 billion rubles - for the organizers of gambling and betting bookmakers.

7. For the purposes of this Federal Law the procedure for calculating the net asset value of the organizers of gambling is established by the Government of the Russian Federation, federal executive body.

8. Abolished .

*Information about changes: See. The text of Article 6 of the 8*

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Part 9 of Article 6 hereof amended, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Text part in the previous edition*

9. The minimum capital requirement of the organizer of gambling or betting bookmaker is set in the amount of 100 million rubles. In return for such authorized capital can only be made cash, except in cases when the organizer of gambling acts established in accordance with the decree of the President of the Russian Federation Joint-Stock Company, which integrates racetracks Russian Federation and one of the priorities is the development of national horse-breeding industry. For the formation of the authorized capital can not be used borrowed funds. The order confirming the source of funds paid into such share capital established by the Government of the Russian Federation.

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of the 10 Article 6 hereof The new wording, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Text part in the previous edition*

10. In order to protect the rights and legitimate interests of gambling activity on the organization and conduct of gambling in the bookmaker is allowed only if the organizer of gambling bookmaker bank guarantee fulfillment of obligations to the participants of gambling. Guarantor, provide a bank guarantee can only be a bank. The validity of the bank guarantee can not be less than five years. The bank guarantee shall be extended or reissued during the validity of the current from the organizer of gambling bookmaker license to conduct such activities and can not be revoked, in these cases the bank guarantee for the corresponding period of its validity must be received the organizer gambling bookmaker day , following the expiration of the contract for the provision of a bank guarantee. The size of the bank guarantee is defined in the relevant contract and can not be less than 500 million rubles.

11. The organizer of gambling shall provide annually authorized by the Government of the Russian Federation federal executive authority information on persons who have voting shares or of the share capital of the gambling organizer in the amount of not less than 10 percent and the direct and (or) indirectly, can have a significant influence on issues related to the competence of the general meeting of the founders (participants) of the organizer of gambling, as well as documents confirming the above information. The composition and procedure of the above information and documents established by the Government of the Russian Federation.

12. The accounting (financial) statements of the organizer of gambling is subject to mandatory annual audit.

13. The information and documents specified in part 11 of this Article, the auditor's report on the results of the annual audit shall be binding applications to accounting (financial) statements of the organizer of gambling.

14. Validation of the information as provided for parts 3 , 9 and 11 of this Article, shall authorized by the Government of the Russian Federation federal executive body . Gambling organizer is responsible for the completeness and reliability of the above information in accordance with the legislation of the Russian Federation.

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 6 of this Federal Law with part 14.1, shall enter into force thirty days after the date of the official publication of the said Federal Law*

14.1. Technical and other means of gambling organizer bookmakers or betting, with which the activities of accounting rates and interactive rates, calculation of the amount to be paid winnings and reporting on calculated winnings, should be placed in the processing center bookmakers betting and processing centers in the territory Russian Federation and owned organizer of gambling.

15. The Government of the Russian Federation may establish additional requirements for the gambling, as well as reporting the organizers of gambling, its composition and presentation.

*GUARANTEE: See. Comments on Article 6 hereof*

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of the name of the article 6.1 of this Federal Law amended, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Designations in the previous edition*

**Article 6.1.** Requirements for organizers of gambling in bookmakers and betting at betting on sports events and official conduct of other gambling center of the accounting requirements for translations online betting bookmakers or betting in carrying out activities for receiving, recording and interactive transfer rates

1. The organizers of gambling bookmakers and betting in order to identify unlawful influence on the results of official sports competitions must:

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of paragraph 1 of Part 1 of Article 6.1 hereof reworded, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

1) accept bets online betting on sporting events and official pay corresponding rewards, the amount of which exceeds the amount of income not subject to tax in accordance with the second part of the Tax Code of the Russian Federation, upon presentation of a party gambling document proving his identity, or the use of another method party identification gambling provided by the Federal Law of 7 August, 2001 N 115-FZ "On counteraction to legalization (laundering) of proceeds from crime and financing of terrorism" and to ensure the establishment of such participant age gambling;

2) inform the procedure established by the Government of the Russian Federation, and in compliance with the legislation of the Russian Federation in the field of personal data and the laws of the Russian Federation on trade secret All-Russian sports federation in the respective sports and authorized federal executive body responsible for state supervision in the field of organizing and conducting gambling winnings paid or payable as a result of a bet made on the official sporting events, culminating with the least likely outcome or outcome. Such information shall be submitted not later than thirty days from the date of the relevant official sporting event;

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of paragraph 3 of Part 1 of Article 6.1 hereof amended, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Item in the previous edition*

3) conduct bookmakers and betting account participants gambling on which bets are accepted, interactive betting on official sporting events, and provide compliance with the legislation of the Russian Federation in the field of personal data such accounting data to the authorized federal executive body responsible for state supervision in organization and conduct of gambling, in carrying out this oversight. Conduct accounting and reporting, their scope and content established by the Government of the Russian Federation.

2. In the event of authorized federal executive power body carrying out state supervision in the field of organization and conduct of gambling, the submission of casino games of incorrect information provided by paragraph 2 of Part 1 of this article, that authority shall notify the All-Russian sports federation in the respective sports . The order and form of notification determined by the federal executive body authorized by the Government of the Russian Federation to exercise the functions of normative legal regulation in the sphere of organization and conduct of gambling.

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 6.1 of this Federal Law part 2.1, shall enter into force thirty days after the date of the official publication of the said Federal Law*

2.1. Translation Center account online betting bookmakers or betting operates reception from an individual funds, including electronic cash (except for postal orders), their registration and transfer to the organizer gambling bookmaker or betting with the participant carrying out the identification of gambling in accordance with the Federal Law of August 7, 2001 N 115-FZ "On counteraction to legalization (laundering) of proceeds from crime and terrorist financing", providing the establishment of such participant age gambling.

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 6.1 of this Federal Law Section 2.2, shall enter into force thirty days after the date of the official publication of the said Federal Law*

2.2. Translation Center account online betting bookmakers or betting in carrying out activities on reception from individuals of cash, including electronic cash, provides accounting and compliance with the legislation of the Russian Federation in the field of personal data to the organizers of gambling bookmakers or betting information Participants gambling, online betting, adopted by the participants of these forms of gambling.

*Information about changes: Federal Law of 21 July 2014 N 222-FZ of Part 3 of Article 6.1 of this Federal Law The new wording, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Text part in the previous edition*

3. Intended Item 1 of Part 1 of this article requirement for admission rates, rates and online payment upon presentation of a party wins gambling document proving his identity, or the application of a method for identifying a participant gambling provided by the Federal Law on August 7, 2001 N 115- FZ "On counteraction to legalization (laundering) of proceeds from crime and financing of terrorism" and implementing establishing the age of the participant gambling applied to any gambling bookmakers and betting in compliance with the processing of personal data relevant legislation of the Russian Federation in the field of personal data.

*GUARANTEE: See. comments to the article 6.1 of this Federal Law*

**Article 7** . The requirements for visitors to the gambling establishment

1. The visitors gambling establishments are located in the gambling establishment gambling participants and other persons whose access to the

General provisions

1. The visitors gambling establishment are located in the gambling establishment gambling participants and other persons whose access to gambling establishments is not prohibited in accordance with this Federal Law.

2. The visitors gambling establishment can not be persons who have not attained the age of eighteen years.

3. The organizer of gambling are free to establish rules of visiting gambling establishments, not inconsistent with this Federal Law.

4. At the request of employees of the organizer of gambling visitor gambling establishment that violates established in accordance with this Federal Law visit gambling establishments must immediately leave the gambling establishment.

 *GUARANTEE: See. Comments on Article 7 of this Federal Law*

**Article 8** . General requirements for the gambling establishment

1. gambling establishments should be divided into the service area of the participants of gambling and gambling establishments service area.

 *Information about changes: Federal Law of 21 July 2014 N 222-FZ of Part 2 of Article 8 of this Federal Law The new wording, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Text part in the previous edition*

2. When entering the gambling establishment, its branch point betting bookmaker or betting or other place of business for the organization and conduct of gambling gambling organizer places and on demand visitor gambling establishment provides information about the company name of the organizer of gambling on address and opening hours, respectively gambling establishment, its branch point betting bookmaker or totalizator, a place of business for the organization and conduct of gambling. In accessible to visitors gambling establishment site should be placed text hereof set of casino games gambling rules, regulations visit the gambling establishment, betting rules and payouts, approval to operate on the organization and conduct of gambling in the gambling zone or copy or license to carry out activities for the organization and conduct of gambling in bookmakers and betting or a copy thereof, to the application of the license or a copy thereof, as well as the decision on admission to the self-regulatory organization of the organizers of gambling in bookmakers and (or) the self-regulatory organization organizers of gambling in the sweepstakes or other proof of membership corresponding document or a copy thereof.

3. Organization and conduct of gambling can be made exclusively employees of the organizer of gambling. Employees of the organizer of gambling can not be persons who have not attained the age of eighteen years.

 *Information about changes: Federal Law of 21 July 2014 N 222-FZ of Part 4 of Article 8 of this Federal Law The new wording, shall enter into force thirty days after the date of the official publication of the said Federal Law*
*See. Text part in the previous edition*

4 . As used in the gambling establishment gaming equipment must be owned by the organizer of gambling.

5. Technically laid average winning percentage of each slot machine can not be less than ninety per cent.

 *Information about changes: Federal Law on October 16, 2012 N 168-FZ of Article 8 of this Federal Law Part 6*

6. In the service area of gambling establishments (excluding items betting bookmaker and betting) must be room for the rest of the workers of the organizer of gambling, a specially equipped room for receiving, issuing and temporary storage of cash, a room for the organization of the security service of gambling establishments.

 *Information about changes: Federal Law on October 16, 2012 N 168-FZ of Article 8 of this Federal Law Part 7*

7. The gambling establishment can not be located in the building, structures, which are located in the sports and recreation and sports facilities (except for bookmakers, betting, betting their items).

 *Information about changes: Federal Law of 21 July 2014 N 222-FZ of Article 8 of this Federal Law section 8, shall enter into force thirty days after the date of the official publication of the said Federal Law*

8. Prizes, the amount of which exceeds the amount of income not subject to tax in accordance with the second part of the Tax Code of the Russian Federation, paid organizer of gambling gambling party upon presentation of a party gambling document proving his identity, or the application of a method for identifying a participant gambling under the Federal Law of 7 August, 2001 N 115-FZ "On counteraction to legalization (laundering) of proceeds from crime and financing of terrorism" and to ensure the establishment of such participant age gambling.

 *GUARANTEE: See. Comments on Article 8 of this Federal Law*

 *Information about changes: Federal Law on October 16, 2012 N 168-FZ of Chapter 1 of this Federal Law Article 8.1*
**Article 8.1.** The requirements for casinos and slot machine halls

1. The casino and gaming arcade can be located only in the building, structures that are subject to capital construction, to hold the specified object in whole or placed in a single isolated part.

2. The area of service to the participants of gambling in the casino can not be less than eight square meters, and it should be box office gambling facility, a cloakroom, a place for leisure visitors to the gambling establishment and toilet.

3. In the service area of the participants casino gambling should be set not less than ten gaming tables, and can be installed slot machines and items may be totalizator betting and (or) a bookmaker.

4. In the case of installation of slot machines in a service area participants casino gambling on this gambling establishment subject to the requirements set out in Part 6 of this Article.

5. The area of service to the participants in the gambling hall of slot machines may not be less than one hundred square meters, and it should be box office gambling establishment and toilet.

6. In the service area of the participants in the gambling hall gaming machines should be installed no less than fifty slot machines, as well as items may be totalizator betting and (or) a bookmaker.

7. In the service area of the hall of slot machines must be specially equipped premises or equipment should be installed for the receipt, delivery and temporary storage of cash.

 *GUARANTEE: See. comments to the article 8.1 of this Federal Law*

Chapter 2 >> Gaming Zone

The content of the Federal Law of 29 December 2006
N 244-FZ "On state regulation of activities of the
organization and conduct ...

---

**Materials copyright**
**site advertising**

© "NPP" Garant-Service ", 2015. System GARANT produced since 1990. The company "Garant "and its partners are members of the Russian Association of Legal Information guarantee.

Portal GARANT.RU (Garant.ru) is registered as an online edition of the Federal Service for Supervision of Communications, Information Technology and Mass Communications (Roskomnadzor), E number FS77-58365 from June 18, 2014

# Response Annex 3

## Traffic by countries

On desktop



🇺🇦 Ukraine                                     **100.00%**

## Traffic Sources

On desktop

Embed Graph





## Traffic by countries

On desktop



Russia **100.00%**

## Traffic Sources

On desktop

Embed Graph



100.00%

Direct | Referrals | Search | Social | Mail | Display
0% | 0% | 0% | 0% | 0%



## Traffic by countries

On desktop



| | | |
|---|---|---|
| Russia | **92.66%** | ↗ 618.1% |
| Ukraine | **5.31%** | ↗ 38.81% |
| Belarus | **0.65%** | ↗ 60.16% |
| Germany | **0.35%** | ↗ 1,366% |
| Kazakhstan | **0.26%** | ↗ 204.3% |

## Traffic Sources

Embed Graph

On desktop



Direct 9.07%
Referrals 78.42%
Search 2.08%
Social 8.27%
Mail 1.07%
Display 1.10%


SimilarWeb

## Traffic by countries



💻 On desktop

🇷🇺 Russia **100.00%**
⌃ 179.0%

## Traffic Sources

Embed Graph

💻 On desktop





## Traffic by countries

🖥 On desktop



| 🇷🇺 Russia | **65.02%** |
| | ⌄ 28.64% |
| 🇩🇪 Germany | **34.98%** |

## Traffic Sources

<u>Embed Graph</u>

🖥 On desktop





## Traffic by countries

On desktop



| | | |
|---|---|---|
| Russia | **46.98%** | ^ 14.92% |
| Korea, Republic Of | **23.81%** | ⌄ 53.70% |
| Ukraine | **21.57%** | ^ 50.56% |
| Germany | **2.26%** | ⌄ 9.18% |
| Belarus | **1.41%** | ⌄ 2.55% |

## Traffic Sources

Embed Graph

On desktop



| Direct | Referrals | Search | Social | Mail | Display |
|---|---|---|---|---|---|
| 30.14% | 19.19% | 42.34% | 1.91% | 6.30% | 0.11% |



## Traffic by countries

🖥 On desktop



🇷🇺 Russia **100.00%**
⌄ 52.41%

## Traffic Sources

Embed Graph

🖥 On desktop



| Direct | Referrals | Search | Social | Mail | Display |
|--------|-----------|--------|--------|------|---------|
| 0% | 0% | 100.00% | 0% | 0% | 0% |



## Traffic by countries

On desktop



| | Country | % | Change |
|---|---|---|---|
| | Russia | **46.78%** | ⌄ 59.50% |
| | Ukraine | **39.63%** | ⌄ 14.22% |
| | Kazakhstan | **9.93%** | ⌃ 58.99% |
| | Belarus | **2.89%** | ⌄ 58.06% |
| | Kyrgyzstan | **0.77%** | |

## Traffic Sources

Embed Graph

On desktop



Direct 21.51% — Referrals 77.05% — Search 1.44% — Social 0% — Mail 0% — Display 0%



# Response Annex 4



**ARBITRATION
AND
MEDIATION CENTER**

WIPO
WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

**ADMINISTRATIVE PANEL DECISION**

EvoPlay LLC v. Mr Timur Ziganshin / Moniker Privacy Services / Timur
Case No. D2015-0222

## 1. The Parties

Complainant is EvoPlay LLC, of the United Kingdom of Great Britain and Northern Ireland, represented by Reed Smith LLP, United States of America.

Respondent is Mr Timur Ziganshin / Moniker Privacy Services / Timur, of the Russian Federation ("Russia") / Seychelles / United States of America, represented by Boston Law Group, PC, United States of America.

## 2. The Domain Names and Registrars

The disputed domain names <casino-vulcan.com>, <clubvulcan.com>, <vulcan-casino.com>, <vulcan-casino.net> and <vulcan-casino.org> are registered with Moniker Online Services, LLC and the disputed domain name <vulcan-cazino.com> is registered with URL Solutions, Inc. (the "Registrars").  The six disputed domain names will be referred to collectively as the "Domain Names" unless context otherwise requires.

## 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on February 11, 2015.  On February 11, 2015, the Center transmitted by e-mail to Moniker Online Services, LLC a request for registrar verification in connection with the Domain Names.  On February 13, 2015, Moniker Online Services, LLC transmitted by e-mail to the Center its verification response disclosing registrant and contact information for the Domain Names which differed from the named Respondent and contact information in the Complaint. The Center sent an e-mail communication to Complainant on February 13, 2015 providing the registrant and contact information disclosed by the Registrar, and inviting Complainant to submit an amendment to the Complaint.  Complainant filed an amended Complaint on February 16, 2015.

The Center verified that the Complaint together with the amended Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified Respondent of the Complaint, and the proceedings commenced on February 17, 2015.  In accordance with the Rules, paragraph 5(a), the due date for Response was March 9, 2015.  The Response was filed with the Center on March 9, 2015.

On February 25, 2015 the Center received an e-mail from Moniker Online Services, LLC informing that, in spite of the registrar lock, the Respondent had transferred the disputed domain name <vulcan-cazino.com> to URL Solutions, Inc.  On February 27, 2015, the Center sent an e-mail to URL Solutions, Inc. requesting it to confirm that the Domain Name <vulcan-cazino.com> had been placed in registrar lock and asking it to inform the registration details for the Domain Name <vulcan-cazino.com>.  On the same date, URL Solutions, Inc. replied to the Center confirming registrar lock and informing the registrant's contact information.

Complainant has filed a supplemental filing on March 11, 2015 including copies of both license agreements referred to in the Complaint as Annex 6.  On the same date, Respondent has filed a supplemental filing requesting ten days to respond to Complainant's supplemental filing.  On March 17, 2015 Complainant filed another supplemental filing in rebuttal to Respondent's Response.

The Center appointed Robert A. Badgley, Michelle Brownlee and Paul M. DeCicco as panelists in this matter on March 27, 2015.  The Panel finds that it was properly constituted.  Each member of the Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.

Both parties made supplemental submissions, which the Panel in its discretion reviewed.


## 4. Factual Background

The parties, and particularly the Complainant, submitted more than 1,000 pages of exhibits in this case.  The Panel need not, and will not, summarize the massive record submitted here beyond what is necessary to reach and explain its decision in this case.

The Complainant alleges that it is the exclusive licensee of the Russian trademarks Вулкан[1], Вулкан (& Design), Vulkan and Volcano trademarks, among other Вулкан, Vulkan, and Volcano composite marks (hereinafter the "VULKAN Marks").

It is alleged that on December 8, 2014, the Complainant executed agreements with Bartlett Corporation ("Bartlett") and Ritzio Purchase Limited ("Ritzio"), both of which are controlled by the same person.  Pursuant to these agreements, the Complainant has the exclusive right to use the identified VULKAN trademarks owned by Ritzio and Bartlett, as well as any applications or registrations owned by Ritzio and Bartlett in Russia.  Additionally, the agreements grant the Complainant the right and authority, subject to Bartlett's and Ritzio's approval, to initiate an action to prevent and/or remedy the unauthorized use of any of the licensed VULKAN trademarks by third parties.  It is alleged that the Complainant, Bartlett and/or Ritzio have been continuously using these marks since at least as early as 1992.  The Complainant is allegedly the exclusive licensee of registrations for the VULKAN Marks in numerous countries around the world, including but not limited to the following registrations in Russia:

---

[1]     The English translation of Вулкан is "Vulcan" or "Volcano." The transliteration of this trademark in Roman letters is "Vulkan" since Cyrillic has no equivalent of the letter "C," only "K," for the "K" sound.

[Footnote continued on next page]

| Country | Trademark | Registration No./ Date | Goods/Services | Registrant |
|---------|-----------|------------------------|----------------|------------|
| Russia | Вулкан (& Design)  | 193239<br><br>August 28, 2000 | Entertainment; provision of equipment and maintenance of gaming halls; provision and maintenance of slot machines. | Bartlett Corporation |
| Russia | Вулкан (& Design)  | 216203<br><br>July 3, 2002 | Games of chance; information on entertainment; providing online electronic publications; leisure; organization of lotteries; organization of entertainment for recreation; provision of gaming halls; entertainment of guests; and casino services. | Bartlett Corporation |
| Russia | Вулкан (& Design)  | 353694<br><br>June 25, 2008 | Automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket machines; automatic equipment for monitoring and control of electronic machinery; computer and computer game programs; computer programs; [etc.] | Ritzio Purchase Limited |
| Russia | Вулкан | 361357<br><br>October 7, 2008 | Same as above. | Bartlett Corporation |
| Russia | VULKAN | 353692<br><br>November 18, 2005 | Same as above. | Ritzio Purchase Limited |
| Russia | VOLCANO | 307879<br><br>June 2, 2006 | Same as above. | Ritzio Purchase Limited |

---

[Footnote continued from previous page]

The Complainant alleges further that, for more than 20 years, "Ritzio has been in the business of providing high-quality gaming, casino and entertainment products and services, including but not limited to the operation and management of gaming halls, the design, development, provision and maintenance of games of chance, including betting bingo and slot machines, the provision of interactive real-money games through a computer network, and other related products and services under the well-known Вулкан and Vulkan brands."  According to the Complaint: "Today, Ritzio is one of the leading gaming operators with more than 200 branded gaming clubs and more than 5,800 gaming machines deployed throughout Europe."

Ritzio's business operations extend beyond Russia into a number of countries, including Germany, Romania, Latvia, Belarus, Croatia and Italy.  The Complainant asserts that the VULKAN Marks constitute one of the most recognized and well-known brands in Europe.  Between 2006 and 2010, Ritzio's operating revenue was in excess of USD 5.5 billion.

The Respondent registered the Domain Names on various dates between June 15, 2011 and October 30, 2012.

The Complainant asserts that, on December 15, 2014, upon discovering the Respondent's registration and operation of the Domain Names, Ritzio and Bartlett both sent letters to the suspected owner(s), advising them that the Complainant is the exclusive licensee of the VULKAN Marks, and that it has the legal authority to prevent any unauthorized use of the VULKAN Marks by third parties.  However, it is alleged that no response was ever received.

According to the Complainant, the Respondent has used the Domain Names to resolve to websites which offer online casino and gaming services in competition with the services offered under the VULKAN marks.  The Complainant alleges further that the Respondent "has copied the look and feel of Ritzio's gaming clubs, copied the Вулкан word mark and lightning bolt logo exactly, created 'copycat' websites," and is "intentionally misrepresenting" that the websites to which the Domain Names resolve are "directly connected to, and/or affiliated with, Ritzio's land-based gaming clubs."

According to the Respondent, online gambling was banned from Russia in its entirety in late 2006 (meaning that, as of 2006 Ritzio could not have had any legal online operations in Russia), and Ritzio ceased all brick-and-mortar gambling operations in Russia and Ukraine in early 2009 as a result of a Russian law that made all gambling illegal in nearly all of Russia.  Because of the illegality of gambling operations, the Respondent contends, the Vulkan Marks are invalid due to abandonment and non-use and are subject to cancellation.

In 2011 – more than five years after Russia had banned Internet gambling, more than three years after Ritzio and Bartlett were legally prohibited from operating casinos, and more than three years after they ceased using the VULKAN Marks in Russia and Ukraine – the Respondent registered the Domain Names.  The Respondent states that it did so knowing that rights in the VULKAN Marks "could not properly survive with regard to an activity which was prohibited by Russia."

Immediately after registering each of the Domain Names, the Respondent asserts, the Respondent transferred operation and control of each, including any websites to which the Domain Names resolve, to GGS Ltd., an Anguilla company ("GGS"), which continues to operate each of the Domain Names and their websites.  Thus, the Respondent alleges, "the operation and control of the Domain Names and their websites lay solely with GGS."

The Respondent alleges further that "almost all of the visitors to the [websites accessible via the Domain Names] come from Russia and Ukraine –where Ritzio and Bartlett can possess no rights in the Disputed Marks."  Moreover, the Respondent asserts, these websites are "available only in Russian and are aimed only at Russian-speaking users."

The Respondent alleges that GGS has operated the Domain Names and their websites "openly and with the

implicit consent of Ritzio (and Bartlett) for nearly four years." Indeed, the Respondent alleges, "over the years, Ritzio has had extensive discussions with GGS regarding the Disputed Domains and their websites, including discussions about possible joint projects."

The Respondent further alleges:

> Although Complainant attempts to conflate itself, Bartlett, and Ritzio, to do so, Complainant must omit a large part of its own history. Complainant alleges that it received a trademark license from Bartlett on December 8, 2014. What Complainant fails to inform the panel, however, is that it has itself been operating domains and websites incorporating the Disputed Marks since at least as early as **2011** – without any authorization or license from the trademark holder that it now claims to have a non-exclusive license.

> In other words, Complainant operated gambling websites for more than three years, apparently without any concern that it was violating Ritzio's (or anyone's) trademark rights. It did so because it knew that the Disputed Marks were void and unenforceable. Indeed, it was only when EvoPlay decided to try to reverse hijack Respondent's domains that it sought a purported license.

> Indeed, prior to this dispute, Complainant and GGS were in a business relationship wherein they shared information regarding operating gambling websites. As a result of this relationship, GGS understands that Complainant has registered at least 18 domain names relating to the Disputed Marks and has operated websites incorporating such marks since at least December 2011 (*after* Respondent had registered two of the Disputed Domains and GGS began operating them).

The domain names registered by the Complainant include:  <club-vulkan.com> (registered on December 12, 2012), <vulkanclub.com> (registered on February 27, 2013), and <club-vulkan-slots.com> (registered on March 28, 2014).


## 5. Parties' Contentions

### A. Complainant

The salient factual allegations set forth in the Complaint are summarized above. The Complainant asserts that it has satisfied the three elements required under the Policy for the transfer of each of the Domain Names.


### B. Respondent

The Respondent's main factual contentions are set forth above. The Respondent raises myriad arguments to dispute this Complaint, only some of which will be taken up by the Panel here.


## 6. Discussion and Findings

Paragraph 4(a) of the Policy lists the three elements which the Complainant must satisfy with respect to each of the Domain Names at issue in this case:

(i)     the Domain Names are identical or confusingly similar to a trademark or service mark in which Complainant has rights;  and

(ii)     Respondent has no rights or legitimate interests in respect of the Domain Names;  and

(iii)    the Domain Names have been registered and are being used in bad faith.

### A. Identical or Confusingly Similar

The Panel need not decide this issue in view of its conclusion below with respect to the "bad faith" element under the Policy.

### B. Rights or Legitimate Interests

The Panel need not decide this issue in view of its conclusion below with respect to the "bad faith" element under the Policy.

### C. Registered and Used in Bad Faith

For each of the Domain Names at issue, paragraph 4(b) of the Policy provides that the following circumstances, "in particular but without limitation", are evidence of the registration and use of the Domain Names in "bad faith":

(i)     circumstances indicating that Respondent has registered or has acquired the Domain Names primarily for the purpose of selling, renting, or otherwise transferring the domain name registrations to Complainant who is the owner of the trademark or service mark or to a competitor of that Complainant, for valuable consideration in excess of its documented out of pocket costs directly related to the Domain Names;  or

(ii)    that Respondent has registered the Domain Names in order to prevent the owner of the trademark or service mark from reflecting the mark in corresponding domain names, provided that Respondent has engaged in a pattern of such conduct;  or

(iii)   that Respondent has registered the Domain Names primarily for the purpose of disrupting the business of a competitor;  or

(iv)    that by using the Domain Names, Respondent has intentionally attempted to attract, for commercial gain, Internet users to Respondent's website or other on line location, by creating a likelihood of confusion with Complainant's mark as to the source, sponsorship, affiliation, or endorsement of Respondent's website or location or of a product or service on Respondent's website or location.

A majority of the Panel concludes, for each of the Domain Names at issue, that the Complainant has not carried its burden of proving that Respondent registered and used the Domain Names in bad faith within the meaning of the Policy.

As the sheer mass of documentation accompanying the parties' submissions in this case tends to indicate, this dispute is not well suited for resolution under the Policy.  In this case, there are potential issues surrounding the Complainant's standing as purported licensee to bring this proceeding, the validity of the underlying trademark rights upon which the Complaint is based, possible trademark abandonment issues, the possible acquiescence of the purported licensors (Bartlett and Ritzio) in the Respondent's conduct, possible issues of the Complainant's unclean hands, and so forth.

The Policy does not contemplate this Panel serving as a tribunal of general jurisdiction over any and all disputes which are somehow related to domain names.  The issues raised by the parties here exceed the relatively narrow confines of the Policy, which is designed chiefly to address clear cases of cybersquatting. *See*, *e.g.*, *Libro v. NA Global Link*, WIPO Case No. D2000-0186.

In view of the foregoing and possibly other issues, the Panel majority concludes that the Complainant has not made out or proven a cognizable case under the Policy.


**7. Decision**

For the foregoing reasons, the Complaint is denied.




**Robert A. Badgley**
Presiding Panelist




**Michelle Brownlee**
Panelist




**Paul M. DeCicco**
Panelist (Concurring)
Date:  April 16, 2015



**CONCURRING OPINION**

Having found that "this dispute is not well suited for resolution under the Policy" and further that "the issues raised … exceed the relatively narrow confines of the Policy,"   I would simply deny the requested relief without considering the merits under Policy 4(a)(iii). See *Clinomics Biosciences, Inc. v. Simplicity Software*, Inc., WIPO Case D2001-0823 (Panel declining to rule on the merits after finding that the dispute centered on subject matter outside the scope of the UDRP Policy).




**Paul M. DeCicco**
Panelist (Concurring)
Date:  April 16, 2015

# Response Annex 5

*Before the:*

## WORLD INTELLECTUAL PROPERTY ORGANIZATION
## ARBITRATION AND MEDIATION CENTER

RITZIO PURCHASE LIMITED
Corporate ID: 144533
Diagorou Street 4, Kermia building
6th Floor, Office 601, P.C. 1097
Nicosia, Cyprus
**(Complainant)**

-v-

Escave Ltd.
Global Gateway 8
Rue de la Perle
Mahe, Seychelles

and

Timur Ziganshin
9th January Street 233-61
Izhevsk, Udmurtia 426050
Russian Federation
**(Respondents)**

**Case No:** D2015-00875

**Disputed Domain Names:**

    casino-vulcan.co
    vulcan-casino.co
    club-vulcan.com
    vulcan-cazino.org
    vulcan-casino2.com
    cazino-vulcan.com

and

vulcan-cazino.net

### AFFIDAVIT OF ANDREY SEVOSTIANOV

I, Andrey Sevostianov, affirm and declare as follows:

1.      My name is Andrey Sevostianov.  I am over the age of 18.  I have personal knowledge of the facts stated herein.

2.      I am an operations manager for GGS Ltd., an Anguilla company ("GGS").

3.      GGS received operations and control of all the Disputed Domains that are subject to the above captioned UDRP proceeding from Timur Ziganshin and Escave Ltd. (the "Registrants").

1

4.      The Registrants do not operate or control and have never operated or controlled the websites at the Disputed Domains.

5.      GGS has always operated and controlled and continues to operate and control each of the Disputed Domains and their websites to this day.

6.      The websites at the Disputed Domains are available only in Russian and are aimed only at Russian-speaking users.

7.      GGS's use of the term "Vulkan" goes back to 2011, when GGS began operating the website at vulcan-casino.com shortly after it was registered on June 15, 2011.  GGS operated numerous other domain names and websites incorporating that term.

8.      GGS has operated the Disputed Domains and their websites openly and in full view and with the implicit and explicit consent of the Complainant, Ritzio Purchase Limited ("Ritzio") for approximately four years.

9.      Over the years, GGS has had extensive discussions with Complainant Ritzio regarding the Disputed Domains and the websites available thereon.

10.     There were even discussions through the years of some form of joint projects between GGS and Complainant Ritzio.

11.     Complainant Ritzio certainly knew about GGS's use and operation of the Disputed Domains for years.

12.     A company by the name of EvoPlay LLP ("Evoplay") previously filed two UDRP complaints against domains used by GGS that included the word "vulkan."  Both of those UDRP complaints were denied.

13.     Prior to the filing of the two prior UDRP proceeding, the management of EvoPlay and GGS were in a business relationship wherein they shared information and ideas regarding operating gaming websites.

14.     GGS understand that EvoPlay currently holds itself out as a licensor of Complainant Ritzio's trademarks (though GGS disputes that Complainant Ritzio has any legitimate trademark rights).

15.     Upon information and belief, EvoPlay operated the following websites before it received any putative license from Complainant Ritzio: club-vulkan.com, play-vulcan-slots.com, vulcanclub.com, volcano-online.com, online-volcano.com, vvulcan.com, wulkanclub.com, volcano-vip.com, vulcan-portal.com, vulcan-play.com, 777vulkan.com, vulkanpremium.com,

2

play-club-vulkan.com, club-vulkan.net, club-wulkan.com, casino-vulkan-online.com, club-vulkan-slots.com, vulkanstavka.com.

16.    Based on the foregoing, GGS believes that the prior two UDRP Disputes were filed by EvoPlay solely as a means for EvoPlay to take away the domains of a legitimate competitor, GGS.

17.    Now that EvoPlay's prior UDRP complaints were dismissed, it appears that EvoPlay has coerced Ritzio into attempting what EvoPlay itself failed –trying to take away the domains of a legitimate competitor, GGS.

18.    GGS believes that the above captioned dispute is a continued attempt by EvoPlay to Reverse Domain Name Hijack GGS's domain names.


I swear under the pains and penalty of perjury that the foregoing is true and correct.


Dated:       July 1, 2015

Andrey Sevostianov
On behalf of GGS Ltd.

3

# Response Annex 6



**WIPO**
WORLD
INTELLECTUAL PROPERTY
ORGANIZATION

**ARBITRATION
AND
MEDIATION CENTER**

# ADMINISTRATIVE PANEL DECISION
## EvoPlay LLP v. Mardiros Haladjian / GGS Ltd.
## Case No. D2015-0252

## 1. The Parties

The Complainant is EvoPlay LLP of Hertfordshire, the United Kingdom of Great Britain and Northern Ireland, represented by Reed Smith LLP, United States of America.

The Respondent is Mardiros Haladjian, GGS Ltd. of Anguilla, Overseas Territory of the United Kingdom, represented by Boston Law Group, PC, United States of America.

## 2. The Domain Names and Registrar

The disputed domain names <bestvulkan.com> and <myvulkan.com> are registered with GoDaddy.com, LLC (the "Registrar").

## 3. Procedural History

The Complaint was filed with the WIPO Arbitration and Mediation Center (the "Center") on February 17, 2015. On February 17, 2015, the Center transmitted by email to the Registrar a request for registrar verification in connection with the disputed domain names. On February 17, 2015, the Registrar transmitted by email to the Center its verification response confirming that the Respondent is listed as the registrant and providing the contact details.

The Center verified that the Complaint satisfied the formal requirements of the Uniform Domain Name Dispute Resolution Policy (the "Policy" or "UDRP"), the Rules for Uniform Domain Name Dispute Resolution Policy (the "Rules"), and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the "Supplemental Rules").

In accordance with the Rules, paragraphs 2(a) and 4(a), the Center formally notified the Respondent of the Complaint, and the proceedings commenced February 26, 2015. In accordance with the Rules, paragraph 5(a), the due date for Response March 18, 2015. On March 10, 2015, the Center received the Complainant's first supplemental filing. On the same day, the Respondent requested an extension of response due date. On March 11, 2015, the Center granted the request of extension and the due date to submit a response was March 30, 2015. The Response was filed with the Center March 30, 2015. On April 1, 2015, the Center received the Complainant's second supplemental filing. On April 24, 2015, the

Center received the Respondent's supplemental filing.  On April 29, 2015, the Center received the Complainant's third supplemental filing.

The Center appointed Michael A. Albert, Maxim H. Waldbaum and Paul C. Van Slyke as panelists in this matter on May 4, 2015.  The Panel finds that it was properly constituted.  Each member of the Panel has submitted the Statement of Acceptance and Declaration of Impartiality and Independence, as required by the Center to ensure compliance with the Rules, paragraph 7.


**4. Factual Background**

This Complaint arises from a dispute between the parties over ownership of a Russian mark which both parties transcribe into Roman letters as VULKAN.

Complainant asserts that it is the exclusive licensee of these marks and that its predecessors in interest have been using them in commerce since 1992.  It provides copies of certain trademark registrations. Respondent denies that the license in question gives Complainant standing to assert the claims herein.

The Disputed Domain Names were registered in 2012 and 2014, respectively.


**5. Parties' Contentions**

**A. Complainant**

Complainant alleges that on December 8, 2014, it entered into agreements with Bartlett Corporation ("Bartlett") and Ritzio Purchase Limited ("Ritzio") to acquire exclusive rights to use the VULKAN trademarks as well as any trademark applications those parties owned in the Russian Federation.  The agreements also grant Complainant the right to initiate actions for unauthorized use of the marks against third parties.

Complainant further alleges that Bartlett and Ritzio owned Russian trademarks incorporating the VULKAN name, some of which also include a design component.  Such trademark registrations date back, variously, to dates between 2000 and 2008, although Complainant claims first use in commerce dating back to 1992.

Complainant asserts that the VULKAN Marks are famous and known world-wide in the gaming and entertainment industries, citing, for example, Ritizio's alleged operating revenue of over USD 5 billion between 2006 and 2010 in connection with these marks.

Complainant wrote to Respondent about its use of the Disputed Domain Names but received no response.

Respondent uses the Disputed Domain Names in connection with online casino and gaming services.

Complainant alleges that the Disputed Domain Names are confusingly similar to its VULKAN marks;  that Respondent has no rights or legitimate interests in such domain names because Respondent has developed no *bona fide* business under or in connection with the VULKAN marks, has not been known by them, and has not been licensed to use them.  For similar reasons, Complainant alleges bad faith registration and use. Specifically, it alleges that Respondent must have known of Complainant's marks because of how well-known they were in the industry in which Respondent operates, and that in any event Respondent has falsely identified itself as affiliated with Complainant, and is engaged in creating fraudulent "copycat" websites.

**B. Respondent**

Respondent asserts that Complainant employed, until recently, a business model similar to that which it now complains about Respondent using, namely to register and use various domain names containing the term "vulkan" without authorization from the entities which it now claims were the owners of those marks.

Respondent further alleges that Complainant lacks standing to assert the claims herein because it does not claim to be the owner of the marks in question, and it does not have an exclusive license to use them.

Respondent further alleges that use of the marks in connection with gaming would be illegal in the Russian Federation, which banned gambling in 2006.

Respondent further asserts that the marks in question were rejected for registration in Ukraine.

Respondent alleges that its own use of the marks as part of domain names goes back to 2011, by which time Complainant and/or its predecessors could not be legally using the marks in connection with gaming in Russia (where virtually all of the visits to the disputed domain name's corresponding web sites came from, since it is a Russian-language site).  Respondent appears to therefore be alleging that Complainant or its predecessors had abandoned the use of the marks.

Respondent goes on to allege that neither Bartlett nor Ritzio had enforceable trademark rights in the disputed marks, because the claimed Russian registrations are invalid as in violation of Russian law. Moreover, it alleges that Complainant fails to offer proof that the marks were used in commerce.

Lastly, Respondent contends that, with respect to domain names, the license granted to Complainant was *non*-exclusive, and Complainant thus lacks standing to pursue this case.

In any event, Respondent argues, it adopted the domain names in good faith and with legitimate rights and interests, because Ritzio and Bartlett had not been using the marks for several years in Russia and Respondent believed in good faith that they were available for use.

**C. Supplemental Filings**

In a first supplemental filing, Complainant submits copies of the relevant license agreement.  In a second supplemental filing, Complainant argues that it has standing because the license in question is indeed exclusive;  and in any event that non-exclusive licensees may have standing.  It further argues that Respondent's challenge to the validity of the Russian trademark registrations is out of place here because "issues concerning trademark validity . . . are clearly not within the purview of any UDRP proceeding and are best left for administrative and/or judicial adjudication." Second Supplemental Submission at page 4, quoting *Gerber Childrenswear Inc. v. David Webb*, WIPO Case No. D2007-0317.

Respondent, in a supplemental filing, calls the Panel's attention to a ruling in a case filed by Complainant herein against Timur Ziganshin (*EvoPlay LLC v. Mr. Timur Ziganshin / Moniker Privacy Services / Timur*, WIPO Case No. D2015-0222) (the "Ziganshin Case").  In that case, on facts substantially identical to those at issue in this case, the three-member panel denied the complaint, finding that the complainaint had not carried its burden of proving bad faith registration and use.

In a third supplemental filing, Complainaint asserts that this Panel is required to assess the case independently of the prior panel because it involves a different Respondent and Registrar.

**6. Discussion and Findings**

The Panel agrees with Complainant that it cannot simply follow the Ziganshin Case but must review the file

of this case and exercise its own independent judgment as to the facts.  Having reviewed the extensive record of this case, however, this Panel comes to essentially the same conclusion as did the *Ziganshin* panel.

This Panel finds that the issues raised in this proceeding are outside the scope of proceedings under the Policy and are properly decided by traditional (*e.g.*, appropriate judicial) means.  Therefore the Complaint should be dismissed.  *See, e.g., Clinomics Biosciences, Inc. v. Simplicity Software, Inc.*, WIPO Case D2001-0823;  *Libro AG v. NA Global Link Limited*, WIPO Case No. D2000-0186.

Complainant itself, citing prior cases decided under the Policy, points out to us that issues of trademark validity are generally outside the purview of UDRP proceedings.  For that very reason (among others), Complainant's case fails.  The facts of this case do not establish a clear-cut case of cybersquatting, and much of the substance of the dispute between the parties turns on issues of trademark ownership, validity, and licensing.  If Complainant's predecessors in interest never had valid trademark rights in the marks, or if they have since become abandoned, Respondent would have every right to make such usage.  These are complex issues best addressed through the court system rather than under the Policy.

Considerable factual and legal disputes appear to remain regarding the validity of the trademarks owned by Ritzio and Bartlett, as well as about the precise scope of the rights conveyed to Complainant, and whether such scope includes the power to act under the Policy to challenge the registration or use by Respondent of domain names to which Complainant itself had no rights whatsoever at the time of the domain name registrations.

In arriving at its decision, the majority of the Ziganshin Panel found that "the Complainant has not carried its burden of proving that Respondent registered and used the Domain Names in bad faith within the meaning of the Policy." The majority continued:

> "[T]his dispute is not well suited for resolution under the Policy.  In this case, there are potential issues surrounding the Complainant's standing as purported licensee to bring this proceeding, the validity of the underlying trademark rights upon which the Complaint is based, possible trademark abandonment issues, the possible acquiescence of the purported licensors (Bartlett and Ritzio) in the Respondent's conduct, possible issues of the Complainant's unclean hands, and so forth.

> The Policy does not contemplate this Panel serving as a tribunal of general jurisdiction over any and all disputes which are somehow related to domain names.  The issues raised by the parties here exceed the relatively narrow confines of the Policy, which is designed chiefly to address clear cases of cybersquatting.  See, *e.g., Libro v. NA Global Link*, WIPO Case No. D2000-0186.

> In view of the foregoing and possibly other issues, the Panel majority concludes that the Complainant has not made out or proven a cognizable case under the Policy."

In a concurring opinion in the Ziganshin Case, the third panelist simply found that the dispute is not well suited for resolution under the Policy and recommended denying the requested relief without considering the merits of the case.

This case is, in all material respects, virtually identical to the Ziganshin Case, and this Panel finds, similarly, that it falls outside the scope of the relatively narrow confines of the Policy, which is designed chiefly to address clear cases of cybersquatting.

**7. Decision**

For the foregoing reasons, the Complaint is denied.

**Michael A. Albert**
Presiding Panelist

**Maxim H. Waldbaum**
Panelist

**Paul C. Van Slyke**
Panelist
Date:  May 18, 2015

# Response Annex 7



# WIPO Arbitration and Mediation Center

### ADMINISTRATIVE PANEL DECISION

### Clinomics Biosciences, Inc. v. Simplicity Software, Inc.

### Case No. D2001-0823

## 1. The Parties

Complainant is Clinomics Biosciences, Inc., a corporation located in Pittsfield, Massachusetts, USA.

Respondent is Simplicity Software, Inc., a corporation located in Waltham, Massachusetts, USA.

## 2. The Domain Name and Registrar

The domain name at issue is: <clinomics.com> ("the Domain Name").

The registrar is Network Solutions, Inc. in Herndon, Virginia.

## 3. Procedural History

This action was brought in accordance with the ICANN Uniform Domain Name Dispute Resolution Policy, dated October 24, 1999 ("the Policy") and the ICANN Rules of Uniform Domain Name Dispute Resolution Policy, dated October 24, 1999 ("the Rules").

Complainant submitted on June 22, 2001, and amended on June 26, 2001. The Response was submitted on July 25, 2001.

On August 14, 2001, the WIPO Arbitration and Mediation Center appointed Mark V. B. Partridge as single panelist.

## 4. Factual Background

Complainant provides clinical pharmaceutical research services. It claims without dispute that it has used the mark CLINOMICS in connection with its services since 1998. Complainant retained Respondent for web development services. In that capacity, Respondent registered the domain name <clinomics.com>. Complainant was not satisfied with Respondent's services, refused to pay several invoices and terminated the relationship on July 16, 1999. Respondent retained the ownership of the domain name in an effort to collect on the unpaid invoices. The amount in dispute appears to be over $100,000.

**5. Parties' Contentions**

Complainant contends that the Domain Name is confusingly similar to its mark, that Respondent has no rights or legitimate interests in the Domain Name, and that Respondent has registered and used the Domain Names in bad faith. More specifically, Complainant contends that Respondent's use of the domain name as a bargaining chip in a commercial dispute is an act of bad faith.

Respondent claims that its use of the Domain Name to collect on unpaid invoices is a bona fide use. Respondent also contends that Complainant lacks rights in the mark, that the name is generic, and that this is really a business dispute outside the scope of the UDRP. Respondent also asks for a finding of reverse domain name hijacking.

**6. Discussion and Findings**

Both parties in this proceeding rely on *Map Supply v. On-line Colour Graphics*, FA0096332, to support their position.

In *Map Supply*, the Complainant hired Multilynx, Inc. to build a web-site. Multilynx in turn contracted with Respondent to help develop the site. When Multilynx failed to pay Respondent for services provided, Respondent claimed ownership of the domain name. After reviewing the contract with Multilynx, the Panelist concluded that there was no contractual authority for the Respondent to take ownership of the Complainant's domain name as security against payment for money allegedly owed by Multilynx and ordered transfer.

Complainant relies on *Map Supply* for the proposition that holding a domain name in order to gain bargaining position over the rightful owner is a commercial use and bad faith. The decision provides support for that proposition in stating:

This is a novel case and does not quite fit within the four illustrations of bad faith expressed in Paragraph 4(b) of the [Policy]. Nevertheless, to re-register a domain name without any authority from the registrant in order to gain a bargaining position over the registrant – *with whom it had no legitimate dispute* – is unconscionable. (emphasis added).

Respondent relies on dicta in *Map Supply* that states a lien in a domain name may be a legitimate interest. In that regard, the decision states:

"The Respondent's argument does raise the interesting question whether an unpaid web designer once given control over a domain name by the client can retain it as a security for payment. In my view, this may be so. The law may recognize some sort of lien or charge against a domain name. To assert such a claim is to assert a legitimate interest. *On that assumption, this could be a dispute to be decided by traditional means – as it would fall outside the scope of this tribunal".* (emphasis added).

The Panelist in *Map Supply* concluded, however, that the matter before him did not involve a legitimate dispute over a lien: "The Respondent has failed to persuade me that there is any chance that the law would permit it, without the consent of the client, to take control of a domain name, and then retain control as a security against payment for web-design work.."

I believe that Complainant's reliance on *Map Supply* is misplaced in this instance. In *Map Supply*, the finding of bad faith arose from the fact that there was no legitimate dispute over payment between Complainant and Respondent. Rather, the dispute involved Respondent and a third party, Multilynx. Here, the parties admit there is a legitimate dispute over Complainant's payment of Respondent's bills. As noted in *Map Supply,* such a dispute, if properly documented and supported by applicable law, could give rise to a legitimate interest in the domain name as a lien to secure payment.

The claims of the parties here turn on whether or not there is a genuine dispute over Respondent's contractual or legal right to retain the domain name as security for payment. Neither party here has provided us with any written contract to show the terms on which Respondent was retained to provide services. Respondent states, however, that it was the intent of the parties in registering the domain name that Respondent would have the right to enforce its contractual rights through the exercise of a lien on the domain name. To decide this issue would require additional evidence and an evaluation of the commercial law of liens. Accordingly, I agree with the Panelist in *Map Supply* that such as dispute is outside the scope of proceedings under the Policy and is properly decided by traditional means.

Prior decisions have rejected complaints where the dispute is primarily contractual and therefore outside the scope

of the policy. See *Adaptive Molecular Technologies, Inc. v. Pricilla Woodward & Charles R. Thornton,* WIPO Case No. D2000-0006 (February 28, 2000). That appears to be the appropriate course here, where the dispute turns on the resolution of legal matters outside the scope of the Policy. In declining to grant relief, I take no position on the merits of the fee or lien dispute that exists between the parties.

I also reject Respondent's claim that this is a case of reverse domain name hijacking. Reverse domain name hijacking involves an attempt by a trademark owner to take a domain name from another party without having a colorable legal right to do so. Here, there is a legitimate dispute over the right to hold the domain name, and Complainant is entitled to pursue that claim in an appropriate forum.


**7. Decision**

I find that this matter involves a commercial dispute outside the scope of the Policy. Therefore, Complainant's request for relief is denied.

––––––––––––––––––––––––––––

Mark V.B. Partridge
Sole Panelist

Dated: August 28, 2001

# Response Annex 8



# WIPO Arbitration and Mediation Center

**ADMINISTRATIVE PANEL DECISION**

**LIBRO AG v. NA Global Link Limited**

**Case No. D 2000-0186**

## 1. The Parties

Complainant is LIBRO AG, a corporation organized under the laws of Austria, having its principal place of business in Industriestrasse 7, 2352 Guntramsdorf, Austria (Complainant).

The Respondent is NA Global Link Limited, a company incorporated in Hong Kong with limited liabilities and having a business place at 1722 Junction Avenue, Suite C, San Jose, California 95112-1011, U.S.A. (Respondent).

## 2. The Domain Name(s) and Registrar(s)

The domain name at issue is "libro.com". The registrar is Network Solutions, Inc. ("NSI"), 505 Huntmar Park Dr., Herndon, Virginia 20170 U.S.A.

## 3. Procedural History

On March 15, 2000, Complainant submitted a Complaint to the World Intellectual Property Organization Arbitration and Mediation Center ("Center") pursuant to the Uniform Domain Name Dispute Resolution Policy ("UDRP") implemented by the Internet Corporation for Assigned Names and Numbers ("ICANN") on October 24, 1999, and under the rules for the UDRP implemented by ICANN on the same date ("UDRP Rules").

The Complaint and Exhibits were received by the Center in hardcopy on March 20, 2000. The Center acknowledged receipt of the Complaint by e-mail and post, both sent on March 23, 2000.

On March 23, 2000, a Request for Registrar Verification was transmitted to NSI. In an e-mail to the Center dated March 24, 2000, NSI confirmed that it is the Registrar for the domain name "libro.com" and that it had not received the Complaint.

On March 31, 2000, the Center sent a Complaint Deficiency Notification to the Complainant's authorized representative by facsimile and e-mail. In the notification the Center requested the Complainant's representative to send proof that payment had been made and to submit the Complaint in electronic form and four copies as required by UDRP Rules, Paragraph 3 (b) and Supplemental Rules, Paragraph 3 (c).

On April 2, 2000, the Complainant transmitted the Complaint in the required form and submitted the fee.

Having verified that the Complaint satisfied the formal requirements of the UDRP and the UDRP Rules, the Center sent a Notification of Complaint and Commencement of Administrative Proceeding to Complainant's authorized

representative by facsimile and e-mail; to Respondent by post, facsimile and e-mail; and to ICANN and NSI. The Center advised the Respondent that the Response was due by April 26, 2000.

On April 8, 2000, the Center received an undeliverable message via e-mail that the Respondent's e-mail address had permanent fatal errors. In an e-mail to the Center dated April 10, 2000, the Respondent acknowledged receipt of the Complaint and requested translation of documents that were not in English.

In an e-mail dated April 13, the Center responded that according to the UDRP Rules, Paragraph 11, the Panel had the right to order that any documents submitted in languages other than the language of the administrative proceeding, be accompanied by a translation in whole or in part in the language of the administrative proceeding but that such a request did not affect the obligation under the rules to file a Response by the deadline.

On April 19, 2000, Respondent sent to the Center a Response to the Complaint, which was received by the Center on April 27, 2000.

On April 28, in view of the Complainant's designation of a single panelist, the Center invited Torsten Bettinger of Bettinger & Abel, Munich to serve as a Panelist in this Administrative Proceeding.

On May 2, 2000, the Center issued to the Panelist a Request for Declaration of Impartiality and Independence. Having received the Panelist's Declaration of Impartiality and Independence, on May 2, 2000, the Center issued a Notification of Appointment of Administrative Panel and set a decision date, with the Panelist's deadline for issuing a decision as of May 16, 2000.

The Center transmitted the case file to the Panelist on May 2, 2000. The case file was received by the Panelist on May 3, 2000.


## 4. Factual Background

Complainant has provided evidence of its ownership of the following marks:

1. "LIBRO", registration No. 139 780, registered with the Austrian Patent and Trademark Office for a term of 10 years from February 28, 1992, for "paints, varnishes, lacquers for painters and artists in class 2; and apparatus for recording, transmission or reproduction of sound and images, magnetic data carriers, recording discs" in class 9; and "horological and chronometric instruments" in class 14; and "paper, adhesives paint brushes, typewriters and office requisites (except furniture), instructional and teaching material (except apparatus), plastic materials for packaging, playing cards, printer's type" in class 16; and "traveling bags, umbrellas, parasols and walking sticks" in class 18; and "mirrors, picture frames, goods of wood, cork, reed, cane or plastics" in class 20; and "games and playthings, gymnastics and sporting articles" in class 28; and for "printed matter, books and calendars" in class 16 on the basis of a proof of secondary meaning.

2. "LIBRO", international registration No. 640 498, registered for a term of 10 years from July 27, 1997, in the Benelux countries, Croatia, France, Germany, Hungary, Italy, Liechtenstein, Poland, the Czech Republic, Slovakia, Slovenia and Switzerland for "apparatus for recording, transmission or reproduction of sound and images, magnetic data carriers, recording discs" in class 9; and "horological and chronometric instruments" in class 14; and "paper, adhesives paint brushes, typewriters and office requisites (except furniture), instructional and teaching material (except apparatus), plastic materials for packaging, playing cards, printer's type" in class 16; and "games and playthings, gymnastics and sporting articles" in class 28.

The Complainant has filed an application for registration of the LIBRO mark with the United States Patent and Trademark Office on December 18, 1999.

The Respondent had registered the domain name on March 29, 1999. Respondent apparently uses the domain name "libro.com" to redirect users to its website at "restaurants.com", that is Internet users who try to access the "www.libro.com" address are automatically redirected to the "restaurants.com" website.


## 5. Parties' Contentions

A. Complainant

Complainant alleges that "LIBRO" is "famous in its market" and "has acquired strong secondary meaning because of Complainant's heavy advertising and exclusive use of the mark in association with books, music, paper supplies and other products" in Austria.

The Complainant alleges that it is "the market leader in Austria for books, music, stationery, new media and video" and that the Respondent's registration has diminished the Complainant's capacity to distinguish and to identify Complainant's products on the Internet.

The Complainant asserts that:

(1) the domain name "libro.com" is confusingly similar to the trademark "LIBRO" in accordance with Article 4a(i) of the UDRP;

(2) the Respondent has no rights or legitimate interest in respect of the domain name "libro.com" as provided in Article 4a(ii) in connection with Article 4c of the UDRP;

(3) the domain name "libro.com" was registered and used in bad faith as provided in article 4(a) (iii) in connection with article 4 (b) of the UDRP because the Respondent listed the domain name with the Internet domain name auction service "greatdomains.com" and offered the domain name for sale for US $ 25,000. It contends that the Respondent has "obviously registered the domain name with the intention of selling or otherwise transferring the domain name to Complainant for a valuable consideration in excess of Respondent's out-of-pocket costs directly related to the domain name."

B. Respondent

Respondent contends that the allegation by the Complainant is "a kind of reverse domain name hijacking".

It disputes Complainant's argument that it registered and used the domain name in bad faith and alleges that Complainant's trademark "LIBRO" is the common word for "book" in the Spanish and Italian languages and is used extensively by third parties.

Respondent contends that it registered the domain name "libro.com" at the same date as the domain name "juego.com" which is the common word for "game" in the Spanish language. It claims that it chose to register the domain name because it was descriptive for services in relation to books and that the registration was made with the intent of establishing a virtual book store.

It contends that no one has the exclusive right over the use of this word in the Internet.

## 6. Discussion and Findings

This Panelist's jurisdiction is limited. Pursuant to Paragraph 4(a) of the UDRP, a domain can be transferred only where the complainant has proven that each of the following three elements is present:

(1) the domain name is identical or confusingly similar to a trademark or service mark in which the complainant has rights;

(2) the domain name holder has no rights or legitimate interests in respect of the domain name; and

(3) the domain name has been registered and is being used in bad faith.

This Panelist finds that while Complainant satisfies the first and the second requirement, the record does not support a finding of the third requirement.

## 6.2 Confusing Similarity

It is beyond dispute that the Complainant has satisfied the first requirement. The domain name registered by Respondent is identical to the registered trademarks owned by Complainant. The addition of ".com" is not significant

in determining similarity.

**6.2 Respondent's rights or legitimate interest in the domain name**

Paragraph 4 (a) (ii) of the UDRP asks whether the Respondent has any rights or legitimate interests in respect of the domain name. Under Paragraph 4 (c) of the UDRP, Respondent may demonstrate that it has a right or legitimate interest to a domain name for the purpose of Paragraph 4 (a) (ii) by providing evidence of any of the following circumstances:

(1) demonstrable preparations to use the domain name in connection with a bona fide offering of goods or services prior to the dispute;

(2) an indication that the registrant has been commonly known by the domain name even if it has acquired no trademark rights;

(3) legitimate noncommercial or fair use of the domain name without intent to divert consumers or to tarnish the trademark

The Complainant argues that the Respondent has no trademark rights in the word "LIBRO" in any country and contends that the Respondent fails the test of Paragraph 4 (c) UDPR because it has never used the domain name "libro.com" in bona fide commerce.

The Respondent asserts that it registered the domain name because it is the Spanish and Italian word for "book" and with the intention of using the domain name for establishing a virtual book store.

The question to be answered by the Panelist is whether the mere registration of a generic name without making preparations to use the domain name for the bona fide offering of goods or services is sufficient to demonstrate the rights or legitimate interests required by Paragraph 4 (a).

Respondent has not provided any evidence of facts that indicate that it has made preparations to use the domain name for the alleged purpose. It is clear from the record that the domain name is currently used to redirect visitors to a website at <restaurant.com>. There is no evidence such as business plans, correspondence, reports or other forms of evidence before the Panelist that show that Respondent is engaged in any activities to use the domain name <libro.com> for the bona fide offering of goods or services.

The Panel finds that the mere speculative idea for a bona fide business application of a generic domain name does not fall within any of the circumstances listed under Paragraph 4 (a) UDRP as evidence of rights or legitimate interests.

While in principle the registrations of descriptive names are perfectly legal in most countries and may constitute considerable value, the mere speculation in generic domain names without showing any demonstrable evidence of plans for the bona fide use is not sufficient to prove legitimate interest in a domain name. Speculation itself is not recognized under the UDRP as a legitimate interest and the UDRP should not be interpreted to hold that mere speculation in domain names is a legitimate interest.

Under these circumstances and on this record, it is concluded that Respondent has no rights or legitimate interests in the domain name "libro.com" and that the requirement of the UDRP Paragraph 4 (a) (ii) is satisfied.

**6.3. Bad Faith**

While Complainant satisfies the first and the second requirement, it cannot be established from the information at hand, that Complainant exhibited the requisite "bad faith" of Paragraph 4 (a) (iii) UDRP.

The UDRP is very narrow in scope; it covers only clear cut cases of "cybersquatting" and "cyberpiracy", and does not cover every dispute that might rise over domain names (see, for example, Second Staff Report on Implementation Documents for the Uniform Dispute Resolution Policy (October 24, 1999), available at <http:www.icann.org/udrp/udrp-second-staff-report-24oct99.htm> which states: "Except in cases involving 'abusive registrations' made with bad faith intent to profit commercially from others' trademarks (e.g. cybersquatting and cyberpiracy) the adopted policy leaves the resolution of disputes to the courts and calls for registrars not to disturb

a registration until those courts decide. The adopted policy establishes a streamlined, inexpensive administrative dispute-resolution procedure intended only for the relatively narrow class of cases of "abusive registrations".)

Respondent's explanation that it selected the domain name because it is the Spanish and Italian word for "book" appears prima facie acceptable. It is a fact that registrations of generic words have acquired considerable commercial value and represent an important asset in electronic commerce especially in a trade sector where product marketing through the Internet has become vitally important as it is for the book industry.

The Complainant has not provided any evidence of facts which might indicate that Respondent knew or should have known of Complainant's trademarks and registered the domain name with the intent of capitalizing on Complainant's trademark interests or even that Respondent was aware of Complainant's existence when it registered the domain name.

It is noted that on this record the Complainant has no trademark rights in the U.S.A and has not started commercial activities on the U.S. market.

The record also shows that the Respondent has registered and acquired the domain name "juego.com" which is also a descriptive term in the Spanish language.

Under these circumstances it is not likely that the Respondent has chosen the domain name with the intent to profit or otherwise abuse Complainant's trademarks, but, in contrast, it appears reasonable to believe that the Respondent's allegation that it has registered the domain name for making profit from descriptive character of this domain name is correct.

Complainant has offered no evidence to contradict this claim. In the absence of additional evidence specifically on issue of bad faith and the reasonably plausible explanation given by the Respondent as to why the domain name was chosen, it cannot be imputed that Respondent's intent was to sell and transfer the domain name to the Complainant.

Therefore, since it has not been demonstrated that the domain name "libro.com" was chosen by Respondent at the time of registration with the intent to profit or otherwise abuse Complainant's trademark rights, I conclude that Complainant has not met its burden of proof under Paragraphs 4 (a) (iii) of the UDRP.


**7. Decision**

For all of the foregoing reasons, the Panelist decides that the domain name "libro.com" should not be transferred to the Complainant.

The Panelist's decision should not be read as a substantive decision on the merits of any trademark infringement claim Complainant ultimately may choose to bring in court under applicable national law, where likelihood of confusion and dilution can be taken into account, irrespective of the intentions of the Respondent in registering the domain name. That issue, however, which would raise difficult questions as to the extent of territorial trademark rights protection in the Internet, is outside the scope of this decision.

---

Torsten Bettinger
Sole Panelist

Dated: May 16, 2000

# Response Annex 9

**Re: Case No. D2015-0875**

**<casino-vulcan.co>**
**<cazino-vulcan.com>**
**<club-vulcan.com>**
**<vulcan-casino.co>**
**<vulcan-casino2.com>**
**<vulcan-cazino.net>**
**<vulcan-cazino.org>**

**Notice of Change in Registrant Information**

Further to the information provided by the Center on June 5, 2015, we are amending the Complaint above-mentioned in the following terms:

On the one hand, we would like to add the newly identified registrants as respondents

(1) As to the domain names

<casino-vulcan.co>
<vulcan-casino.co>
<club-vulcan.com>
<vulcan-cazino.org>
<vulcan-casino2.com>
<cazino-vulcan.com>:

Lianna Tall
wlewo777@gmail.com
Escave ltd
Global Gateway 8, Rue de la Perle
Mahe
Other
Seychelles na
+380.992765710

(2) As to the domain name <vulcan-cazino.net>:

First Name - Timur
Last Name - Ziganshin
Organization - Timur Ziganshin
Street - 9th January st. 233-61
ZIP – 426050
City – Izhevsk
State - Udmurtia
Phone - 7.9058777027
Country – Russian Federation
Phone - 7.9058777027
Email - daminc@udm.net

Furthermore, despite the fact that the domain names belong to different owners, we would like to keep a single consolidated complaint. WIPO panels have articulated principles governing the question of whether a complaint filed with WIPO by multiple complainants may be brought against (one or more) respondents. These criteria encompass situations in which (i) the complainants either have a specific common grievance against the respondent, or the respondent has engaged in common conduct that has affected the complainants' individual rights in a similar fashion; (ii) it would be equitable and procedurally efficient to permit the consolidation; or in the case of complaints brought (whether or not filed by multiple complainants) against more than one respondent, where (i) **the domain names or the websites to which they resolve are subject to common control**, and (ii) the consolidation would be fair and equitable to all parties.

As stated in prior UDRP decisions, a consolidation of multiple respondents in a single proceeding may be appropriate, under paragraphs 3(c) and 10(e) of the Rules, where the circumstances of a given case indicate that common control is being exercised over the disputed domain names or the web sites to which the domain names resolve and the consolidation would be fair and equitable to all parties. See *Speedo Holdings B.V. v. Programmer, Miss Kathy Beckerson, John Smitt, Matthew Simmons*, <u>WIPO Case No. D2010-0281</u> and <u>paragraph 4.16 of the WIPO Overview of WIPO Panel Views on Selected UDRP Questions</u>, Second Edition ("WIPO Overview 2.0").

The burden of proof for establishing that the disputed domain names are subject to common control is a preponderance of the evidence, as stated amongst others in *Seiko HoldingsKabushiki Kaisha v. L. Collins Travis, C. Turner Jose, et al.*, <u>WIPO Case No. D2013-0994</u>; and *Lanc me Parfums Et Beaut Et Compagnie v. You Ge, Jean Buding, Kang Tianhuan, Zongkaili, Leigeng*, <u>WIPO Case No. D2013-1559</u>.

We believe that these criteria are met in the present case due to the following reasons:

- According to the documentation submitted in support of the complaint (annexes 25-38), the disputed domain name "vulcan-cazino.net" (owned by TIMUR) is a complete copy of "vulcan-casino.co", "vulcan-cazino.org", "vulcan-casino2.com" (owned by LIANNA TALL). Therefore, we can conclude that the domains are subject to common control.

- In addition, we are providing a screenshot (below) which proves the relation between "vulcan-cazino.net" (owned by TIMUR) and another of the disputed domains "vulcan-casino2.com" (owned by the other respondent). This screenshot is taken from the web "vulcan-cazino.net" and links this domain with "vulcan-casino2.com": "REMEMBER OFFICIAL MIRROR CASINO VOLCANO: VULCAN-CASINO2.COM".



The rest of the complaint remains unchanged.

Respectfully submitted,

Sandra Santos

Date: June 10, 2015

## COMPLAINT TRANSMITTAL COVERSHEET

Attached is a Complaint that has been filed against you with the World Intellectual Property Organization (**WIPO**) Arbitration and Mediation Center (the **Center**) pursuant to the Uniform Domain Name Dispute Resolution Policy (the **Policy**) approved by the Internet Corporation for Assigned Names and Numbers (**ICANN**) on October 24, 1999, the Rules for Uniform Domain Name Dispute Resolution Policy (the **Rules**) approved by ICANN on October 30, 2009, and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the **Supplemental Rules**).

The Policy is incorporated by reference into your Registration Agreement with the Registrar(s) of your domain name(s), in accordance with which you are required to submit to a mandatory administrative proceeding in the event that a third party (a **Complainant**) submits a complaint to a dispute resolution service provider, such as the Center, concerning a domain name that you have registered. You will find the name and contact details of the Complainant, as well as the domain name(s) that is/are the subject of the Complaint in the document that accompanies this Coversheet.

You have no duty to submit a Response to the Complaint until you have been formally Notified of the Complaint and Commencement of Administrative Proceedings by the Center. Once the Center has checked the Complaint to determine that it satisfies the formal requirements of the Policy, the Rules and the Supplemental Rules, it will forward an official copy of the Complaint, including annexes, to you by e-mail as well as sending you hardcopy Written Notice by post and/or facsimile, as the case may be. You will then have 20 calendar days from the date of Commencement within which to submit a Response to the Complaint in accordance with the Rules and Supplemental Rules to the Center and the Complainant. You may represent yourself or seek the assistance of legal counsel to represent you in the administrative proceeding.

- The **Policy** can be found at http://www.icann.org/en/dndr/udrp/policy.htm

- The **Rules** can be found at http://www.icann.org/en/dndr/udrp/uniform-rules.htm

- The **Supplemental Rules**, as well as other information concerning the resolution of domain name disputes can be found at http://www.wipo.int/amc/en/domains/supplemental/eudrp/

- A **model Response** can be found at http://www.wipo.int/amc/en/domains/respondent/index.html

Alternatively, you may contact the Center to obtain any of the above documents. The Center can be contacted in Geneva, Switzerland by telephone at +41 22 338 8247, by fax at +41 22 740 3700 or by e-mail at domain.disputes@wipo.int.

You are kindly requested to contact the Center to provide an alternate e-mail address to which you would like (a) the Complaint, including Annexes and (b) other communications in the administrative proceeding to be sent.

A copy of this Complaint has also been sent to the Registrar(s) with which the domain name(s) that is/are the subject of the Complaint is/are registered.

By submitting this Complaint to the Center the Complainant hereby agrees to abide and be bound by the provisions of the Policy, Rules and Supplemental Rules.

*Before the:*

## WORLD INTELLECTUAL PROPERTY ORGANIZATION
## ARBITRATION AND MEDIATION CENTER

| | |
|---|---|
| *RITZIO PURCHASE LIMITED*<br>Corporate ID: 144533<br>Diagorou Street 4, Kermia building<br>6th floor, Office 601, P.C.1097,<br>Nicosia, Cyprus<br>(**Complainant**) | **Disputed Domain Name(s):** |
| -v- | |
| [a] *PRIVACYPROTECT.ORG*<br>ID#10760, PO Box 16<br>Nobby Beach, Queensland<br>QLD 4218, Australia | https://vulcan-casino.co/<br>https://casino-vulcan.co/ |
| And | |
| [b] *GLOBAL DOMAIN PRIVACY*<br>*SERVICES INC*<br>Salduba Bldg, 3rd floor, 53rd East<br>Street, Marbella, Panama | https://www.club-vulcan.com/<br>http://vulcan-cazino.org/<br>http://vulcan-casino2.com/<br>http://cazino-vulcan.com/ |
| And | |
| [c] *MONIKER PRIVACY*<br>*SERVICES*<br>2230 NE 9th Street, Second Floor<br>Fort Lauderdale, FL 33304, US<br>(**Respondents**) | http://vulcan-cazino.net/ |

_____

## COMPLAINT

(Rules, Paragraph 3(b);  Supplemental Rules, Paragraphs 4(a), 12(a), Annex E)

## I. Introduction

[1.]   This Complaint is hereby submitted for decision in accordance with the Uniform Domain Name Dispute Resolution Policy (the **Policy**), approved by the Internet Corporation for Assigned Names and Numbers (**ICANN**) on October 24, 1999, the Rules for Uniform Domain Name Dispute Resolution Policy (the **Rules**), approved by ICANN on October 30, 2009, and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the **Supplemental Rules**).

2

## II.  The Parties

### A.  The Complainant
(Rules, Paragraphs 3(b)(ii) and (iii))

[2.]   The Complainant in this administrative proceeding is Ritzio Purchase Limited.

[3.]   The Complainant's contact details are:

|  |  |
|---|---|
| Registered Address: | Ritzio Purchase Limited Diagorou Street 4, Kermia building 6th floor, Office 601, P.C.1097, Nicosia, Cyprus |

[4.]   The Complainant's authorized representative in this administrative proceeding is:

[a.] Name: MAPA TRADEMARKS SL
[b.] Address: C/Henao Nº 7, 5ª Planta, Dpto 8; E-48009 Bilbao (Bizkaia); Spain
[c.] Telephone: +34.944019133
[d.] Fax: +34.944104765
[e.] E-Mail: info@mapasl.com

[5.]   The Complainant's preferred method of communications directed to the Complainant in this administrative proceeding is:

Electronic-only material

Electronic-only material
Method:          E-mail
Address:         info@mapasl.com
Contact:         Sandra Santos

### B.  The Respondent
(Rules, Paragraph 3(b)(v))

[6.]   According to the WHOIS database located at http://www.whois.com, the Respondent in this administrative proceeding is

[a]   Name:          Domain Admin
      Organization:  PrivacyProtect.org
      Address:       ID#10760, PO Box 16
                     Nobby Beach, QLD 4218
                     Australia
      Telephone:     +45.36946676
      E-mail:        contact@privacyprotect.org

3

[b]  Name:          Private Whois
Organization:  GLOBAL DOMAIN PRIVACY SERVICES INC
Address:       Salduba Bldg, 3rd floor, 53rd East Street, Marbella
               Panama
Telephone:     +507.8365260
E-mail:        vulcan-cazino.org@domains-anonymizer.com
               Club-vulcan.com@domains-anonymizer.com
               Vulcan-casino2.com@domains-anonymizer.com
               Cazino-vulcan.com@domains-anonymizer.com


[c]  Name:          Moniker Privacy Services
Organization: Moniker Privacy Services
               Address:    2320 NE 9th Street, Second Floor
               Fort Lauderdale, FL 33304, United States
Telephone:     (800) 688 6311
Fax:           (954) 585 9186
E-mail:
d027ec8e83659db56325ff25f4d5573de50c373610d71d1328b5c9306a1bbea9
@vulcan-cazino.net.whoisproxy.org


Copies of the printout of the WHOIS database searches conducted on May 21st, 2015 are provided as Annexes 1-3.


*CONSOLIDATION*


[7.]   Although we apparently deal with three different Respondents, according to the data provided in Annexes 1-3, the Complainant strongly believes that there is only one Respondent.

Due to the impossibility to disclose the registrant information, we will wait until the Center informs us on the identity of the Respondents and, in case there is more than one, we will apply for the consolidation of Respondents since all the domain names seem to be operated by the same person.

Following the criteria of the WIPO Center case-law (Case No D2015-0066), *"As stated in prior UDRP decisions, a consolidation of multiple respondents in a single proceeding may be appropriate, under paragraphs 3(c) and 10(e) of the Rules, where the circumstances of a given case indicate that common control is being exercised over the disputed domain names or the web sites to which the domain names resolve and the consolidation would be fair and equitable to all parties. See* Speedo Holdings B.V. v. Programmer, Miss Kathy Beckerson, John Smitt, Matthew Simmons*, WIPO Case No. D2010-0281 and paragraph 4.16 of the WIPO Overview of WIPO Panel Views on Selected UDRP Questions, Second Edition ("WIPO Overview 2.0").*

The domain names in dispute can be classified either by registrant or by the content of the corresponding webpage. In the first case, as stated above, we have:

   a)  VULCAN-CASINO.CO and CASINO-VULCAN.CO registered with PublicDomainRegitry

   b)  CLUB-VULCAN.COM, VULCAN-CAZINO.ORG, VULCAN-CASINO2.COM and CAZINO-VULCAN.COM registered with URL SOLUTIONS INC

   c)  VULCAN-CAZINO.NET registered with MONIKER ONLINE SERVICES LLC

Nevertheless, if we attend to the use of the domain names, they can only be classified in three groups that do not match the registrar criteria:

   1  VULCAN-CASINO.CO, VULCAN-CAZINO.NET, VULCAN-CAZINO.ORG, VULCAN-CASINO2.COM,

   2  CASINO-VULCAN.CO, CAZINO-VULCAN.COM,

   3  CLUB-VULCAN.COM

### III.  The Domain Name(s) and Registrar(s)
(Rules, Paragraphs 3(b)(vi), (vii))

[8.]   This dispute concerns the domain names identified below:

   [a] **vulcan-casino.co**

   Last Transferred Date:      Mar 01, 2015
   Domain Registration Date:  Jul 31, 2014
   Domain Expiration Date:    Jul 30, 2016

   [b] **casino-vulcan.co**

   Last Transferred Date:      Mar 01, 2015
   Domain Registration Date:  Jul 31, 2014
   Domain Expiration Date:    Jul 30, 2016

   [c] **club-vulcan.com**

   Updated Date:       Mar 07, 2015
   Creation Date:      Feb 29, 2012
   Expiration Date:    Feb 28, 2017

   [d] **vulcan-cazino.org**

   Creation Date:         Sep 10, 2013
   Updated Date:          May 05, 2015
   Registry Expiry Date: Sep 10, 2016

[e] **vulcan-casino2.com**

| | |
|---|---|
| Updated Date: | Feb 25, 2015 |
| Creation Date: | Oct 30, 2013 |
| Expiration Date: | Oct 30, 2016 |

[f] **cazino-vulcan.com**

| | |
|---|---|
| Updated Date: | Feb 25, 2015 |
| Creation Date: | Aug 06, 2013 |
| Expiration Date: | Aug 06, 2016 |

[g] **vulcan-cazino.net**

| | |
|---|---|
| Updated Date: | Feb 18, 2015 |
| Creation Date: | Sep 10, 2013 |
| Expiration Date: | Sep 10, 2015 |

[9.]   The registrars with which the domain names are registered are:

**vulcan-casino.co; casino-vulcan.co;**

| | | |
|---|---|---|
| [a.] | Registrar Name: | PublicDomainRegistry.com |
| [b.] | Registrar's Address: | 9450 SW Gemini Dr. #48732, Beaverton, Oregon, 97008, United States |
| [c.] | Telephone Number: | +1.2013775952 |
| [d.] | Fax: | +1.3202105146 |
| [e.] | E-Mail Address: | domain.manager@publicdomainregistry.com |

**club-vulcan.com; vulcan-cazino.org;**

**vulcan-casino2.com; cazino-vulcan.com**

| | | |
|---|---|---|
| [a.] | Registrar Name: | URL SOLUTIONS INC. |
| [b.] | Registrar's Address: | Ipasa Building, Third Floor, 41st Street, Bella Vista, Panama |
| [c.] | Telephone Number: | +507.8339556 |
| [d.] | Fax: | +1.3022889676 |
| [e.] | E-Mail Address: | support@pananames.com |
| [f.] | Correspondence address: 53-55 Agios Athanasios Street, Michaelangelo House, 4102 Limassol, Cyprus | |

**vulcan-cazino.net**

| | | |
|---|---|---|
| [a.] | Registrar Name: | Moniker Online Services LLC |
| [b.] | Registrar's Address: | 2320 NE 9th Street, Second Floor Fort Lauderdale, FL 33304 United States |
| [c.] | Telephone Number: | (800) 688 6311 (954) 607 1294 |
| [d.] | E-Mail Address: | abuse@moniker.com |

6

### IV.  Language of Proceedings
(Rules, Paragraph 11)

[10.]  Paragraph 11(a) of the Rules provides that, subject to the authority of the Panel, the language of the proceedings shall be the same as the language of the Registration Agreement unless the Parties have otherwise agreed to proceeding in a different language.

To the best of the Complainant's knowledge, the language of the Registration Agreements is English, a copy of which are provided as Annex 4 for Public Domain Registry, Annex 5 for URL Solutions inc. and Annex 6 for  Moniker Online Services LLC to this Complaint.  The Complaint has been submitted in English, and submits that given the above the language of proceeding should be English.


### V.  Jurisdictional Basis for the Administrative Proceeding
(Rules, Paragraphs 3(a), 3(b)(xv))

[11.]  This dispute is properly within the scope of the Policy and the Administrative Panel has jurisdiction to decide the dispute.  The registration agreement, pursuant to which the domain names that are the subject of this Complaint are registered, incorporates the Policy.  A true and correct copy of the domain name dispute policy that applies to the domain names in question are provided as Annexes 4, 5, 6 for Public Domain Registry, URL Solutions INC. and Moniker Online Services LLC respectively,  to this Complaint and can be found at:

[a.] Public Domain Registry - http://publicdomainregistry.com/legal/

[b]. URL Solutions INC. -
https://pananames.com/upload/landing/urlsolutions/legal/DOMAIN_NAME_REGIST RATION_SERVICE_AGREEMENT.pdf

[c] http://www.moniker.com/legal/registration-agreement


### VI.  Factual and Legal Grounds
(Policy, Paragraphs 4(a), (b), (c); Rules, Paragraph 3)

[12.]   This Complaint is based on the following grounds:

This Complaint is based on the Вулкан[1], Вулкан (& Design), Vulcan and Volcano trademarks, among other Вулкан, Vulcan, Vulkan and Volcano composite marks (hereinafter the "Vulcan Marks") owned by a Complainant in numerous countries around the world and which Complainant have been continuously using since at least as early as 1992—long before Respondent's registration of the subject domain names in 2012 and 2014. Complainant is the owner of registrations for the Vulcan Marks in numerous countries around the world, including but not limited to the below registrations in Russia.  Copies of trademark records for a representative sample of the Vulcan Marks are attached hereto as Annex 7.

In addition, we are providing the internet the links corresponding to these TM from the official database of the Russian Federation (ROSPATENT), also attached as Annexes 8-11

(a) TM — "Вулкан" (Russian Federation), Reg. number: 342290 (link to the original Russian text from Rospatent:

http://www1.fips.ru/fips_servl/fips_servlet?DB=RUTM&rn=1248&DocNumber=342290&TypeFile=html

(b) TM — "Вулкан" (Russian Federation), Reg. number: 342291 (link to the original Russian text from Rospatent:

http://www1.fips.ru/fips_servl/fips_servlet?DB=RUTM&rn=1248&DocNumber=342291&TypeFile=html

(c) TM – VULKAN (Russian Federation), Reg. number 353692 (link to the original Russian text from Rospatent:

http://www1.fips.ru/fips_servl/fips_servlet?DB=RUTM&rn=1248&DocNumber=353692&TypeFile=html

(d) TM — "Вулкан" (Russian Federation), Reg. number: 353694 (link to the original Russian text from Rospatent:

http://www1.fips.ru/fips_servl/fips_servlet?DB=RUTM&rn=1248&DocNumber=353694&TypeFile=html

Furthermore, Annexes 12-16 consists of some of the TM duly registered by the Complainant worldwide.

For more than 20 years, Ritzio has been in the business of providing high-quality gaming, casino and entertainment products and services, including but not limited to the operation and management of gaming halls, the design, development, provision and maintenance of games of chance, including betting bingo and slot machines, the provision of interactive real-money games through a computer network, and other related products and services under the well-known Вулкан and Vulcan brands.

---

[1] The English translation of Вулкан is "Volcano" or "Vulcan". The transliteration of this trademark in Roman letters is "Vulkan" since Cyrillic has no equivalent of the letter "C," only "K," for the "K" sound.

Today, Ritzio is one of the leading gaming operators with more than 200 branded gaming clubs and more than 5,800 gaming machines deployed throughout Europe. Photographs of Вулкан and Vulcan branded gaming halls, and a listing of Ritzio's operations, are attached here to as Annexes 17 and 18.

Moreover, Ritzio's business operations continue to expand far beyond Russia. With more than 2,000 employees, operations in a number of countries, including but not limited to Germany, Romania, Latvia, Belarus, Croatia and Italy, multiple Вулкан and/or Vulcan branded gaming halls opening each year, Ritzio has developed a global reputation as a high-quality, technologically advanced, multi-national gaming operator. A summary of Ritzio's operations and locations, and a collection of press releases reflecting Ritzio's growth, are attached hereto as Annex 19 containing detailed information on the development of Ritzio's key brand VULCAN in the following countries respectively: Germany, Italy, Croatia, Romania, Belarus, Latvia.

As demonstrated above, the Vulcan Marks are famous and enjoy a worldwide reputation in connection with high quality products and services in the gaming and entertainment industries.

Since at least as early as 1992, Ritzio has expended significant resources to promote its products and services using the Vulcan Marks through various media outlets. As a result, Ritzio has developed significant goodwill in the Vulcan Marks and has grown the Vulcan Marks into one of the most recognized and well-known brands in Europe, Eastern Europe. In fact, between 2006 and 2010, Ritzio's operating revenue was in excess of USD $5.5 billion. Id. Ritzio has expended significant time, money and resources to build goodwill in the Vulcan Marks, and as a result, the Vulcan Marks have become famous and are extremely valuable trademarks. Annexes 20 - 22 consist of excerpts from independent sources that prove Ritzio's growth and the success of VULCAN chain of gaming clubs widely spread in several countries.

Ritzio has also been recognized by the International Gaming Awards for its commitment to corporate social responsibility providing since 2005 active support to the Paralympic movement and sportsmen with disabilities. A long-term partnership between Ritzio and the Russian Paralympic Committee began with the company's sponsorship of the Russian national team at the 2006 Winter Paralympic Games in Turin (see Annexes 23-24).

Yet, not only is Respondent using the Vulcan Marks without authorization, but in an effort to illicitly profit off the goodwill and reputation of the Vulcan Marks, it has copied the look and feel of Ritzio's gaming clubs, copied the registered "Вулкан" word mark and lightning bolt logo exactly, created "copycat" websites, and is intentionally misrepresenting in the descriptions of the web-sites that the disputed domain names (and the content associated therewith) is directly connected to, and/or affiliated with, Ritzio's land-based gaming clubs. Screenshots reflecting these false representations are attached hereto as Annexes 25-31.

A. **The domain name(s) is(are) identical or confusingly similar to a trademark or service mark in which the Complainant has rights;**
(Policy, Paragraph 4(a)(i); Rules, Paragraphs 3(b)(viii), (b)(ix)(1))

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---|---|---|---|---|
| Armenia Azerbaijan Belarus Estonia Georgia Kyrgyzstan Kazakhstan Lithuania Latvia Moldova Tajikistan Turkmenistan Ukraine Uzbekistan | Вулкан (& design)  | 791038 03.09.2002 | gaming; recreational information; entertainment information; club services (entertainment or education); night clubs; game services provided on-line (from a computer network); providing recreational facilities; organisation of competitions (entertainment); lotteries; holiday camp services (entertainment); organisation of shows (impresario services); television entertainment; bookmobile services; providing karaoke services; providing golf facilities; providing amusement arcade services; providing cinema facilities; presentation of live performances; theatre productions; videotape film production; film production; radio entertainment; entertainer services;; news reporters services; party planning (entertainment); music composition services; subtitling; providing of casino facilities (gambling); providing museum facilities (presentation, exhibitions); educational services; orchestra services; translation; scriptwriting services; recording studio services; digital imaging services; circuses; production of shows. | Ritzio Purchase Limited |

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---------|-----------|---------------------|----------------|------------|
| Russia | Вулкан (& design)  | 342290 28.01.2008 | Entertainment; providing an interactive game [through a computer network], providing interactive, organization of lotteries, organization of entertainment recreation, provision of gaming halls, rental of slot machines, [Entertainment] casino services. | Ritzio Purchase Limited |
| Belarus European Community Croatia Kazakhstan Serbia Ukraine | VOLCANO | 989103 11.08.2008 | Automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket machines; automatic equipment for monitoring and control of electronic machinery; computer and computer game programs; computer programs [downloadable software]; betting; gaming devices with mandatory use of television sets; devices for electronic games; providing access and telecommunications connections to the Internet; casino games; information on recreation, entertainment, and clubs; providing interactive games through a computer network; provision of gaming halls; organizing lotteries; casino services; design of computer systems; and the arrangement of websites. | Ritzio Purchase Limited |

11

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---------|-----------|---------------------|----------------|------------|
| Russia | VULKAN | 353692 18.11.2005 | Automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket machines; automatic equipment for monitoring and control of electronic machinery; computer and computer game programs; computer programs [downloadable software]; betting; gaming devices with mandatory use of television sets; devices for electronic games; providing access and telecommunications connections to the Internet; casino games; information on recreation, entertainment, and clubs; providing interactive games through a computer network; provision of gaming halls; organizing lotteries; casino services; design of computer systems; and the arrangement of websites. | Ritzio Purchase Limited |

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---------|-----------|---------------------|----------------|------------|
| Russia | Вулкан (& Design)  | 342291 28.01.2008 | Entertainment; sporting and cultural activities, including rental of tennis courts, billiard halls, ticket booking for shows, video, disco, casino games, book publishing, information on recreation, information on entertainment, clubs, cultural and educational and entertaining, Clubs cafe night, providing an interactive game [through a computer network], providing interactive electronic publications [not downloadable], practical training [demonstration], organization of exhibitions with cultural and educational purpose, recreation, organization of workshops [training] organization of competitions education or entertainment, organization of lotteries, organization of entertainment recreation, organizing sports events, amusement parks, providing sports equipment, provision of gaming halls, cinemas services, programming, sports, movies and film production, rental of sound recordings and audio , rental of audio equipment and video recorders, rental of slot machines, rental movies, equipment rental stadiums, using desktop publishing electronic publishing, interactive publication of books and periodicals, publication of texts [other than advertising], entertaining guests, programming meetings [Entertainment] casino services, translation services, photography, shows, music halls. | Ritzio Purchase Limited |

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---------|-----------|---------------------|----------------|------------|
| Russia | Вулкан (& Design)  | 353694 25.06.2008 | Automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket machines; automatic equipment for monitoring and control of electronic machinery; computer and computer game programs; computer programs [downloadable software]; betting; gaming devices with mandatory use of television sets; devices for electronic games; providing access and telecommunications connections to the Internet; casino games; information on recreation, entertainment, and clubs; providing interactive games through a computer network; provision of gaming halls; organizing lotteries; casino services; design of computer systems; and the arrangement of websites. | Ritzio Purchase Limited |

14

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---|---|---|---|---|
| Belarus Kazakhstan Ukraine | Вулкан (& Design)  | 992196 October 17, 2008 | automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket dispensers; juke boxes (musical), automatic distribution machines; computer operation programs, recorded; computer game programs, computer programs (downloadable software), electronic publications (downloadable), integrated circuit cards (smart cards), totalizators, apparatus for games adapted for use with television receivers only, amusement apparatus adapted for use with television receivers only, computer peripheral devices, anti-theft warning apparatus, chips (integrated circuits). Entertainment; gaming, recreation information, entertainment information, club services (entertainment or education), night clubs, game services provided on-line (from a computer network), providing recreation facilities, arranging and conducting workshops (training), organization of competitions (education or entertainment), operating lotteries, holiday camp services (entertainment), organization of sports competitions, providing amusement arcade services, rental of slot machines, rental of cine-films, rental of stadium facilities, electronic desktop publishing, entertainer services, party planning (entertainment), providing casino facilities (gambling), production of shows. | Ritzio Purchase Limited |

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---|---|---|---|---|
| Belarus Kazakhstan Ukraine | Вулкан (& Design)  | 977713 12.08.2008 | automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket dispensers; juke boxes (musical), automatic distribution machines; computer operation programs, recorded; computer game programs, computer programs (downloadable software), electronic publications (downloadable), integrated circuit cards (smart cards), totalizators, apparatus for games adapted for use with television receivers only, amusement apparatus adapted for use with television receivers only, computer peripheral devices, anti-theft warning apparatus, chips (integrated circuits). Entertainment; gaming, recreation information, entertainment information, club services (entertainment or education), night clubs, game services provided on-line (from a computer network), providing recreation facilities, arranging and conducting workshops (training), organization of competitions (education or entertainment), operating lotteries, holiday camp services (entertainment), organization of sports competitions, providing amusement arcade services, rental of slot machines, rental of cine-films, rental of stadium facilities, electronic desktop publishing, entertainer services, party planning (entertainment), providing casino facilities (gambling), production | Ritzio Purchase Limited |

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---|---|---|---|---|
| Belarus European Community Croatia Kazakhstan Serbia Ukraine | VULKAN | 984297 11.08.2008 | Automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket machines; automatic equipment for monitoring and control of electronic machinery; computer and computer game programs; computer programs [downloadable software]; betting; gaming devices with mandatory use of television sets; devices for electronic games; providing access and telecommunications connections to the Internet; casino games; information on recreation, entertainment, and clubs; providing interactive games through a computer network; provision of gaming halls; organizing lotteries; casino services; design of computer systems; and the arrangement of websites. | Ritzio Purchase Limited |

Copies of the registration certificates and the corresponding translation into English are attached in Annexes 7-16

As stated above, the disputed domain names were created in 2012-2015 years and currently are used to offer exactly the same services (online gambling and casino services) that the Complainant provides under the Vulcan trademarks.

The disputed domain names are identical to the English translation of the registered Vulcan mark, and differ by only one letter when compared to the Cyrillic literation.  This minor difference has no impact aurally. As such, the mark and the domain names are virtually identical, which render them confusingly similar. *See e.g., Compagnie Generale Des Etablissements Michelin - Michelin & Cie. v. Graeme Foster,* D2004-0279 (WIPO Apr. 9, 2010)

"noting that confusing similarity can exist if the trademark and the disputed
domain name contain word elements of different languages and a
considerable part of the public understands the meaning of the translation";

*See also W.W. Grainger, Inc. v. PPA Media Services, Ryan G Foo / Fundacion Private
Whois*, D2013-1854 (WIPO Dec. 17, 2013) (The modification of one letter in a disputed
domain name does nothing to diminish the confusingly similarity.

"This is yet another example of 'typosquatting' whereby a domain name
registrant omits, adds or substitutes one letter from the wording of a
trademark in the hope that the Internet user will mis-type the search enquiry
and will be diverted to the respondent's website."

Further, a user encountering Respondent's domain names is likely to be confused into
believing that any websites associated with the domain names are owned by, affiliated with,
or sponsored by Complainant.

Here, the disputed domain names incorporate and completely appropriate the
Complainant's Vulcan mark (including the English translation thereof), adding only the
generic terms "casino" and "club," which identify the core services rendered under the
Vulcan Marks, namely, the operation and management of casinos and gaming halls, the
design, development, provision and maintenance of games of chance, including betting bingo
and slot machines, and the provision of interactive real-money games through a computer
network. As a result, the disputed domain names will mislead consumers into believing that
the domain names are either owned by or associated with Complainant. *Scholastic Inc. v. 366
Publications*, D2000-1627 (WIPO Feb. 21, 2001)

"The addition of a generic term is not a distinguishing feature. . . . In fact, it
may increase the likelihood of confusion if it is an apt term for the
Complainant's business"

Additionally, because: (1) Respondent's sites copy the look-and-feel of Ritzio's gaming
clubs; (2) provide online gaming services that are competitive to those offered in connection
with the Vulcan Marks;  and (3) the domain names are expected to attract consumers
interested in Ritzio's products and services, confusion is likely.

Furthermore it is important to pay attention to the **fact that the disputed domain names
copy completely Vulcan Marks, including design and wording that are registered and
owned by the Complainant**.

18

See screenshots of the main pages of the disputed domains below (It should be considered that reproduction of Vulcan Marks can be found on almost all pages of the disputed domains):

**vulcan-casino.co (same at vulcan-cazino.net; vulcan-cazino.org; vulcan-casino2.com)**



**casino-vulcan.co (same at cazino-vulcan.com)**



**club-vulcan.com**



**B.** **The Respondent has no rights or legitimate interests in respect of the domain name(s);**
(Policy, Paragraph 4(a)(ii); Rules, Paragraph 3(b)(ix)(2))


Following the decision in Charles Jourdan Holding AG v. AAIM, D2000-0403 (WIPO June 27, 2000), Respondent has no legitimate rights or interests in the domain name if (i) it is not a licensee of Complainant, nor has it received any permission or consent to use Complainant's trademark; (ii) Complainant has prior rights in that trademark which precedes Respondent's registration of its domain name; and (iii) Respondent is not commonly known by the trademark.

In this case, the Respondent is not a licensee of Complainant, nor has the Complainant authorized or consented to Respondent's use of any of the Vulcan Marks. The complainant has provided extensive evidence of its rights to the registered Vulcan Marks, use of which commenced about 20 years before the creation and registration of the disputed domain names in 2012-2015. In fact, it is Complainant's position, as supported by the evidence of record, that Respondent simply acquired the domain name registrations in hopes of intentionally attracting, for commercial gain, Internet users to Respondent's website by creating a likelihood of confusion.

As noted above, the Complainant is the owner of numerous trademark registrations for Вулкан, Вулкан (& Design), Vulkan, and Vulcan trademarks, among other Вулкан, Vulkan, and Volcano composite marks around the world. Aside from the rights derived from its registrations, Ritzio has also acquired a substantial reputation under common law by virtue of its extensive and significant advertising of the Vulcan Marks, and its substantially exclusive and continuous use of the Vulcan Marks since at least as early as 1992.

Paragraph 4(c) of the Policy provides that a respondent may demonstrate rights or legitimate interests in a domain name by establishing that: (1) prior to the dispute, it used, or made demonstrable preparations to use a domain name in connection with a bona fide offering of goods or services; (2) it has been commonly known by the domain names, even if it has not acquired any trademark or service mark rights; or (3) it is making a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue. Respondent cannot satisfy **any** of these factors.

In this case, the disputed domain names bear no relationship to any legitimate business of Respondent nor has Respondent shown any demonstrable preparations to use the domain names in connection with any bona fide offering of goods or services.  In fact, to the best of Complainant's knowledge, Respondent has not developed any legitimate business relating to or incorporating the Vulcan Marks.  *See e.g., E. J. McKernan Co. v. Texas International Property Associates*, D2007-1499 (WIPO Dec. 17, 2007) (citing *Disney Enters., Inc. v. Dot Stop,* FA 145227 (NAF March 17, 2003)

> "finding that Respondent's diversionary use of Complainant's mark to attract Internet users to its own website was not a bona fide offering of goods or services".

Nor has Respondent ever been commonly known by the disputed domain names.  Rather, as Annexes 1-3 establish, Respondent has purposely hidden itself from the consuming public by using the WHOIS privacy service to register the disputed domain names. Furthermore, Respondent uses as many ways as possible to assure users, that the disputed domain names belong to Complainant. This issue is described in details below in Section C.

Furthermore, **the commercial use to which the disputed domain name has been put, because it trades on the Complainants fame, is not bona fide, and because it is commercial is not a fair or non-commercial use**.

21

See Consitex S.A., Lanificio Ermenegildo Zegna & Figli S.p.A., Ermenegildo Zegna Corporation v. LaPorte Holdings, Inc., D2005-0030 (WIPO Feb. 25, 2005) (citing Bank of Am. Corp. v. Nw. Free Cmty. Access, FA 180704 (NAF Sept. 30, 2003)

> "Respondent's demonstrated intent to divert Internet users seeking Complainants' website to a website of Respondent and for Respondent's benefit is not a *bona fide* offering of goods or services" under Policy 4(c)(i) and it is not a legitimate noncommercial or fair use under Policy 4(c)(iii);

See also America Online, Inc. v. Xianfeng Fu, D2000-1374 (WIPO Dec. 11, 2000)

> "It would be unconscionable to find a bona fide offering of services in a respondent's operation of its website using a domain name which is confusingly similar to the complainant's mark and for same business".

Eventually, we would like to quote a recent Decision issued by the Center in the case Paddy Power PLC v Oded Keinan, Winning Partner Traffic Label Limited, D2014-1192 (WIPO Sep. 09, 2014)

> "First, the Complainant never authorized the Respondent to utilize any of the PADDY POWER Marks nor does the Complainant apparently have any relationship or association whatsoever with the Respondent. Furthermore, given the exclusive trademark rights that reside in the Complainant, the Respondent could not legitimately acquire any public association between itself and the mark PADDY POWER or even any mark similar thereto such as a mark containing PADDY with a generic gambling-related term(s) appended thereto, at least for the goods and services provided by the Complainant under its marks.
>
> The Respondent once used the disputed domain name <paddybingo.com> to address a guide/review site with links to various bingo websites but now uses it as an address of a "pay to play" bingo site. The Respondent uses the disputed domain name <paddyscasino.com> as an address of an online gambling site. The Respondent's evident purpose behind choosing <paddybingo.com> and <paddyscasino.com> and continuing to use those names is to exploit the ensuing source confusion of Internet users in order to divert traffic away from the Complainant's competing gambling sites to the Respondent's sites instead and hence commercially benefit the Respondent to the detriment of the Complainant. Neither of these uses constitutes a *bona fide* offering of goods or services consistent with paragraph 4(c)(i) of the Policy, nor a legitimate noncommercial or fair use under paragraph 4(c)(iii) of the Policy".

**C.**   **The domain name(s) was/were registered and is/are being used in bad faith.**
(Policy, paragraphs 4(a)(iii), 4(b);  Rules, paragraph 3(b)(ix)(3))


Given the reputation and widespread use of the Vulcan Marks, any use by the Respondent of the domain name in dispute would constitute an infringement of the Complainant's trademark rights.


Bad faith can be presumed in that the Respondent was aware of Complainant's well-known marks and claim of rights therein. *See Aktiebolaget Electrolux v. Protected Domain Name Services*, D2011-2005 (WIPO March 6, 2012) (finding that, in light of the notoriety of the Complainant's famous marks, the Respondent had actual or constructive knowledge of the ELECTROLUX mark at the time it registered the disputed domain name and such knowledge constituted bad faith); *Yahoo! Inc. v. David Ashby*, D2000-0241 (WIPO June 14, 2000) (finding that the fame of the YAHOO! mark negated any plausible explanation for Respondent's registration of the yahooventures.com domain name)); *Crocs Inc. v. Alex Xie*, D2011-1500 (WIPO Nov. 15, 2011) (finding that ─the disputed domain is not one that one could legitimately adopt other than for the purpose of creating an impression or association with Complainant given Complainant's registration its CROCS marks in many countries, and the fact that Complainant was the subject of extensive media coverage).


Furthermore, **Respondent is not only aware of Complainants' trademarks, but also in as many ways as possible shows that disputed domains are associated with Complainant**. Usually at the bottom of the main-page and at the "about"-page, where Respondent describes its services, user can see the following texts that clearly refer to Complaints history while emphasizing the word "Official" (quotes are from translated by Google Chrome web-pages of disputed domain names. See Annexes 32-38 where these translated versions are presented in full):

(a) http://casino-vulcan.co/about (the same at http://cazino-vulcan.com/about and )  "Slots Volcano - a gaming brand, well-known in many countries. As for Russia and the CIS countries, there is, perhaps, there will be no such gamblers, who would not love to play clubs volcano.

The highest quality of service and the most generous slot machines on the market of gambling entertainment - these are our main features. It is because of this approach to business brand, "Volcano" was the undisputed leader, and even synonymous with "slots". Have you caught yourself thinking "Where to play slot machines?" Of course - in the volcano!

23

Keeping pace with the times, not so long ago we went out and the open spaces of the Internet. Now the old familiar games available right in your browser! Moreover - Casino-Vulcan.co on our site you can play slot machines for free, without registration and SMS."

http://casino-vulcan.co/ (the same at http://cazino-vulcan.com/ )

"Official Game Club Volcano offers to play slot machines for free, without registration and sms! It is inconceivable that someone does not recognize good old red-and-blue logo "Game Club Volcano." Slot machines Vulcan were deservedly known throughout Russia and CIS countries."

"By taking advantage of the Internet, we can now offer our customers an even greater service. One of our innovations is that you can play as well as in free slot machines for money in our club - Volcano online casino!"

(b) http://vulcan-casino.co/about.html   (the   same   at   http://vulcan-cazino.net/about.html; http://vulcan-cazino.org/about.html; http://vulcan-casino2.com/about.html)

"We are sure that there is not a man that would not be familiar with the brand name "Volcano". We have long been a leading national network of gaming clubs, but after some changes in the Russian legislation, the club "Volcano" had left his home and now we're working on the territory of countries such as Belarus, Latvia, Serbia, Italy, Germany, Romania, the Czech Republic, Peru and Bolivia.

We keep up with the progress and are ready to offer you a long-familiar and favorite games - now on the Internet. All of our old players, no doubt, already vkurse the advantages offered by the game at the "volcano".

http://vulcan-casino.co/ (the same at http://vulcan-cazino.net/about.html; http://vulcan-cazino.org/about.html; http://vulcan-casino2.com/about.html)

"Surely you are familiar with our brand, because not so long ago the gaming club "Volcano" with blue-red sign can be found in any large, and not very city. Without false modesty we can say that Vulkan had the largest network of gaming clubs in Russia and Moscow. And now - in 2011 - we are glad to see you on our official web-site!"

(c) http://www.club-vulcan.com/ "Club Volcano - familiar to many, if not all, gambling brand, has long become synonymous with big winnings and gambling Activity. Since the heyday of gaming network "Volcano" Many years have passed, and now we have shifted our emphasis on Europe, Latin America, and most importantly - we are now represented on the Internet!"

"All lovers of the casino in real life yet, of course, is well remembered the blue-red sign gambling clubs "Volcano". He was in any major city. It was the largest network gaming

establishments, which united a great many true connoisseurs of gambling in the casino. Now free slot machines you can play online casino Volcano."

Finally, the Respondent has acted in bad faith pursuant to Paragraph 4(b)(iv) by using domain name that incorporates the Vulcan mark to intentionally attract, for commercial gain, Internet users to Respondent's website by creating a likelihood of confusion. This fraudulent activity in creating "copycat" websites and directly attempting to deceive consumers is clearly bad faith. As noted above, the Vulcan Marks are well-known and have a global reputation.

The Respondent has attempted to capitalize off this fact by purchasing the domain name in dispute which has nothing to do with Respondent concealing its identity, and trading off the goodwill that Ritzio has established over the past 20 years. In fact, as noted above, Respondent has solely *used* the disputed domains names which completely appropriate the Vulcan mark to divert consumers from Complainant, and to profit from competitive online gaming and casino services conduct that WIPO has routinely ruled constitutes bad faith. *See e.g., The Knot, Inc. v. Alex Luongo*, D2006-0296 (WIPO Apr. 15, 2006)

> "When typosquatting is done by a competitor or for competitive services, the evidence is conclusive. A close misspelling of a competitor's mark betrays both knowledge of the mark and an intentional attempt to use that mark to divert Internet users to competitors for profit, taking advantage of whatever goodwillw attaches to the mark and bringing the circumstances within paragraph 4(b)(iii) and 4(b)(iv) of the Policy."

*Telstra Corporation Limited v. Nuclear Marshmallows,* D2000-0003 (WIPO Feb. 18, 2000)

> "noting that a respondent's concealment of its true identity as domain name holder strongly indicates a bad faith intention".

*The American Automobile Association, Inc. v. aaaaautoinsurance.com Privacy--Protect.org, aaa-netaccess.com Privacy--Protect.org, aaanetacceess.com Privacy--Protect.org, Isaac Goldstein,* D2011-2069 (WIPO Feb. 8, 2012)

> "Further evidence of bad faith use can be inferred from the choice to register the Disputed Domain Names <aaaaautoinsurance.com>, <aaanetacceess.com>, and <aaa-netaccess.com> using a privacy service. Whereas the Panel accepts that **use of a privacy or proxy registration service is not in and of itself an indication of bad faith, it notes that the manner in which such service is used can in certain circumstances constitute a factor indicating bad faith**, for example use of a privacy service in combination with provision of incomplete contact information or continued concealment of the "true" or "underlying" registrant (see paragraph 3.9 of the WIPO Overview 2.0 and *Fifth Third Bancorp v. Secure WhoIs Information Service*, WIPO Case No. D2006-0696). Given that certain registrant contact information provided, per the relevant WhoIs records, is

inaccurate (for example the telephone number provided for each of the three Disputed Domain Names is for a number located in Brazil rather than Shanghai, China, which is the location of the stated address) and given the elaborate attempts to conceal what the Panel considers to be at least an association between the Respondent Privacy--Protect.org, the registrar, and the alleged new registrant of the three Disputed Domain Names, Milan Kovac, with the Respondent Isaac Goldstein (as discussed under Proper Respondents above), the Panel considers that an inference of bad faith use on the basis of the Respondents' use of a privacy registration service to be appropriate in the present case".

Accordingly, the disputed domain names are confusingly similar to Complainant's registered Vulcan Mark and were registered without the Complainant's consent, the Respondent has no legitimate interests in the domain name and is not making any legitimate non-commercial or fair use of the domain name, and the domain name are registered in bad faith as evidenced by the Respondent's hidden identity, typosquatting, and attempt to trade off the fame and goodwill of the Vulcan Marks.

## VII.  Remedies Requested
(Rules, Paragraph 3(b)(x))

[13.]  In accordance with Paragraph 4(i) of the Policy, for the reasons described in Section VI. above, the Complainant requests the Administrative Panel appointed in this administrative proceeding that the disputed domain names be transferred to the Complainant.

## VIII.  Administrative Panel
(Rules, Paragraph 3(b)(iv);  Supplemental Rules, Paragraph 8(a))

[14.]  The Complainant elects to have the dispute decided by a single-member Administrative Panel.

## IX.  Mutual Jurisdiction
(Rules, Paragraph 3(b)(xiii))

[15.]  In accordance with Paragraph 3(b)(xiii) of the Rules, the Complainant will submit, with respect to any challenges that may be made by the Respondent to a decision by the Administrative Panel to transfer or cancel the domain names that are the subject of this Complaint, to the jurisdiction of the courts at the location of the domain name holder's address, as shown for the registration of the domain names in the concerned registrar's WhoIs database at the time of the submission of the Complaint to the Center.

## X.  Other Legal Proceedings
(Rules, Paragraph 3(b)(xi))

[16.]   None.


## XI.  Communications
(Rules, Paragraphs 2(b), 3(b)(xii);  Supplemental Rules, Paragraphs 3, 4, 12)

[17.]   A copy of this Complaint, together with the cover sheet as prescribed by the Supplemental Rules, has been sent or transmitted to the Respondent on May 27, 2015 by email to:

contact@privacyprotect.org

club-vulcan.com@domains-anonymizer.com
vulcan-cazino.org@domains-anonymizer.com
vulcan-casino2.com@domains-anonymizer.com
casino-vulcan.com@domains-anonymizer.com

d027ec8e83659db56325ff25f4d5573de50c373610d71d1328b5c9306a1bbea9@vulcan-cazino.net.whoisproxy.org


[18.]   A copy of this Complaint has been sent or transmitted to the concerned registrars on May 27, 2015 by email to contact@privacyprotect.org; support@pananames.com; abuse@moniker.com

[19.] This Complaint is submitted to the Center in electronic form, including annexes, in the appropriate format.


## XII.  Payment
(Rules, Paragraph 19;  Supplemental Rules Paragraph 10, Annex D)

[20.]   As required by the Rules and Supplemental Rules, payment in the amount of USD 1500  has been made by bank transfer (Annex 39).

### XIII.  Certification
(Rules, Paragraph 3(b)(xiv);  Supplemental Rules, Paragraph 14)

[21.]   The Complainant agrees that its claims and remedies concerning the registration of the domain name(s)*,* the dispute, or the dispute's resolution shall be solely against the domain name holder and waives all such claims and remedies against (a) the WIPO Arbitration and Mediation Center and Panelists, except in the case of deliberate wrongdoing, (b) the concerned registrar(s), (c) the registry administrator, (d) the Internet Corporation for Assigned Names and Numbers, as well as their directors, officers, employees, and agents.

[22.] The Complainant certifies that the information contained in this Complaint is to the best of the Complainant's knowledge complete and accurate, that this Complaint is not being presented for any improper purpose, such as to harass, and that the assertions in this Complaint are warranted under the Rules and under applicable law, as it now exists or as it may be extended by a good-faith and reasonable argument.

Respectfully submitted,

Sandra Santos

Date: 27 May, 2015

28

## XIV.   List of Annexes
(Rules, Paragraph 3(b)(xv);  Supplemental Rules, Paragraphs 4(a), 12(a), Annex E)

Annex 1 - Printout of the Whois search for the disputed domain names VULCAN-CASINO.CO and CASINO-VULCAN.CO on May 21, 2015 (registered with PublicDomainRegistry)

Annex 2 - Printout of the Whois search for the disputed domain names CLUB-VULCAN.COM, VULCAN-CAZINO.ORG, VULCAN-CASINO2.COM, CAZINO-VULCAN.COM on May 21, 2015 (registered with URL SOLUTIONS INC)

Annex 3 - Printout of the Whois search for the disputed domain name VULCAN-CAZINO.NET on May 21, 2015 (registered with MONIKER ONLINE SERVICES LLC)

Annex 4 - Registration Agreement between Public Domain Registry and ICANN

Annex 5 – Registration Agreement between URL and ICANN

Annex 6 – Registration Agreement between MONIKER and ICANN

Annex 7 - Copies of Russian TM 342290 / 352291 / 353694

Annex 8 – RU TM 342290 (ROSPATENT)

Annex 9 – RU TM 342291 (ROSPATENT)

Annex 10 – RU TM 353692 (ROSPATENT)

Annex 11 – RU TM 353694 (ROSPATENT)

Annex 12 – IR 989103 (ROMARIN)

Annex 13 – IR 984297 (ROMARIN)

Annex 14 – IR 791038 (ROMARIN)

Annex 15 – IR 992196 (ROMARIN)

Annex 16 – IR 977713 (ROMARIN)

Annex 17 – Photos on VULKAN

Annex 18 – Ritzio presentation

Annex 19 – VULCAN in Germany, Italy, Croatia, Romania, Belarus, Latvia  (Ritzio's webpage)

Annex 20 – General information on Ritzio Group (VULCAN) Source: http://cbonds.com

Annex 21 – Article from The Moscow Times on Ritzio activities

Annex 22 -  Ritzio Entertainment Group (Bally's Casino)

Annexes 23 and 24 – Ritzio's social responsibility (Ritzio's webpage)

Annex 25 – Webpage operated with the disputed domain name vulcan-casino.co (in Russian language)

Annex 26 - Webpage operated with the disputed domain name casino-vulcan.co (in Russian language)

Annex 27 – Webpage operated with the disputed domain name club-vulcan.com (in Russian language)

Annex 28 – Webpage operated with the disputed domain name vulcan-cazino.org (in Russian language)

Annex 29 – Webpage operated with the disputed domain name vulcan-casino2.com (in Russian language)

Annex 30 – Webpage operated with the disputed domain name vulcan-cazino.net (in Russian language)

Annex 31 – Webpage operated with the disputed domain name cazino-vulcan.com (in Russian language)

Annex 32 – Webpage operated with the disputed domain name vulcan-casino.co (translated into English)

Annex 33 - Webpage operated with the disputed domain name casino-vulcan.co (translated into English)

Annex 34 – Webpage operated with the disputed domain name club-vulcan.com (translated into English)

Annex 35 – Webpage operated with the disputed domain name vulcan-cazino.org (translated into English)

Annex 36 – Webpage operated with the disputed domain name vulcan-casino2.com (translated into English)

Annex 37 – Webpage operated with the disputed domain name vulcan-cazino.net (translated into English)

Annex 38 – Webpage operated with the disputed domain name cazino-vulcan.com (translated into English)

Annex 39 – Payment (transfer to WIPO account)

# Response Annex 10

## COMPLAINT TRANSMITTAL COVERSHEET

Attached is a Complaint that has been filed against you with the World Intellectual Property Organization (**WIPO**) Arbitration and Mediation Center (the **Center**) pursuant to the Uniform Domain Name Dispute Resolution Policy (the **Policy**) approved by the Internet Corporation for Assigned Names and Numbers (**ICANN**) on October 24, 1999, the Rules for Uniform Domain Name Dispute Resolution Policy (the **Rules**) approved by ICANN on October 30, 2009, and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the **Supplemental Rules**).

The Policy is incorporated by reference into your Registration Agreement with the Registrar(s) of your domain name(s), in accordance with which you are required to submit to a mandatory administrative proceeding in the event that a third party (a **Complainant**) submits a complaint to a dispute resolution service provider, such as the Center, concerning a domain name that you have registered. You will find the name and contact details of the Complainant, as well as the domain name(s) that is/are the subject of the Complaint in the document that accompanies this Coversheet.

You have no duty to submit a Response to the Complaint until you have been formally Notified of the Complaint and Commencement of Administrative Proceedings by the Center. Once the Center has checked the Complaint to determine that it satisfies the formal requirements of the Policy, the Rules and the Supplemental Rules, it will forward an official copy of the Complaint, including annexes, to you by e-mail as well as sending you hardcopy Written Notice by post and/or facsimile, as the case may be. You will then have 20 calendar days from the date of Commencement within which to submit a Response to the Complaint in accordance with the Rules and Supplemental Rules to the Center and the Complainant. You may represent yourself or seek the assistance of legal counsel to represent you in the administrative proceeding.

- The **Policy** can be found at http://www.icann.org/en/dndr/udrp/policy.htm

- The **Rules** can be found at http://www.icann.org/en/dndr/udrp/uniform-rules.htm

- The **Supplemental Rules**, as well as other information concerning the resolution of domain name disputes can be found at http://www.wipo.int/amc/en/domains/supplemental/eudrp/

- A **model Response** can be found at http://www.wipo.int/amc/en/domains/respondent/index.html

Alternatively, you may contact the Center to obtain any of the above documents. The Center can be contacted in Geneva, Switzerland by telephone at +41 22 338 8247, by fax at +41 22 740 3700 or by e-mail at domain.disputes@wipo.int.

You are kindly requested to contact the Center to provide an alternate e-mail address to which you would like (a) the Complaint, including Annexes and (b) other communications in the administrative proceeding to be sent.

A copy of this Complaint has also been sent to the Registrar(s) with which the domain name(s) that is/are the subject of the Complaint is/are registered.

By submitting this Complaint to the Center the Complainant hereby agrees to abide and be bound by the provisions of the Policy, Rules and Supplemental Rules.

*Before the:*

## WORLD INTELLECTUAL PROPERTY ORGANIZATION
## ARBITRATION AND MEDIATION CENTER

*RITZIO PURCHASE LIMITED*
Corporate ID: 144533
Diagorou Street 4, Kermia building     **Disputed Domain Name(s):**
6th floor, Office 601, P.C.1097,
Nicosia, Cyprus
(**Complainant**)

-v-

*GLOBAL DOMAIN PRIVACY*     [a] http://bestvulkan.net/
*SERVICES INC*     [b] http://vulkandeluxe.com/
Salduba Bldg, 3rd floor, 53rd East     [c] http://vulkandelux.com/
Street, Marbella, Panama     [d] http://moivulcan.com/
    [e] http://vulkanplay.com/

_____

## COMPLAINT
(Rules, Paragraph 3(b);  Supplemental Rules, Paragraphs 4(a), 12(a), Annex E)

## I. Introduction

[1.]     This Complaint is hereby submitted for decision in accordance with the Uniform Domain Name Dispute Resolution Policy (the **Policy**), approved by the Internet Corporation for Assigned Names and Numbers (**ICANN**) on October 24, 1999, the Rules for Uniform Domain Name Dispute Resolution Policy (the **Rules**), approved by ICANN on October 30, 2009, and the WIPO Supplemental Rules for Uniform Domain Name Dispute Resolution Policy (the **Supplemental Rules**).

## II.  The Parties

### A.  The Complainant
(Rules, Paragraphs 3(b)(ii) and (iii))

[2.]    The Complainant in this administrative proceeding is **RITZIO PURCHASE LIMITED**.

[3.]    The Complainant's contact details are:

| | |
|---|---|
| Registered Address: | Ritzio Purchase Limited<br>Diagorou Street 4, Kermia building<br>6th floor, Office 601, P.C.1097,<br>Nicosia, Cyprus |

[4.]    The Complainant's authorized representative in this administrative proceeding is:

[a.] Name: MAPA TRADEMARKS SL
[b.] Address: C/Henao Nº 7, 5ª Planta, Dpto 8; E-48009 Bilbao (Bizkaia); Spain
[c.] Telephone: +34.944019133
[d.] Fax: +34.944104765
[e.] E-Mail: info@mapasl.com

[5.]    The Complainant's preferred method of communications directed to the Complainant in this administrative proceeding is:

Electronic-only material

Electronic-only material
Method:           E-mail
Address:          info@mapasl.com
Contact:          Sandra Santos

### B.  The Respondent
(Rules, Paragraph 3(b)(v))

[6.]    According to the WHOIS database located at http://www.whois.com, the Respondent in this administrative proceeding is

[a]  Name:          Private Whois
     Organization:  GLOBAL DOMAIN PRIVACY SERVICES INC
     Address:       Salduba Bldg, 3rd floor, 53rd East Street, Marbella
                    Panama
     Telephone:     +507.8365260

3

E-mail:     [a] bestvulkan.net@domains-anonymizer.com
            [b] vulkandeluxe.com@domains-anonymizer.com
            [c] vulkandelux.com@domains-anonymizer.com
            [d] moivulcan.com@domains-anonymizer.com
            [e] vulkanplay.com@domains-anonymizer.com


[7] According to information provided by registrar to WIPO Arbitration and
Mediaton Center:

Name:        Sergey Budusov
Organization:  INFOSTAR MANAGEMENT LTD
Address:     Suite 13054, 43 Bedford Street
City:        London
Zip:         WC2E 9HA
Country:     UK
Phone:       +44 207862191
Email:       ifsdomains@gmail.com


Copies of the printout of the WHOIS database searches conducted on June 18th,

2015 are provided as Annex 1.


### III.  The Domain Name(s) and Registrar(s)
(Rules, Paragraphs 3(b)(vi), (vii))

[8.]    This dispute concerns the domain names identified below:


[a]  http://bestvulkan.net/

Updated Date:       Feb 20, 2014
Creation Date:      Mar 07, 2014
Expiration Date:    Mar 07, 2017


[b] http://vulkandeluxe.com/

Updated Date:       Apr 08, 2015
Creation Date:      Mar 27, 2013
Expiration Date:    Mar 27, 2018


[c] http://vulkandelux.com/

Updated Date:       Apr 08, 2015
Creation Date:      Mar 27, 2013
Expiration Date:    Mar 27, 2018

[d] http://moivulcan.com/

| | |
|---|---|
| Updated Date: | Feb 19, 2015 |
| Creation Date: | May 20, 2014 |
| Expiration Date: | May 20, 2016 |

[e] http://vulkanplay.com/

| | |
|---|---|
| Updated Date: | Feb 19, 2015 |
| Creation Date: | Jul 10, 2012 |
| Expiration Date: | Jul 10, 2016 |

[9.]   The registrars with which the domain names are registered are:

http://bestvulkan.net; http://vulkandeluxe.com; http://vulkandelux.com; http://moivulcan.com; http://vulkanplay.com

| | | |
|---|---|---|
| [a.] | Registrar Name: | **URL SOLUTIONS INC.** |
| [b.] | Registrar's Address: | Ipasa Building, Third Floor, 41st Street, Bella Vista, |
| | | Panama |
| [c.] | Telephone Number: | +507.8339556 |
| [d.] | Fax: | +1.3022889676 |
| [e.] | E-Mail Address: | support@pananames.com |
| [f.] | Correspondence address: 53-55 Agios Athanasios Street, Michaelangelo House, 4102 Limassol, Cyprus | |

### IV.  Language of Proceedings
(Rules, Paragraph 11)

[10.]   Paragraph 11(a) of the Rules provides that, subject to the authority of the Panel, the language of the proceedings shall be the same as the language of the Registration Agreement unless the Parties have otherwise agreed to proceeding in a different language.

To the best of the Complainant's knowledge, the language of the Registration Agreement is English, a copy of which is provided as Annex 2 for URL Solutions inc. to this Complaint.  The Complaint has been submitted in English, and submits that given the above the language of proceeding should be English.

5

## V.  Jurisdictional Basis for the Administrative Proceeding
(Rules, Paragraphs 3(a), 3(b)(xv))

[11.]   This dispute is properly within the scope of the Policy and the Administrative Panel has jurisdiction to decide the dispute.   The registration agreement, pursuant to which the domain names that are the subject of this Complaint are registered, incorporates the Policy.  A true and correct copy of the domain name dispute policy that applies to the domain names in question is provided as Annex 2 for URL Solutions INC to this Complaint and can be found at:

URL Solutions INC. -

https://www.pananames.com/upload/landing/urlsolutions/legal/DOMAIN_NAM
E_REGISTRATION_SERVICE_AGREEMENT.pdf

## VI.  Factual and Legal Grounds
(Policy, Paragraphs 4(a), (b), (c); Rules, Paragraph 3)

[12.]   This Complaint is based on the following grounds:

This Complaint is based on the Вулкан[1], Вулкан (& Design), Vulcan and Volcano trademarks, among other Вулкан, Vulcan, Vulkan and Volcano composite marks (hereinafter the "Vulkan Marks") owned by a Complainant in numerous countries around the world and which Complainant have been continuously using since at least as early as 1992—long before Respondent's registration of the subject domain names in 2012-2014. Complainant is the owner of registrations for the Vulkan Marks in numerous countries around the world, including but not limited to the below registrations in Russia, which, to Complainant' thinking are the most relevant in the case. Not to overload the case, Complainant decided not to attach Vulkan Marks that are owned by companies which are a part of Ritzio Group, like Bartlett Corporation' Vulkan Trademarks #s: 216203; 257824; 307722; 307880; 361357 registered in period 2000-2005 and valid until 2022. Copies of trademark records for a representative sample of the Vulkan Marks are attached hereto as Annex 3.

In addition, we are providing the internet the links corresponding to these TM from the official database of the Russian Federation (ROSPATENT), also attached as Annexes 4-7

(a)  TM – VULKAN (Russian Federation), Reg. number 353692 (link to the original Russian text from Rospatent:

---

[1] The English translation of Вулкан is "Volcano" or "Vulcan". The transliteration of this trademark in Roman letters is "Vulkan" since Cyrillic has no equivalent of the letter "C," only "K," for the "K" sound.

6

http://www1.fips.ru/fips_servl/fips_servlet?DB=RUTM&rn=1248&DocNumber=353692&TypeFile=html

(b) TM — "Вулкан" (Russian Federation), Reg. number: 353694 (link to the original Russian text from Rospatent:

http://www1.fips.ru/fips_servl/fips_servlet?DB=RUTM&rn=1248&DocNumber=353694&TypeFile=html

(c) TM — "Вулкан" (Russian Federation), Reg. number: 342290 (link to the original Russian text from Rospatent:

http://www1.fips.ru/fips_servl/fips_servlet?DB=RUTM&rn=1248&DocNumber=342290&TypeFile=html

(d) TM — "Вулкан" (Russian Federation), Reg. number: 342291 (link to the original Russian text from Rospatent:

http://www1.fips.ru/fips_servl/fips_servlet?DB=RUTM&rn=1248&DocNumber=342291&TypeFile=html

Furthermore, Annexes 8-12 consists of some of the Vulkan Marks duly registered by the Complainant worldwide with basic registrations in Russia but currently independent due to Article 6.2 on the Protocol (period of 5 years from registration passed), such as:

**791038** – EE (ESTONIA) – GE (Georgia) – LT (Lithuania) – TM (Turkmenistan) – UZ (Uzbekistan) – AM (Armenia) – AZ (Azerbaijan) – BY (Belarus) – KG (Kyrgyzstan) – KZ (Kazakhstan) – LV (Latvia) – MD (Republic of Moldova) – TJ (Tajikistan) –UA (Ukraine);

**989103** – EM (OHIM) – BY (Belarus) – HR (Croatia) – KZ (Kazakhstan) – RS (Serbia) - UA (Ukraine);

**992196** – BY (Belarus) – KZ (Kazakhstan) – UA (Ukraine);

**977713** – BY (Belarus) – KZ (Kazakhstan) – UA (Ukraine);

**984297** – EM (OHIM) – BY (Belarus) – HR (Croatia) – KZ (Kazakhstan) – RS (Serbia) – UA (Ukraine).

Furthermore, Complainant does not include in Annexes, not to make the size of complaint huge, other Vulkan marks, which are also registered in Europe. These are trademarks #s: 3020080171499; 307386619; 307377903; 307579271; 200702888; Z20080152A; Z20080153A; 461972; 200702970. All these Vulkan marks have been verified by respective governments, registered, valid and belong to Complainant.

For more than 20 years, Ritzio has been in the business of providing high-quality gaming, casino and entertainment products and services, including but not limited to the operation and management of gaming halls, the design, development, provision and

maintenance of games of chance, including betting bingo and slot machines, the provision of interactive real-money games through a computer network, and other related products and services under the well-known Вулкан and Vulkan brands.

Today, Ritzio is one of the leading gaming operators with more than 200 branded gaming clubs and more than 5,800 gaming machines deployed throughout Europe. Photographs of Вулкан and Vulkan branded gaming halls, and a listing of Ritzio's operations, are attached here to as Annexes 13 and 14.

Moreover, Ritzio's business operations continue to expand far beyond Russia. With more than 2,000 employees, operations in a number of countries, including but not limited to Germany, Romania, Latvia, Belarus, Croatia and Italy, multiple Вулкан and/or Vulkan branded gaming halls opening each year, Ritzio has developed a global reputation as a high-quality, technologically advanced, multi-national gaming operator. A summary of Ritzio's operations and locations, and a collection of press releases reflecting Ritzio's growth, are attached hereto as Annex 15 containing detailed information on the development of Ritzio's key brand VULKAN in the following countries respectively: Germany, Italy, Croatia, Romania, Belarus, Latvia.

Russia and former CIS countries is where Ritzio began the creation of the Vulkan brand which has always been and still is - a flagship of the Complainant' games of chance business. That is why Respondent-like persons find it extremely profitable to act on these territories. While Russian legislative changes from time to time, switching the schematics and business models of all business holders in this field, it requires colossal efforts to continue work, expand Vulkan brand and modify business models for every particular region of the World, where Vulkan brand is presented.

For example, Russian gambling law, particularly – legal act "*On state regulation of activities for the organization and conduct of gambling and on amending some legislative acts of the Russian Federation*" http://pravo.gov.ru/proxy/ips/?docbody=&nd=102111150&rdk=&backlink=1 (Official governmental resource) dated 29.12.2006 with current edition dated 22.07.2014 regulates all types of games of chance, their positioning, reporting system and all other aspects of how gaming services can be provided, where can they be provided and what needs to be done to provide them. At the same time, this legal act imposes a lot of difficulties, which are extremely difficult to overcome for such persons like Respondent. Thus, while Complainant makes efforts, invest human and financial resources to hold positions and weight of the Vulkan brand by creating Licensing programs, Social networks programs with partners (for example: vk.com/app4836341; vk.com/vulcan_game; vk.com/vulcan2_game), advertising, expanding the brand

8

internationally or providing services from abroad, **Respondent chooses the way to** *parasitize* **on the famous Vulkan Brand!** Respondent **didn't even bother** to receive authorization from Ritzio to use Vulkan Marks! Moreover, **Respondents ignored** each and all cease-and-desist e-mails regarding **deliberate Vulkan trademark infringement!**

Since at least as early as 1992, Ritzio has expended significant resources to promote its products and services using the Vulkan Marks through various media outlets.  As a result, Ritzio has developed significant goodwill in the Vulkan Marks and has grown the Vulkan Marks into one of the most recognized and well-known brands in Europe, Eastern Europe.  In fact, between 2006 and 2010, Ritzio's operating revenue was in excess of USD $5.5 billion. Id. Ritzio has expended significant time, money and resources to build goodwill in the Vulkan Marks, and as a result, the Vulkan Marks have become famous and are extremely valuable trademarks. Annexes 16 - 18 consist of excerpts from independent sources that prove Ritzio's growth and the success of VULKAN chain of gaming clubs widely spread in several countries.

Ritzio has also been recognized by the International Gaming Awards for its commitment to corporate social responsibility providing since 2005 active support to the Paralympic movement and sportsmen with disabilities. A long-term partnership between Ritzio and the Russian Paralympic Committee began with the company's sponsorship of the Russian national team at the 2006 Winter Paralympic Games in Turin (see Annexes 19-20).

As demonstrated above, the Vulkan Marks are famous and enjoy a **worldwide** reputation in connection with high quality products and services in the gaming and entertainment industries.

Complainant, being a giant group of companies in huge number of Countries, provides services in gambling for more than twenty years and bears **legal, reputational and financial risks and loss** because of Respondent-like persons who expressly misstate on their web-sites that "Only real", "official" referring to Complainant' Vulkan Marks. For example: Complainant owes a number of nearly **120** gaming halls in Germany where huge reputational and financial damage is dealt because of Respondent. People playing online believe that Respondent's fake websites belong to Complainant, while they are not.

Yet, not only is Respondent using the Vulkan Marks **without authorization**, but in an effort to illicitly profit off the goodwill and reputation of the Vulkan Marks, it has copied the look and feel of Ritzio's gaming clubs, copied the registered "Вулкан" word mark and lightning bolt logo **exactly**, created "copycat" websites, and is intentionally misrepresenting in the descriptions of the web-sites that the disputed domain names (and the content associated therewith) is directly connected to, and/or affiliated with, Ritzio's land-based gaming clubs. Screenshots reflecting these false representations are attached hereto as Annexes 21-25. Translated pages of the description that is used to confuse users are attached as well as Annexes 26-32.

**A.** **The domain name(s) is(are) identical or confusingly similar to a trademark or service mark in which the Complainant has rights;**
(Policy, Paragraph 4(a)(i);  Rules, Paragraphs 3(b)(viii), (b)(ix)(1))

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---|---|---|---|---|
| Armenia Azerbaijan Belarus Estonia Georgia Kyrgyzstan Kazakhstan Lithuania Latvia Moldova Tajikistan Turkmenistan Ukraine Uzbekistan | Вулкан (& design)  | 791038 03.09.2002 | gaming; recreational information; entertainment information; club services (entertainment or education); night clubs; game services provided on-line (from a computer network); providing recreational facilities; organisation of competitions (entertainment); lotteries; holiday camp services (entertainment); organisation of shows (impresario services); television entertainment; bookmobile services; providing karaoke services; providing golf facilities; providing amusement arcade services; providing cinema facilities; presentation of live performances; theatre productions; videotape film production; film production; radio entertainment; entertainer services;; news reporters services; party planning (entertainment); music composition services; subtitling; providing of casino facilities (gambling); providing museum facilities (presentation, exhibitions); educational services; orchestra services; translation; scriptwriting services; recording studio services; digital imaging services; circuses; production of shows. | Ritzio Purchase Limited |

| | | | | |
|---|---|---|---|---|
| **Country** | **Trademark** | **Reg. No./ Reg. Date** | **Goods/Services** | **Registrant** |
| Russia | VULKAN | 353692 18.11.2005 | Automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket machines; automatic equipment for monitoring and control of electronic machinery; computer and computer game programs; computer programs [downloadable software]; betting; gaming devices with mandatory use of television sets; devices for electronic games; providing access and telecommunications connections to the Internet; casino games; information on recreation, entertainment, and clubs; providing interactive games through a computer network; provision of gaming halls; organizing lotteries; casino services; design of computer systems; and the arrangement of websites. | Ritzio Purchase Limited |
| Russia | Вулкан (& design)  | 342290 28.01.2008 | Entertainment; providing an interactive game [through a computer network], providing interactive, organization of lotteries, organization of entertainment recreation, provision of gaming halls, rental of slot machines, [Entertainment] casino services. | Ritzio Purchase Limited |

11

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---|---|---|---|---|
| Belarus European Community Croatia Kazakhstan Serbia Ukraine | VOLCANO | 989103 11.08.2008 | Automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket machines; automatic equipment for monitoring and control of electronic machinery; computer and computer game programs; computer programs [downloadable software]; betting; gaming devices with mandatory use of television sets; devices for electronic games; providing access and telecommunications connections to the Internet; casino games; information on recreation, entertainment, and clubs; providing interactive games through a computer network; provision of gaming halls; organizing lotteries; casino services; design of computer systems; and the arrangement of websites. | Ritzio Purchase Limited |

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---------|-----------|---------------------|----------------|------------|
| Russia | Вулкан (& Design)  | 342291 28.01.2008 | Entertainment; sporting and cultural activities, including rental of tennis courts, billiard halls, ticket booking for shows, video, disco, casino games, book publishing, information on recreation, information on entertainment, clubs, cultural and educational and entertaining, Clubs cafe night, providing an interactive game [through a computer network], providing interactive electronic publications [not downloadable], practical training [demonstration], organization of exhibitions with cultural and educational purpose, recreation, organization of workshops [training] organization of competitions education or entertainment, organization of lotteries, organization of entertainment recreation, organizing sports events, amusement parks, providing sports equipment, provision of gaming halls, cinemas services, programming, sports, movies and film production, rental of sound recordings and audio , rental of audio equipment and video recorders, rental of slot machines, rental movies, equipment rental stadiums, using desktop publishing electronic publishing, interactive publication of books and periodicals, publication of texts [other than advertising], entertaining guests, programming meetings [Entertainment] casino services, translation services, photography, shows, music halls. | Ritzio Purchase Limited |

13

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---------|-----------|---------------------|----------------|------------|
| Russia | Вулкан (& Design)  | 353694 25.06.2008 | Automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket machines; automatic equipment for monitoring and control of electronic machinery; computer and computer game programs; computer programs [downloadable software]; betting; gaming devices with mandatory use of television sets; devices for electronic games; providing access and telecommunications connections to the Internet; casino games; information on recreation, entertainment, and clubs; providing interactive games through a computer network; provision of gaming halls; organizing lotteries; casino services; design of computer systems; and the arrangement of websites. | Ritzio Purchase Limited |

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---|---|---|---|---|
| Belarus Kazakhstan Ukraine | Вулкан (& Design)  | 992196 October 17, 2008 | automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket dispensers; juke boxes (musical), automatic distribution machines; computer operation programs, recorded; computer game programs, computer programs (downloadable software), electronic publications (downloadable), integrated circuit cards (smart cards), totalizators, apparatus for games adapted for use with television receivers only, amusement apparatus adapted for use with television receivers only, computer peripheral devices, anti-theft warning apparatus, chips (integrated circuits). Entertainment; gaming, recreation information, entertainment information, club services (entertainment or education), night clubs, game services provided on-line (from a computer network), providing recreation facilities, arranging and conducting workshops (training), organization of competitions (education or entertainment), operating lotteries, holiday camp services (entertainment), organization of sports competitions, providing amusement arcade services, rental of slot machines, rental of cine-films, rental of stadium facilities, electronic desktop publishing, entertainer services, party planning (entertainment), providing casino facilities (gambling), production of shows. | Ritzio Purchase Limited |

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---|---|---|---|---|
| Belarus Kazakhstan Ukraine | Вулкан (& Design)  | 977713 12.08.2008 | automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket dispensers; juke boxes (musical), automatic distribution machines; computer operation programs, recorded; computer game programs, computer programs (downloadable software), electronic publications (downloadable), integrated circuit cards (smart cards), totalizators, apparatus for games adapted for use with television receivers only, amusement apparatus adapted for use with television receivers only, computer peripheral devices, anti-theft warning apparatus, chips (integrated circuits). Entertainment; gaming, recreation information, entertainment information, club services (entertainment or education), night clubs, game services provided on-line (from a computer network), providing recreation facilities, arranging and conducting workshops (training), organization of competitions (education or entertainment), operating lotteries, holiday camp services (entertainment), organization of sports competitions, providing amusement arcade services, rental of slot machines, rental of cine-films, rental of stadium facilities, electronic desktop publishing, entertainer services, party planning (entertainment), providing casino facilities (gambling), production | Ritzio Purchase Limited |

| Country | Trademark | Reg. No./ Reg. Date | Goods/Services | Registrant |
|---|---|---|---|---|
| Belarus European Community Croatia Kazakhstan Serbia Ukraine | VULKAN | 984297 11.08.2008 | Automatic vending machines and mechanisms for coin-operated apparatus; data processing equipment and computers; ticket machines; automatic equipment for monitoring and control of electronic machinery; computer and computer game programs; computer programs [downloadable software]; betting; gaming devices with mandatory use of television sets; devices for electronic games; providing access and telecommunications connections to the Internet; casino games; information on recreation, entertainment, and clubs; providing interactive games through a computer network; provision of gaming halls; organizing lotteries; casino services; design of computer systems; and the arrangement of websites. | Ritzio Purchase Limited |

Copies of the registration certificates and the corresponding translation into English are attached in Annexes 3-12

**Complainant here expressly states that all the mentioned in this complaint Vulkan Marks are valid and there are no requests for cancellation or any opposition approved against any of the Vulcan marks whatsoever**. That information is proven by each and all Governmental and\or International Registers and extracts provided therefrom.

As stated above, the disputed domain names were created in 2012-2014 years and currently are used to offer exactly the same services (gambling and casino services) that the Complainant provides under the Vulkan trademarks.

The disputed domain names are identical to the English translation of the registered Vulkan mark and absolutely identical to "VULKAN" trademarks (IR984297 and IR353692), and differ by only one letter when compared to the Cyrillic literation in case of moivulcan.com. This minor difference has no impact aurally. As such, the mark and the domain names are virtually identical, which render them confusingly similar. *See e.g., Compagnie Generale Des Etablissements Michelin - Michelin & Cie. v. Graeme Foster,* D2004-0279 (WIPO Apr. 9, 2010)

> "noting that confusing similarity can exist if the trademark and the disputed domain name contain word elements of different languages and a considerable part of the public understands the meaning of the translation";

Further, a user encountering Respondent's domain names is likely to be confused into believing that any websites associated with the domain names are owned by, affiliated with, or sponsored by Complainant.

Here, the disputed domain names incorporate and completely corresponds the Complainant's Vulkan marks (including the English translation thereof), adding only the generic terms "best", "deluxe", "delux", "play" and "moi" (that is a transliteration of Russian word "мой" and is translated as "my") that are considered irrelevant under Policy and do not affect the confusing similarity of domain names and trademarks. See *Dr. Ing. h.c. F. Porsche AG v Vasiliy Terkin,* WIPO Case No. D2003-0888:

> "In numerous cases, it has been held that a domain name that wholly incorporates a Complainant's registered mark may be sufficient to establish confusing similarity for purposes of the UDRP."

See also *Hoffmann-La Roche Inc. v. Wei-Chun Hsia*, WIPO Case No.D2008-0923:

> "The mere addition of words "your" and "shop" before and after the Complainant's mark does little to avoid the conclusion that the contested domain name is confusingly similar to the Complainant's TAMIFLU mark."
>
> and
>
> "In the circumstances of this case wrapping a well-known mark with merely descriptive or generic words is a doomed recipe for escaping a conclusion that the domain name is confusingly similar to the well-known mark."

18

Moreover, word "play" even creates extra confusion effect, due to the main and well known reputation of Vulkan marks - the operation and management of casinos and gaming halls, the design, development, provision and maintenance of games of chance, including betting bingo and slot machines, and the provision of interactive real-money games through a computer network. As a result, the disputed domain names will mislead consumers into believing that the domain names are either owned by or associated with Complainant. *Scholastic Inc. v. 366 Publications*, D2000-1627 (WIPO Feb. 21, 2001)

> "The addition of a generic term is not a distinguishing feature. . . . In fact, it may increase the likelihood of confusion if it is an apt term for the Complainant's business"

Additionally, because: (1) Respondent's sites copy the look-and-feel of Ritzio's gaming clubs; (2) provide online gaming services that are competitive to those offered in connection with the Vulkan Marks;  and (3) the domain names are expected to attract consumers interested in Ritzio's products and services, confusion is likely.

Furthermore it is important to pay attention to the **fact that the disputed domain names copy completely Vulkan Marks, including design and wording that are registered and owned by the Complainant**. As pictured on photos that are included in Annex 13, Vulkan marks are the "face" of Complainant's gaming halls. It is shown below, that Respondent uses the exact copy of Vulkan marks on all of the disputed domain names to maximize the effect of confusion and misrepresentation.

See screenshots of the main pages of the disputed domains below (It should be considered that reproduction of Vulkan Marks can be found on almost all pages of the disputed domains):

http://bestvulkan.net/  (the same at http://moivulcan.com/)



http://vulkandeluxe.com/ (same at http://vulkanplay.com/ and http://vulkandelux.com/)



## B.  The Respondent has no rights or legitimate interests in respect of the domain name(s);
(Policy, Paragraph 4(a)(ii);  Rules, Paragraph 3(b)(ix)(2))

Following the decision in Charles Jourdan Holding AG v. AAIM, D2000-0403 (WIPO June 27, 2000), Respondent has no legitimate rights or interests in the domain name if (i) it is not a licensee of Complainant, nor has it received any permission or consent to use Complainant's trademark; (ii) Complainant has prior rights in that trademark which precedes Respondent's registration of its domain name; and (iii) Respondent is not commonly known by the trademark.

In this case, the Respondent is not a licensee of Complainant, nor has the Complainant authorized or consented to Respondent's use of any of the Vulkan Marks. The complainant has provided extensive evidence of its rights to the registered Vulkan Marks, use of which commenced about 20 years before the creation and registration of the disputed domain names in 2012-2015. In fact, it is Complainant's position, as supported by the evidence of record, that Respondent simply acquired the domain name registrations in hopes of intentionally attracting, for commercial gain, Internet users to Respondent's website by creating a likelihood of confusion.

As noted above, the Complainant is the owner **of numerous active trademark registrations** for Вулкан, Вулкан (& Design), Vulkan, and Vulcan trademarks, among other Вулкан, Vulkan, and Volcano composite marks around the world. Aside from the

rights derived from its registrations, Ritzio has also acquired a substantial reputation under common law by virtue of its extensive and significant advertising of the Vulkan Marks, and its substantially exclusive and continuous use of the Vulkan Marks since at least as early as 1992.

Complainant has its authorized licensees, partners, affiliates, etc. who work legally with Complainant' Vulkan Makrs, and that is a part of our business, of course. **Respondents,** on the other hand**, are neither and never been authorized to use Vulcan marks. Ever!** And, as stated above, **ignored** all cease-and-desist communications regarding **Vulkan trademarks infringement,** submitted to them!

Paragraph 4(c) of the Policy provides that a respondent may demonstrate rights or legitimate interests in a domain name by establishing that: (1) prior to the dispute, it used, or made demonstrable preparations to use a domain name in connection with a bona fide offering of goods or services; (2) it has been commonly known by the domain names, even if it has not acquired any trademark or service mark rights; or (3) it is making a legitimate noncommercial or fair use of the domain name, without intent for commercial gain to misleadingly divert consumers or to tarnish the trademark or service mark at issue.  Respondent cannot satisfy **any** of these factors.

In this case, **the disputed domain names bear no relationship to any legitimate business of Respondent nor has Respondent shown any demonstrable preparations to use the domain names in connection with any bona fide offering of goods or services**.   In fact, to the best of Complainant's knowledge, Respondent has not developed any legitimate business relating to or incorporating the Vulkan Marks.  *See e.g., E. J. McKernan Co. v. Texas International Property Associates*, D2007-1499 (WIPO Dec. 17, 2007) (citing *Disney Enters., Inc. v. Dot Stop,* FA 145227 (NAF March 17, 2003)

> "finding that Respondent's diversionary use of Complainant's mark to attract Internet users to its own website was not a bona fide offering of goods or services".

Nor has Respondent ever been commonly known by the disputed domain names. Rather, as Annex 1 establish, Respondent has purposely **hidden itself** from the consuming public by using the privacy services to register the disputed domain names. Furthermore, Respondent uses as many ways as possible to assure users, that the disputed domain names belong to Complainant. This issue is described in details below in Section C.

Furthermore, **the commercial use to which the disputed domain name has been put, because it trades on the Complainants fame, is not bona fide, and because it is commercial is not a fair or non-commercial use**. *See Consitex S.A., Lanificio Ermenegildo Zegna & Figli S.p.A., Ermenegildo Zegna Corporation v. LaPorte Holdings, Inc.*, D2005-0030 (WIPO Feb. 25, 2005) (citing Bank of Am. Corp. v. Nw. Free Cmty. Access, FA 180704 (NAF Sept. 30, 2003)

> "Respondent's demonstrated intent to divert Internet users seeking Complainants' website to a website of Respondent and for Respondent's benefit is not a *bona fide* offering of goods or services" under Policy 4(c)(i) and it is not a legitimate noncommercial or fair use under Policy 4(c)(iii);

See also *America Online, Inc. v. Xianfeng Fu*, D2000-1374 (WIPO Dec. 11, 2000)

> "It would be unconscionable to find a bona fide offering of services in a respondent's operation of its website using a domain name which is confusingly similar to the complainant's mark and for same business".

The web-sites located on the disputed domain names **are an operating casinos**! They have casino games, payment solutions attached and all other attributes of casino. That is **clearly not a fair or non-commercial use**.

Eventually, we would like to quote a recent Decision issued by the Center in the case Paddy Power PLC v Oded Keinan, Winning Partner Traffic Label Limited, D2014-1192 (WIPO Sep. 09, 2014)

> "First, the Complainant never authorized the Respondent to utilize any of the PADDY POWER Marks nor does the Complainant apparently have any relationship or association whatsoever with the Respondent. Furthermore, given the exclusive trademark rights that reside in the Complainant, the Respondent could not legitimately acquire any public association between itself and the mark PADDY POWER or even any mark similar thereto such as a mark containing PADDY with a generic gambling-related term(s) appended thereto, at least for the goods and services provided by the Complainant under its marks.
>
> The Respondent once used the disputed domain name <paddybingo.com> to address a guide/review site with links to various bingo websites but now uses it as an address of a "pay to play" bingo site. The Respondent uses the disputed domain name <paddyscasino.com> as an address of an online

gambling site. <u>The Respondent's evident purpose behind choosing</u> <u><paddybingo.com> and <paddyscasino.com> and continuing to use those</u> <u>names is to exploit the ensuing source confusion of Internet users in order to</u> <u>divert traffic away from the Complainant's competing gambling sites to the</u> <u>Respondent's sites instead and hence commercially benefit the Respondent</u> <u>to the detriment of the Complainant.</u> Neither of these uses constitutes a *bona fide* offering of goods or services consistent with paragraph 4(c)(i) of the Policy, nor a legitimate noncommercial or fair use under paragraph 4(c)(iii) of the Policy".

**C.   <u>The domain name(s) was/were registered and is/are being used in bad faith.</u>**
(Policy, paragraphs 4(a)(iii), 4(b);  Rules, paragraph 3(b)(ix)(3))

Given the reputation and widespread use of the Vulkan Marks that is described above in details, any use by the Respondent of the domain name in dispute would constitute an infringement of the Complainant's trademark rights.

*"For the purposes of Paragraph 4(a)(iii), the following circumstances, in particular but without limitation, if found by the Panel to be present, shall be evidence of the registration and use of a domain name in bad faith:*

> *(iv) by using the domain name, you have intentionally attempted to attract, for commercial gain, Internet users to your web site or other on-line location, by creating a likelihood of confusion with the complainant's mark as to the source, sponsorship, affiliation, or endorsement of your web site or location or of a product or service on your web site or location."*

All the disputed domain names are operating as full-functional online-casinos. All the web-sites are almost identical and include a "Gaming Hall" with a set of games, a "Cashier", a "Jackpot" page with board of winners with amount of prize shown, "Bonuses", "Lotteries" pages, all the allowed Payment methods shown at the bottom of the pages and all other classic attributes of casino. See attached as Annexes 28-32 the translated with Google Translate pages of disputed domain names demonstrating that all of them are created for obvious commercial gain (All the sites are almost identical and have all these elements). The Respondent has acted in bad faith by using domain name that incorporates the Vulkan mark to intentionally attract, for commercial gain, Internet users to Respondent's website by creating a likelihood of confusion. This

fraudulent activity in creating "copycat" websites and directly attempting to deceive consumers is clearly bad faith. As noted above, the Vulkan Marks are well-known and have a global reputation. To maximize the effect of confusion Respondent uses the Vulkan trademark on all the pages of the disputed domain names as shown below (this navigation panel is shown in the top of each page):



The Respondent has obviously attempted to capitalize prestigious reputation by purchasing the domain name in dispute which has nothing to do with Respondent, concealing its identity, and trading off the goodwill that Ritzio has established over the past 20 years. In fact, as noted above, Respondent has solely *used* the disputed domains names which completely correspond with the Vulkan mark to attract consumers from Complainants authorized partners and to profit from competitive online gaming and casino services conduct that WIPO has routinely ruled constitutes bad faith. *See e.g., The Knot, Inc. v. Alex Luongo*, D2006-0296 (WIPO Apr. 15, 2006)

> "When typosquatting is done by a competitor or for competitive services, the evidence is conclusive. A close misspelling of a competitor's mark betrays both knowledge of the mark and an intentional attempt to use that mark to divert Internet users to competitors for profit, taking advantage of whatever goodwill attaches to the mark and bringing the circumstances within paragraph 4(b)(iii) and 4(b)(iv) of the Policy."

Furthermore, Respondent is not only very well aware of Complainants' trademarks, but also demonstrates that disputed domains are associated with Complainant in text descriptions on the pages of the sites. For example, right on the main page at http://vulkandeluxe.com/ where Respondent describes its services, users see not only trademark but also the following texts that clearly refer to Complaints history (quotes are from translated by Google Chrome web-pages of disputed domain names. See Annex 26 where these translated version is presented in full):

24

"Excitement, prestige, honesty: more than 20 years Slots Volcano combine these three concepts. Visiting the house's residents have already visited Russia, Ukraine, Kazakhstan, as well as foreign countries."

Respondent also uses the words "original" and "Only real" to emphasize its connection to Ritzio – the only and genuine owner of Vulkan marks (these words can be found at http://bestvulkan.net/safety; http://vulkandeluxe.com/safety; http://vulkandelux.com/safety; http://moivulcan.com/safety; http://vulkanplay.com/safety; See Annex 27 with translated by Google translate version of these pages):

"Game Club volcano gives its players the best opportunity for a perfect pastime in the online casino. Being original and only real club volcano we guarantee the integrity of the game and the maximum safety of your data."

Web-sites at domains in dispute contain casino games, payment solutions attached **and** all that on the domain-names that incorporate Vulcan marks **and** descriptions that refer to Complainant' history on their pages and, to finalize the picture, registered by Complainant trademarks all over the pages! **Is that even possible to create a bigger confusion for visitors?!**

Complainant also draws attention of the Panel to the fact that Respondent has another notice on the same page (Annex 27) (also translated by Google translate):

"If you have already faced the **problem of blocking of our website by your ISP**, for an even more comfortable use of online services Club Volcano, we recommend you install the plugin SmartPlay.
After installing the plugin SmartPlay, when entering the website address into the address bar when you go to the site via the link or when you click on the icon plugin SmartPlay, You will be automatically redirected to the nearest **available mirror** site Volcano. This will give you unlimited access to our games with our own site with a different domain."

The fact that Respondent has created a by-pass instrument to overcome Internet Service Provider's block and as stated in this sign – that is a common and well known problem, is another argument to prove that Respondent acts in bad faith.

25

Complainant also draws attention of the Panel to the fact, that Respondent conceals its identity not only using the Privacy services but also by not including any contact information on the pages of the disputed domain names, except for e-mail and Russian phone number for player-support and phone number +44 208 1235605 (the same at all disputed domain names) which seems to be non-existent (Complainant was rejected all the times when tried to call). No company name, no address whatsoever on the "Contacts" page or even on the pages with Rules which user has to accept when passing the registration process.

See *Telstra Corporation Limited v. Nuclear Marshmallows,* D2000-0003 (WIPO Feb. 18, 2000)

> "noting that a respondent's concealment of its true identity as domain name holder strongly indicates a bad faith intention".

Also see *The American Automobile Association, Inc. v. aaaaautoinsurance.com Privacy--Protect.org, aaa-netaccess.com Privacy--Protect.org, aaanetacceess.com Privacy--Protect.org, Isaac Goldstein*, D2011-2069 (WIPO Feb. 8, 2012)

> "Further evidence of bad faith use can be inferred from the choice to register the Disputed Domain Names <aaaaautoinsurance.com>, <aaanetacceess.com>, and <aaa-netaccess.com> using a privacy service. Whereas the Panel accepts that use of a privacy or proxy registration service is not in and of itself an indication of bad faith, it notes that the manner in which such service is used can in certain circumstances constitute a factor indicating bad faith, for example use of a privacy service in combination with provision of incomplete contact information or continued concealment of the "true" or "underlying" registrant (see paragraph 3.9 of the WIPO Overview 2.0 and Fifth Third Bancorp v. Secure WhoIs Information Service, WIPO Case No. D2006-0696). Given that certain registrant contact information provided, per the relevant WhoIs records, is inaccurate (for example the telephone number provided for each of the three Disputed Domain Names is for a number located in Brazil rather than Shanghai, China, which is the location of the stated address) and given the elaborate attempts to conceal what the Panel considers to be at least an association between the Respondent Privacy--Protect.org, the registrar, and the alleged new registrant of the three Disputed Domain Names, Milan Kovac, with the Respondent Isaac Goldstein (as discussed under Proper Respondents above), the Panel considers that an inference of bad faith use on the basis of the

Respondents' use of a privacy registration service to be appropriate in the present case".

Eventually, we would like to quote a recent decision of the Center in case No D2014-0787:

"The examples of bad faith registration and use set forth in paragraph 4(b) of the Policy are not meant to be exhaustive of all circumstances from which such bad faith may be found. See *Telstra Corporation Limited v. Nuclear Marshmallows*, WIPO Case No. D2000-0003. The overriding objective of the Policy is to curb the abusive registration of domain names in circumstances where the registrant seeks to profit from and exploit the trademark of another. *Match.com, LP v. Bill Zag and NWLAWS.ORG*, WIPO Case No. D2004-0230.

(…) The Panel concludes that the Respondent was aware of the Complainant and the Complainant's marks when registering the disputed domain names. In the absence of any reply by the Respondent, the Panel considers that the Respondent's primary motive in relation to the registration and use of the disputed domain names was to capitalize on, or otherwise take advantage of, the Complainant's trademark rights through the creation of Internet user confusion. The record reflects that the Respondent has registered and is using the disputed domain names in bad faith to intentionally attract for commercial gain Internet users to the Respondent's websites, by creating a likelihood of confusion with the Complainant's marks as to source, sponsorship or affiliation. See *Edmunds.com, Inc. v. Ult. Search Inc.*, WIPO Case No. D2001-1319".

Thus, the disputed domain names are confusingly similar to Complainant's registered Vulkan Mark and were registered without **any** Complainant's consent or **any** authorization whatsoever, the Respondent has **no legitimate** interests in the domain name and is **not making any legitimate non-commercial or fair use** of the domain name, and the domain name are registered in bad faith as evidenced by the Respondent's obvious **numerous** Vulkan Marks infringement for a commercial gain (casino) by creating a 100% likelihood of confusion via **gross, deliberate and malicious misrepresentations** while hiding own identity, providing anti-ISP block plug-ins.

## VII. **Remedies Requested**
(Rules, Paragraph 3(b)(x))

[13.]  In accordance with Paragraph 4(i) of the Policy, for the reasons described in Section VI. above, the Complainant requests the Administrative Panel appointed in this administrative proceeding that the disputed domain names be transferred to the Complainant.

## VIII. **Administrative Panel**
(Rules, Paragraph 3(b)(iv);  Supplemental Rules, Paragraph 8(a))

[14.]  The Complainant elects to have the dispute decided by a single-member Administrative Panel.

## IX. **Mutual Jurisdiction**
(Rules, Paragraph 3(b)(xiii))

[15.]  In accordance with Paragraph 3(b)(xiii) of the Rules, the Complainant will submit, with respect to any challenges that may be made by the Respondent to a decision by the Administrative Panel to transfer or cancel the domain names that are the subject of this Complaint, to the jurisdiction of the courts at the location of the domain name holder's address, as shown for the registration of the domain names in the concerned registrar's WhoIs database at the time of the submission of the Complaint to the Center.

## X. **Other Legal Proceedings**
(Rules, Paragraph 3(b)(xi))

[16.]   There is only one case that has been already reviewed by WIPO under UDRP Process where **all the circumstances were the same as in this proceeding**. The only difference was – different web-site design. All other circumstances were absolutely the same:

*Ritzio Purchase Limited v. Whoisguard Protected, Whoisguard, Inc / Zhoselin-Patrick Mandzela*, Case No. D2015-0295. Panel of this case stated the following:

*"The Complainant has provided evidence of the scope of its activities internationally. The disputed domain name is confusingly similar to the VOLCANO trademark and was registered without the consent of the Complainant, and the **Respondent has failed to show any rights or legitimate interests in it.** The VOLCANO trademark of the Complainant was registered*

28

*and used long before the registration of the disputed domain name, and the website at the disputed domain name was linked to a website that copies the Complainant's VOLCANO trademarks and the design of the Complainant's website, and offers services that compete with those of the Complainant, while misrepresenting that this website is somehow related to the Complainant. In these circumstances, the Panel is satisfied that the disputed domain name was registered with knowledge of, and in view of the popularity of, the Complainant and its VOLCANO trademark and the goodwill attached to it. Therefore, the Panel accepts that the disputed domain name was registered in bad faith.*

*The disputed domain name is linked to a website that offers online gaming services which are not authorized by the Complainant. The Respondent's website copies the look and feel of the Complainant's gaming clubs, copies exactly the ВУЛКАН ("VULKAN" in Latin transliteration) trademark with a lightning bolt logo, and on top of this does not feature a disclaimer for the lack of relation with or endorsement by the Complainant. The Panel does not regard such conduct as being made in good faith. Rather, it appears that the Respondent, by using the disputed domain name, attempts to attract to its own website for commercial gain the consumers that are looking for the online gaming services offered by the Complainant by creating a likelihood of confusion with the Complainant's VOLCANO trademark as to the source or affiliation of the Respondent's website."*

[16.1]  There were also 2 previous WIPO cases witch concerned Vulkan\Volcano trademarks, where circumstances were different from the above case and from the current proceeding:

*EvoPlay LLC v. Mr. Timur Ziganshin / Moniker Privacy Services / Timur*, WIPO Case No.D2015-0222 and *EvoPlay LLP v. Mardiros Haladjian / GGS Ltd.*, WIPO Case No. D2015-0252

First of all these cases have absolutely different circumstances comparing to current one, due to it been held by our licensee, which is not the owner of Vulkan marks.

Second, and what is most important here, is that Respondent drew the Complainant **with made-up stories and tons of unbelievably distorted information** into unnecessary and unreasonable discussion which **overloaded the Panelists.** We have reviewed these cases and saw that **Respondent used a**

**set of tricks to mislead Panelists and distract them from the essence of the complaint by tons of untrue and unnecessary information!**

Complainant strongly believes that Respondent here shall use the same set of tricks to distract Panelist with enormous volume of information, which shall either be not concerning the essence of the complaint, or be pointed to overload the Panel or in any other way will be irrelevant or, what has been seen in the former response – **false** information, unbelievable information distortion or will provide never-existed facts**.** Given the all above – it's their way to win some more time to parasitize on our history, our hard work and created by Complainant, year by year and step-by-step outstanding World-known reputation and value of Vulcan brand.

That is why we – creator, holder and owner of the Vulcan trademarks initiated this proceeding **to restore justice** under UDRP process as it is designed to do so. There are **no third parties** in this proceeding and it only concerns unfaithful and unauthorized Respondent vs the owner of the Vulcan Marks - Complainant.

## XI.  Communications
(Rules, Paragraphs 2(b), 3(b)(xii);  Supplemental Rules, Paragraphs 3, 4, 12)

[17.]   A copy of this Complaint, together with the cover sheet as prescribed by the Supplemental Rules, has been sent or transmitted to the Respondent on July 13, 2015 by email to:

> bestvulkan.net@domains-anonymizer.com
> vulkandeluxe.com@domains-anonymizer.com
> vulkandelux.com@domains-anonymizer.com
> moivulcan.com@domains-anonymizer.com
> vulkanplay.com@domains-anonymizer.com
> ifsdomains@gmail.com

[18.]   A copy of this Complaint has been sent or transmitted to the concerned registrar on July 13, 2015 by email to support@pananames.com

[19.] This Complaint is submitted to the Center in electronic form, including annexes, in the appropriate format.

## XII.  **Payment**
(Rules, Paragraph 19;  Supplemental Rules Paragraph 10, Annex D)

[20.]   As required by the Rules and Supplemental Rules, payment in the amount of USD 1500 has been made by transfer (Annex 33).

## XIII.  **Certification**
(Rules, Paragraph 3(b)(xiv);  Supplemental Rules, Paragraph 14)

[21.]   The Complainant agrees that its claims and remedies concerning the registration of the domain name(s), the dispute, or the dispute's resolution shall be solely against the domain name holder and waives all such claims and remedies against (a) the WIPO Arbitration and Mediation Center and Panelists, except in the case of deliberate wrongdoing, (b) the concerned registrar(s), (c) the registry administrator, (d) the Internet Corporation for Assigned Names and Numbers, as well as their directors, officers, employees, and agents.

[22.]   The Complainant certifies that the information contained in this Complaint is to the best of the Complainant's knowledge complete and accurate, that this Complaint is not being presented for any improper purpose, such as to harass, and that the assertions in this Complaint are warranted under the Rules and under applicable law, as it now exists or as it may be extended by a good-faith and reasonable argument.

Respectfully submitted,

Sandra Santos

Date: July 13, 2015

31

## XIV.   List of Annexes
(Rules, Paragraph 3(b)(xv);  Supplemental Rules, Paragraphs 4(a), 12(a), Annex E)


Annex 1 - Printout of the Whois search for the disputed domain names
BESTVULKAN.NET, VULKANDELUXE.COM, VULKANDELUX.COM,
MOIVULCAN.COM, VULKANPLAY.COM on June 18, 2015 (registered with URL
SOLUTIONS INC)

Annex 2 - Registration Agreement between URL Solutions Inc and ICANN

Annex 3 – Copies of Russian TM 342290 / 352291 / 353694 (English translation)

Annex 4 – RU TM 353692 (ROSPATENT)

Annex 5 – RU TM 342290 (ROSPATENT)

Annex 6 – RU TM 353694 (ROSPATENT)

Annex 7 – RU 342291 (ROSPATENT)

Annex 8 – IR 984297 (ROMARIN)

Annex 9 – IR 791038 (ROMARIN)

Annex 10 – IR 989103 (ROMARIN)

Annex 11 – IR 992196 (ROMARIN)

Annex 12 – IR 977713 (ROMARIN)

Annex 13 – Photos on VULKAN

Annex 14 – Ritzio presentation

Annex 15 – VULKAN in Germany, Italy, Croatia, Romania, Belarus, Latvia  (Ritzio's
webpage)

Annex 16 – General information on Ritzio Group (VULKAN) Source:
http://cbonds.com

Annex 17 – Ritzio Entertainment Group (Bally's Casino)

Annexes 18 – Ritzio Entertainment Group (source: www.ballys.ee)

Annexes 19 and 20 – Ritzio's social responsibility (Ritzio's webpage)

Annex 21 – Webpage operated with the disputed domain name bestvulkan.net (in
Russian language)

Annex 22 - Webpage operated with the disputed domain name vulkandeluxe.com (in
Russian language)

Annex 23 – Webpage operated with the disputed domain name vulkandelux.com (in Russian language)

Annex 24 – Webpage operated with the disputed domain name moivulcan.com (in Russian language)

Annex 25 – Webpage operated with the disputed domain name vulkanplay.com (in Russian language)

Annex 26 – Webpage operated with the disputed domain name vulkandeluxe.com (translated into English)

Annex 27 – Safety page corresponding to bestvulkan.net, bestvulkan.com, vulkandelux.com, moivulcan.com, vulkanplay.com (in English)

Annex 28 - Webpage operated with the disputed domain name bestvulkan.net (translated into English)

Annex 29 – Webpage operated with the disputed domain name vulkandeluxe.com (translated into English) - bonus

Annexes 30 and 31 – Webpage operated with the disputed domain name vulkandelux.com (translated into English)

Annex 32 – Webpage operated with the disputed domain name moivulcan.com (translated into English)

Annex 33 –Payment (transfer to WIPO account)

# Response Annex 11



NO: B 950502

GOVERNMENT OF SEYCHELLES

Date: 11/05/16

Received from

The sum of Rupees

Being

Collector of Revenue

1

**COMMENCING PROCEEDING BY PLAINT**

Court Fees (Supreme Court) and Costs Act 2009, Schedule 1

Civil Side: CS / CC _____ / _____

Plaintiff: ESCAVE LTD & or v GGS LTD (Represented by Serge Rouillon A Horney)

| Item | | Statutory reference | Formula | Calculation | Fee payable |
|---|---|---|---|---|---|
| Entering plaint | Claim of ≤ 10,000 | Part I r 1(a) | | | 750 |
| | Claim of 10,001 – 50,000 | Part I r 1(b) | Additional 1% on amount between 10,000 and 50,000 (= **400** for any claim over 50,000) | | |
| | Claim of > 50,000 | Part I r 1(c) | Additional ½% on amount over 50,000 | | |
| Seeking injunction/other judicial relief (**if applicable**) | | Part I r 3 | 100 | | 100 |
| Accompanying petition, motion or application (MA) (**if applicable**) | In chambers / ex parte | Part I rr 9, 10, 28, 30 and 40 | 100 for filing 235 for calling, hearing, order and sealing | 335 total | |
| | Other | Part I rr 8, 28, 30, 40 Part II r 88 | 185 for filing 235 for calling, hearing and order | 420 total | |
| Summons | | Part I r 4 | 30 per person to be summoned | | 30 |
| Service and mileage | Per person to be served | Part II r 90 | 25 per person to be served | | 25 |
| | MAHE Mileage: ≤ 2 miles of courthouse | Part II r 89 | 30 per person to be served | | 30 |
| | MAHE Mileage: additional, on Mahe | | **Additional** charge: no. of extra miles, counted both ways (x 25), multiplied by no. of parties to be served | | |
| | Mileage: on Praslin or La Digue | | 600 per person to be served | | |
| Calling | | Part II r 88 | | | 25 |
| Hearing (advance charge) | | Part I r 26 | | | 300 |
| Final judgment/order (advance charge) | | Part I r 39 Part I r 30 | 30 for entering order 60 for sealing | 90 total | 90 |
| | | | **TOTAL FEES PAYABLE** | | 1350 |
| ➔ **Stamps** | | | 3 for every document filed by an attorney | | 3 |

Date: 1.9.18

For Registrar: _____

PAID IN FULL: [  ]   CASHIER'S RECEIPT ATTACHED: 950502

## IN THE SUPREME COURT OF SEYCHELLES

**ESCAVE LTD**
of Global Gateway 8,
Rue de la Perle in Mahe, Seychelles                                    **1st Plaintiff**
and herein represented by its Director
Ms Lianna Tall of Anse Boileau, Mahe, Seychelles

**and**

**GGS LTD**
of 201 Rogers Office Building,
George Hill P.C., 4103 Anguilla
West Indies and electing domicile
In the Chambers of Mr Serge Rouillon
Attorney at Law of Suite 14 Kingsgate House,
Victoria, Mahe, Seychelles                                    **2nd Plaintiff**

**Versus**

**RITZIO PURCHASE LIMITED**
of Diagorou Street 4, Kermia building,
6th floor, Office 601, P.C. 1097, Nicosia, Cyprus          **Defendant**

c.c. no.....................

---

## PLAINT

1. The 1st Plaintiff is a Seychelles International Business Company bearing registration number 125765 incorporated with the objects of, inter alia, to engage in any act or activity that is not prohibited under any law and the registered owner of six Internet Disputed Domains (hereinafter referred to as the "Disputed Domains"), each of which contain the word "vulcan" by virtue of the registration of the Disputed Domains.

2. The 2nd Plaintiff is an Anguilla International Business Company registered as company number 2152333 which operates Internet websites at each of the Internet Disputed Domains.

3. The Defendant is a Cyprus Limited Company registered in Nicosia, Cyprus with company number HE 144533.

1

4.  Each of the websites at each of the Disputed Domains are almost exclusively used by individuals in Russia and Ukraine and these websites allow users to engage in slot gambling online.

5.  Until about 2009 Defendant operated casinos in Russia and used the Russian word ВУЛКАН (translated into English as "Vulkan" or "Vulcan," meaning "Volcano") in connection therewith and the Defendant registered its ВУЛКАН trademark with the Russian trademark office.

6.  Following the passing of the Federal Law of December 29, 2006, No. 244FZ, "On government regulation of gambling activities and on introduction of amendments to some legislative acts of Russian Federation," as amended, by which Russia banned all online gambling in late 2006 and made all gambling illegal in Russia except for in four government-approved locations, the Defendant ceased operating in Russia in 2009 and had not used its ВУЛКАН mark (or any variations) in Russia since that time.  The Defendant ceased operating in Ukraine in the same time period as well.

7.  From 2012 and going through to 2014, after three years of Defendant's non-use of the ВУЛКАН mark in Russia, the 1st Plaintiff (or one of its affiliates) began registering the Internet Disputed Domains at issue in this litigation.

8.  The six registered Internet Disputed Domains include the word "vulcan" and these are now registered in the name of the 1st Plaintiff as follows: casino-vulcan.co; vulcan-casino.co; club-vulcan.com; vulcan-cazino.org; vulcan-casino2.com; and cazino-vulcan.com.

9.  Since the time each of the Disputed Domains were registered by the 1st Plaintiff the 2nd Plaintiff operated gambling websites (hereinafter, the "Websites") at the Disputed Domains and almost all of the users of the Websites come from Russia and Ukraine, which are Russian speaking countries.

10. The Plaintiffs operated for three years without incident until on or about May 27, 2015 the Defendant filed an administrative Complaint against the 1st Plaintiff under the rules of the Uniform Domain-Name Dispute Resolution

2

Policy ("UDRP"), a specialized non-final streamlined arbitration proceeding, alleging that Plaintiffs were infringing the Defendant's trademarks and requesting that the Disputed Domains be transferred to the Defendant.

11. The Plaintiffs vehemently denied the allegations of the Defendant in the UDRP proceeding and disputed that Defendant had any trademark rights in Russia and Ukraine where the Websites were being used and where the Defendant had not had any operations for six years, and requested that the UDRP's arbitration panel deny the Defendant's requested relief that the Disputed Domains be transferred to the Defendant.

12. The arbitration panel issued a decision that the Disputed Domains should be transferred to the Defendant.

13. The Plaintiffs believe that the arbitration panel wrongly decided the issue and by this Plaint they dispute the outcome of that UDRP proceeding as is specifically permitted pursuant to the UDRP and in accordance with the UDRP, may halt the execution of the arbitration panel's decision and have their rights properly decided by this Honorable Court.

14. The Plaintiffs bring this Plaint to request that this Honorable Court fully review the merits of the Plaintiffs' arguments and to evaluate the validity of the Defendant's putative trademarks and registrations as the UDRP panel's decision is subservient to this Court's decisions on these matters.

15. Upon bringing its Complaint in the UDRP Proceeding the Defendant agreed to submit to any challenges that the 1st Plaintiff made to a decision by the UDRP's arbitration panel, to the jurisdiction of the courts at the location of 1st Plaintiff's address as shown in its registration information for the Disputed Domains which in fact is the Republic of Seychelles.

16. Therefore the Defendant agreed to submit to the courts of Seychelles for the purposes of this dispute challenging the decision by the UDRP arbitration panel and the Plaintiffs now bring this Plaint in the location of the 1st Plaintiff's registered address in Seychelles, to prevent the wrongful transfer of the Disputed Domains.

3

17. In accordance with Section 4(k) of the UDRP the relevant domain name registrars will not implement the decision of the UDRP panel if the 1st Plaintiff files a suit in the jurisdiction agreed upon by the Defendant within the prescribed time and in order to halt the transfer of the Disputed Domains and to fully adjudicate the rights of the Plaintiffs, the Plaintiffs are required to file this lawsuit in the Republic of Seychelles.

18. The Plaintiffs therefore seek a declaratory relief to establish that the 1st Plaintiff's registration and the 2nd Plaintiff's use of the Disputed Domains, does not infringe on putative trademarks held by the Defendant and an injunctive relief to prevent the transfer of those Disputed Domains to the Defendant.

19. On July 24, 2015, 2nd Plaintiff filed a Complaint with the Russian trademark office seeking to cancel Defendant's trademark registrations, including registrations with registration numbers 307879 (VOLCANO), 342290 (ВУЛКАН), 342291 (ВУЛКАН), 353692 (VULKAN) and 353694 (ВУЛКАН).

**Wherefore the Plaintiffs jointly and severally pray this honorable court for the following reliefs;**

1. A declaration that the Plaintiffs have not infringed the Defendant's Putative Trademarks, meaning;

    a. the 1st Plaintiff has lawfully and rightfully registered the Disputed Domains in good faith and has not infringed the Defendant's putative trademarks.

    b. the 2nd Plaintiff has lawfully and rightfully used the Disputed Domains and the Websites in good faith and has not infringed the Defendant's putative trademarks.

    c. the Defendant has no trademark rights in Russia or Ukraine where the Websites are used.

    d. a declaration that the registration and use of the Disputed Domains by the Plaintiffs and the Websites are lawful; and

2. For an Injunctive Relief Prohibiting the Transfer of the Disputed Domains meaning;

    a. that the UDRP arbitration panel has incorrectly decided this matter because the Plaintiffs did not register or use the Disputed Domains and the Websites in an unlawful manner and they do not infringe on any of the Defendant's rights, including its putative trademark rights; and

4

b. the Plaintiffs have no other prompt and expeditious remedies to protect their interests and to prevent

them from the irreparable harm if the Disputed Domains were wrongly transferred to the Defendant in

accordance with the decision of the UDRP arbitration panel.

c. Under the circumstances, injunctive relief from this Honorable Court is necessary and appropriate at this

time in order for the Plaintiffs to protect their legitimate interests in and to the Disputed Domains.

d. the Plaintiffs therefore request that this Honorable Court issue an injunctive order prohibiting the transfer

of the Disputed Domains to the Defendant; and

3. an order for the costs of this suit in favour of the Plaintiffs and against the Defendant including any reasonable

travelling expenses incurred by the Plaintiffs in processing their case.

Dated this 1st day of September, 2015

**Plaintiffs' Attorney**
**Serge Rouillon**

**Address for service: Serge Rouillon, Attorney-at-Law of Suite 14, Kingsgate House, Victoria, Mahe.**

**Documents that may be inspected at the Chambers of the Plaintiffs' Attorney**

1. statutory documents of the Plaintiffs

2. documents in respect of the UDRP proceedings;

  a.  <u>Exhibit A</u> Defendant's Complaint;

  b.  <u>Exhibit B</u> Defendant's Amended Complaint;

  c.  <u>Exhibit C</u> 1st Plaintiff's Response to the Complaint;

  d.  <u>Exhibit D</u> Defendant's Supplementary Filing in support of its Complaint;

  e.  <u>Exhibit E</u> is 1st Plaintiff's First Supplementary Filing;

  f.  <u>Exhibit F</u> 1st Plaintiff's Second Supplementary Filing; and

  g.  <u>Exhibit G</u> UDRP arbitration panel's decision.

  h.  <u>Exhibit H</u> UDRP Policy and Rules

5

# Response Annex 12



High Court of Justice (Chancery/IPEC)

# Claim Form

Fee Account no.

Claim no.   *IP-2015-000181*

Issue date   *30-10-2015*

For court use only

**You may be able to issue your claim online which may save time and money.**
**Go to www.moneyclaim.gov.uk to find out more.**

Claimant(s) name(s) and address(es) including postcode

(1) INFOSTAR MANAGEMENT LTD of Suite 13054 43 Bedford Street, London, WC2E 9HA

(2) GGS LTD of 201 Rogers Office Building, Edwin Wallace Rey Drive, George Hill, Anguilla

*[SEAL: HIGH COURT OF JUSTICE 30 OCT 2015]*

Defendant(s) name and address(es) including postcode

(1)  RITZIO PURCHASE LIMITED of Diagorou Street 4, Kermia building, 6th floor, Office 601,1097 Nicosia, CYPRUS

(2)  EVOPLAY LLP of Suite 1 The Studio, St. Nicholas Close, Elstree, WD6 3EW

Brief details of claim

A claim in the Intellectual Property Enterprise Court for:-

Declaratory Relief
Injunction
Enquiry as to Damages

Value

NOT NORE THAN £50,000

You must indicate your preferred County Court Hearing Centre for hearings here *(see notes for guidance)*

Chancery Division (Intellectual Property Enterprise Court)

| Defendant's name and address for service including postcode | (1)  RITZIO PURCHASE LIMITED of Diagorou Street 4, Kermia building, 6th floor, Office 601,1097 Nicosia, CYPRUS (2) EVOPLAY LLP of Suite 1 The Studio, St. Nicholas Close, Elstree, WD6 3EW | | £ |
|---|---|---|---|
| | | Amount claimed | 50,000 |
| | | Court fee | 2,980 |
| | | Legal representative's costs | TBA |
| | | **Total amount** | |

For further details of the courts www.gov.uk/find-court-tribunal.
When corresponding with the Court, please address forms or letters to the Manager and always quote the claim number.

| Claim No. | |
|---|---|

Does, or will, your claim include any issues under the Human Rights Act 1998?   ☐ Yes   ☑ No

Particulars of Claim (attached)(to follow)

Attached

**Statement of Truth**

*(I believe)(The Claimant believes) that the facts stated in these particulars of claim are true.

* I am duly authorised by the claimant to sign this statement

Full name   Richard Howlett

Name of claimant's legal representative's firm   Selachii LLP

signed                                          position or office held   Partner

*(Claimant)(Litigation friend)                            (if signing on behalf of firm or company)
(Claimant's legal representative)

*delete as appropriate*

Selachii LLP
96 Kensington High Street
London
W8 4SG

Claimant's or claimant's legal representative's
address to which documents or payments
should be sent if different from overleaf including
(if appropriate) details of DX, fax or e-mail.

Claim No:

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

INTELLECTUAL PROPERTY ENTERPRISE COURT

Between

(1) INFOSTAR MANAGEMENT LTD

(2) GGS LTD

**Claimants**

-and-   .

(1) RITZIO PURCHASE LIMITED

(2) EVOPLAY LLP

**Defendants**

PARTICULARS OF CLAIM

**The Ritzio Group**

1.   The First Defendant is a member of a group of companies known as the *Ritzio Entertainment Group* (**"REG"**) which was founded in Moscow in 1992. REG runs gaming clubs, casinos, bars, night clubs, restaurants, sports betting outlets, and entertainment parks in parts of the former Soviet Union, Central Europe and Eastern Europe.

2.   Before gambling was banned in almost all of Russia, REG operated an extensive gaming business in Russia under signs depicting a volcano accompanied by the word *Vulkan* which means "volcano" in Russian (**"the volcano signs"**). REG ceased to carry on such business in Russia after that ban but it continues to operate similar businesses under such signs in other countries.

3.   One of the functions of the First Defendant is to hold trade marks that have been registered for use by members of REG. For instance, its portfolio includes the sign

# VULKAN

which it has registered at the Office for Harmonization in the Internal Market as a Community trade mark for goods and service in classes 9, 16, 21, 28, 35, 38, 39, 41,

42, 43, 45. Particulars of that registration appear at Tab 1 of the accompanying bundle of documents (**"the Bundle"**).

**The Claimants**

4.    The Claimants are members of another group of companies (**"the GGS group"**) that offer online betting and gaming services around the world.  The First Claimant holds domain name registrations for use by other members of the GGS group while the Second Claimant runs online gaming services.

**The Licence**

5.    After REG was obliged to give up its gaming business in Russia, it licensed the GGS group to run an online gaming service in Russian using the volcano signs.

**Particulars**

(1)    Such licence was necessarily secret and informal because the parties did not wish to be seen to flout Russian law, but the intention to grant a licence may be inferred from the following facts and matters:

(a)    *Alexander Alexandrov*, one of REG's officers or employees referred to the trade mark licence in terms in an email dated 1 Oct 2014 after he had been asked why he had sent banking details to the Claimants in an email dated 19 Sept 2014;

(b)    The narrative on the funds transfer slips for 2 interbank payments of US$100,000 each, which were made on 1 Oct and 6 Nov 2014 respectively to The Bartlett Corporation (another member of REG), stated that those payments were "for trademark license"; and

(c)    the reference to "all previous agreements" in the First Defendant's notification of 16 Feb 2015 mentioned in paragraph 11 hereof.

(2)    Those facts and matters also indicate the existence of such licence.

(3)    The narrative on the fund transfer slips indicates that the monthly licence fee was to be US$100,000 per month.

(4)    As the First Defendant did not object to the GGS group's use of the volcano signs before the 11 February 2015 it may be inferred that it was licensed to use those signs.

(5)    As the GGS group would have spent substantial sums on developing and promoting their business as well as the said monthly licence fees such licence is unlikely to have been terminable on notice.

(6)    Business efficacy would have required such licence to be perpetual or terminable only after the Second Claimant had recouped its expenditure and earned a

2

reasonable return.   If the licence is terminable the Claimants say that 3 years is the minimum period of notice to which they are entitled given that the Defendants has agreed that 3 years was a reasonable terms for the Second Defendant's purported exclusive licence (see para 12 hereof).

(7)   The precise date upon which the parties agreed such licence is uncertain but it must have been after 1 Jan 2007 (the date upon which gambling was prohibited in Russia but before 10 July 2012 (the registration of the first of the domain names).

(8)   Although a Russian language online betting service may have been unlawful in Russia it was not unlawful in other countries of the former Soviet Union where Russian is widely spoken or in countries such as the United Kingdom where there are numerous Russian speaking expatriates so long as such service was not provided by Russian companies or by companies that were owned and/or controlled by Russians.

(9)   Redacted copies of emails mentioned in paragraph (1) (a) of these particulars and translations into English and of the fund transfer slips mentioned in paragraph (1) (b) are at Tab 2 of the Bundle.

6.   In accordance with the said licence, the First Claimant (or some other member(s) of the GGS group) registered the following domain names (**"the domain names"**) and arranged for them to be held in the name of the privacy service, *Global Domain Privacy Services Inc*:

| Date             of Registration | Domain Name |
|---|---|
| 10 July 2012 | vulkanplay.com |
| 27 March 2013 | vulkandelux.com |
| 27 March 2013 | vulkandeluxe.com |
| 7 March 2014 | bestvulkan.net |
| 20 May 2014 | moivulcan.com |

7.   In reliance on such licence the Second Claimant spent considerable time and money on:

3

(1)   developing the websites at the domain names (screen dumps of which appears at Tab 3 of the Bundle (**"the websites"**)) which uses all the domain names and through which the Second Claimant provides its online betting and gaming service, and also on

(2)   promoting those services;

between 12 July 2012 and 11 Feb 2015.

8.    Further or alternatively, if, which is denied, REG did not intend to grant, or, alternatively, did not grant, the licence mentioned in paragraph 5 hereof, REG or, alternatively, the First Defendant is estopped from denying such licence because:

    (1)   it acquiesced, allowed, authorized or encouraged the Claimants to act to their detriment in incurring the expense and taking the steps mentioned in paragraphs 6 and 7 hereof;

    (2)   knowing that it possessed trade marks and/or other rights in at least some of the countries in which the GGS group operated that it could have used or attempted to use to prevent the development and promotion of the website but

    (3)   chose not to enforce those rights.

### Derogation from the Licence

9.    Because of the success of the website and notwithstanding the aforementioned payments that REG had received from the GGS group and/or the time and money that the Second Claimant had invested in developing the website and promoting its business, the Defendants attempted to:

    (1)   take that business away from the Second Claimant before it could recoup and profit from its investment and without offering compensation and

    (2)   give it to the Second Defendant

in breach of the above mentioned licence agreement.

10.   On or about 11 Feb 2015 the Second Defendant sent the Claimants a notice on its headed notepaper (a copy of which appears at Tab 4 of the Bundle) signed by one *Marios Tzisortzis* and sealed with its limited liability partnership seal.   That notice alleged that the Second Defendant had been using the volcano signs on the website and in the domain names for a significant time without any authorization. It claimed that the Second Defendant had acquired "an exclusive licence for all the Vulkan trade marks in classes 9, 41 and 42 specifically and exclusively for use online" and that the Second Defendant had been authorized by the First Defendant and the aforementioned Bartlett Corporation to enforce those rights through litigation.  It required the Second Claimant to stop using the domain names and the volcano signs.

4

11.     On that same day the Second Defendant applied unsuccessfully to domain name dispute resolution panellists who had been appointed by the *World Intellectual Property Organization* ("**the WIPO**") under the provisions of the *Internet Corporation for Assigned Names and Numbers Uniform Domain Name Dispute Resolution Policy* (**"the UDRP"**) for the transfer of the domain names <vulcan-casino.com>, <vulcan-casino.org>, <vulcan-casino.net>, <vulcan-cazino.com>, <casino-vulcan.com>, and <clubvulcan.com> which had also been used by the Second Claimant in its aforementioned business in Case No. D2015-0222 *EvoPlay LLC v. Mr Timur Ziganshin and Others*. A copy of the decision in that case, rejecting the transfer of those domain names, appears at Tab 5 of the Bundle.

12.     On or about 16 Feb 2015 the Frist Defendant sent the Claimants a notification in English and Russian (a copy of which appears at Tab 6 of the Bundle) signed by one *Rena David* and sealed with its company seal. That notification stated that an exclusive right to use the "Vulkan" (in Cyrillic script) trade marks over the internet had been transferred to the Second Defendant for 3 years on 8 Dec 2014 together with the right to sue for infringement. It added: "Given the above, we notify you that all previous agreements in respect of the use of the 'Vulkan' [in Cyrillic script] trademarks, if any, are terminated from 08.12.2014 and all our obligations connected thereto are considered fulfilled."

13.     On 17 Feb 2015 the Second Defendant applied unsuccessfully to domain name dispute resolution panellists who had been appointed by the WIPO under the provisions of the UDRP for the transfer of the domain names <bestvulkan.com> and <myvulkan.com> which had also been used by the Second Claimant in its business in Case No. D2015-0252 *EvoPlay LLC v. Mardiros Haladjian and Another*. A copy of the decision in that case appears at Tab 7 of the Bundle.

14.     On 25 June 2015 the First Defendant applied successfully to domain name dispute resolution panellists who had been appointed by the WIPO under the provisions of the UDRP for the transfer of the domain names in Case No. D2015-1106 *Ritzio Purchase Limited v. Private Whois, Global Domain Privacy Services Inc. and Others*. A copy of the decision in that case appears at Tab 8 of the Bundle and its implementation is subject to the decision of this court.

**Groundless Threats**

15.     By the Second Defendant's notice of 11 Feb 2015 (a copy appears at Tab 4 and which is more particularly described in paragraph 10 hereof) and the First Defendant's notification of 16 Feb 2015 (a copy of which appears at Tab 6 and which is more particularly described in paragraph 12 hereof) the Defendants and each of them

5

threatened the Claimants with proceedings for infringement of a Community trade mark.   Such threats are actionable under reg. 6 (1) of The Community Trade Mark Regulations 2006 and s.21 (1) of the Trade Marks Act 1994 and fall outside the exceptions provided by s.21 (1) (c) and (4) of that Act.

**Particulars**

 (1) As the said notice was sent by an English limited liability partnership to an English private limited company it was reasonable to infer that any proceedings for trade mark infringement would be brought in England.

 (2) That notice alleged that the Second Defendant had been using the Vulkan trade mark on its website and in domain names for a significant time without authorization

 (3) The Vulkan mark had been registered as a Community trade mark by the First Defendant.

 (4) The notice did not confine its complaint to acts other than supplying services under the mark or to acts done outside the European Union.

16. The Claimants and each of them are aggrieved by those threats and are entitled to the relief set out in s.21 (2) of the 1994 Act.

**Relief**

17. By reason of the breaches of the licence agreement mentioned in paragraphs 10 to 14 hereof and the groundless threats mentioned in paragraphs 15 and 16, the Claimants and each of them have suffered loss and/or damage and incurred unnecessary expense the precise nature and full extent of which can only be determined upon an inquiry as to damages.

18. Unless restrained by this Honourable Court the Defendants and each of them threaten and intend further breaches of their licence agreement and actionable threats whereby the Claimants will suffer further loss (including, without limitation, the loss of the domain names) and/or damage or be put to further expense.

**Jurisdiction**

19. In order to bring its claim for the transfer of the domain names the First Defendant submitted to the jurisdiction of this Court pursuant to rule 3 (b) (xiii) of the *Rules for Uniform Domain Name Dispute Resolution Policy* (**"the Rules"**).

20. Nothing in the UDRP or the Rules ousts or limits the jurisdiction of this Court. Para. 4 (k) of the UDRP specifically allows domain name disputes that have been referred to a domain name dispute resolution panel under the UDRP to be referred to a court of

competent jurisdiction for independent resolution before or after the UDRP proceedings have been concluded.   The same paragraph also provides for the suspension of the panel's decision until after such court has given judgment provided proceedings before that court are begun within 10 business days of the notification of the panel's decision.

**General**

21.   Because the Claimants had to comply with the above-mentioned 10 business day deadline, the Claimants have been unable to send a letter before claim as specified in paragraph 7.1 (1) and Annex A (paragraph 2) of the *Practice Direction (Pre-Action Conduct)*.   Further, the said Practice Direction has been revoked and replaced by *Practice Direction – Pre-Action Conduct and Protocol* and that the new Practice Direction contains no provisions that correspond to paragraph 7.1 (1) and Annex A (paragraph 2) of the old one.

22.   The Claimants are, and each of them is, entitled to accrued interest upon all sums due to them hereunder whether by way of damages, accountable profits or otherwise computed on a day to day basis at the annual rate of 8% from the date upon which each such sum fell due until the date hereof, and continuing at such rate and on such basis, or at such other rate or upon such basis as this Honourable Court thinks fit, until judgment or sooner payment pursuant to s.35A of the Senior Courts Act 1981.

**AND THE CLAIMANTS CLAIM:**

1.   The following declarations:

(1)   The First Claimant is entitled to hold, and the Second Claimant to use, the following domain names (namely <bestvulkan.net>, <moivulcan.com>, <vulkandelux.com>, <vulkandeluxe.com>, <vulkanplay.com>) notwithstanding the decision to the contrary of the UDRP panel in Case No. D2015-1106 *Ritzio Purchase Limited v. Private Whois, Global Domain Privacy Services Inc. and Others*;

(2)   The threats contained in the Second Defendant's notice of 11 Feb 2015 and the First Defendant's notification of 16 Feb 2015 are unjustifiable; and

(3)   The licence agreement mentioned in para 5 hereof is determinable only upon 3 years notice or such other period as the Court thinks fit;

2.   Injunctions restraining the Defendants and each of them whether by themselves, their employees or agents (including any holding. subsidiary or associated company or director. controlling shareholder or officer of such company) or otherwise howsoever from doing or authorizing any of the following acts:

(1)   Continuing and/or repeating the above-mentioned threats; and/or

7

(2)   Taking any steps calculated or likely to determine the Second Claimant's licence or interfere with its business including in particular instituting any further applications under the UDRP for the transfer of its domain names for so long as its licence subsists;

3   An inquiry as to damages for groundless threats and breaches of licence agreement; or at the Claimants' option an account of profits for breach of the licence agreement together with interest thereon pursuant to s.35A of the Senior Courts Act 1981;

4   Further and other relief; and

5   Costs


JANE LAMBERT


**Statement of Truth**

The Claimants believe that the facts stated in these particulars of claim are true:

I am duly authorised to sign this statement on behalf of the Claimants.

Signed .................................................................

**Richard Howlett Partner**

**Selachii LLP**


**SERVED** this 30th day of October 2015 by Selachii LLP of 96 Kensington High Street. XRH233 solicitors for the Claimants.